fee paid

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

JOHN D. WHITFIELD

        Plaintiff,

v.                                                          Civil Action No.

CITY OF NEW YORK, officially
JOSEPH CARDIERI, individually;
KATHLEEN SKOWYRA, individually;
JENNIFER FIELLMAN, ESQ, individually;
PHOEBE ROSEN, individually;
DAVID A. HANSELL, individually;

        Defendants.

---

## CIVIL RIGHTS VERIFIED COMPLAINT WITH REQUEST FOR TRIAL BY JURY

---

    Plaintiff John D. Whitfield, Pro Se, complains against Defendants and requests trial by jury as follows:

## I. INTRODUCTION

    1. This is an action brought by John D. Whitfield to vindicate profound deprivations of his First Amendment right to Freedom of Speech caused by Defendants' refusal to hire him because of protected speech he expressed fifteen years ago that dealt with matters of public concern and was unrelated to the job.

    2. On May 29, 2018, Plaintiff applied to the New York City Administration for Children's Services (ACS) for employment as a Youth Development Specialist (YDS) to work in youth detention centers.

    3. On or about June 10, 2018, Plaintiff was interviewed by Eulena Hall-Leader, an Investigator for ACS's Candidate Processing Unit, and received an offer to start the Youth Development Specialist (YDS) position pending the outcome of a criminal background check.

4. Plaintiff's criminal background investigation was conducted by the NYS Justice Center and NYC Department of Citywide Administrative Services (DCAS). Both of these agencies performed the eight-factor statutory analysis in accordance with Correction Law, Article 23-A and approved Plaintiff to be considered for the YDS job, despite his criminal convictions.

5. Defendants did not perform an eight-factor statutory analysis in accordance with Correction Law, Article 23-A, but accepted the Justice Center and DCAS's analyses. Defendants Cardieri, Skowyra, Fiellman and Rosen formulated a "Personnel Review Panel" to determine whether to hire Plaintiff for the YDS job.

6. Defendants did not hire Plaintiff because of the speech he made in 2003 in his award-winning memoir entitled, *The Whitfield Files.*

7. The Defendants violated Plaintiff's First Amendment rights to freedom of speech when they relied on Plaintiff's constitutionally protected speech expressed in this fifteen-year-old award-winning memoir to deny him employment.  The way this violation occurred clearly indicated that the Defendants had no prior training on the lawful use of protected activities to deny employment.

8. Defendants' actions are content-and viewpoint-based punishment because Plaintiff was denied the YDS job based on his protected speech that encouraged society to take a serious look at Police and Prosecutorial Misconduct and Wrongful Convictions (i.e., matters of public concern).

## II. JURISDICTION, VENUE, AND NOTICE

9. This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988. The Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343.

10. This case is instituted in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

### III. PARTIES

11. At all times relevant hereto, Plaintiff John D. Whitfield was a resident of the State of New York and a citizen of the United States of America.

12. Defendant City of New York, hereinafter "Defendant City" is a New York municipal corporation and is the legal entity responsible for itself and for the NYC Administration for Children's Services (ACS). This Defendant is also the employer of the individual Defendants and is a proper entity to be sued under 42 U.S.C. § 1983.

13. At all times relevant hereto, Defendant Joseph Cardieri was a citizen of the United States and a resident of the State of New York and was acting under color of state law in his capacity as General Counsel of ACS employed by the City of New York and/or ACS. Defendant Cardieri is sued individually.

14. At all times relevant hereto, Defendant Kathleen Skowyra was a citizen of the United States and a resident of the State of New York and was acting under color of state law in her capacity as a NYC Division of Youth and Family Justice administrator employed by the City of New York and/or the NYC Division of Youth and Family Justice and/or ACS. Defendant Skowyra is sued individually.

15. At all times relevant hereto, Defendant Jennifer Fiellman, Esq., was a citizen of the United States and a resident of the State of New York and was acting under color of state law in her capacity as Assistant Commissioner of Accountability and Audit for ACS employed by the City of New York and/or ACS. Defendant Fiellman is sued individually.

16. At all times relevant hereto, Defendant Phoebe Rosen was a citizen of the United States and a resident of the State of New York and was acting under color of state law in his capacity as Chief of Staff to First Deputy Commissioner of ACS employed by the City of New York and/or ACS. Defendant Rosen is sued individually.

17. At all times relevant hereto, Defendant David A. Hansell was a citizen of the United States and a resident of the State of New York and was acting under color of state law in his capacity as the Commissioner of ACS employed by the City of New York and/or ACS. Defendant Hansell is sued individually.

## IV. STATEMENT OF FACTS

18. Plaintiff incorporates all preceding paragraphs as if they were fully set forth again at this point.

19. Plaintiff is an African American man who spent 24 and a half years in prison for a homicide he adamantly maintained and continues to maintain his innocence. Despite strong evidence of his innocence, he did not receive any redress in the courts.  In 2003, with nowhere else to go, he wrote a memoir based on the evidence of his innocence entitled, *The Whitfield Files*, with hopes of compelling the public to take a serious look at police and prosecutorial misconduct that causes wrongful convictions and to galvanize the public to get involved in his case. In 2004, Plaintiff entered the memoir into a national writing competition sponsored by PEN American Center (a nonprofit organization that works to defend and celebrate free expression in the United States and worldwide through the advancement of literature and human rights (https://pen.org/about-us/). The memoir ultimately won a national award (https://pen.org/prison-writing-award-winners-2004-2005/).

20. From 2008 to 2012, while confined at Woodbourne Correctional Facility, Plaintiff was a Youth Assistant Program (YAP) facilitator and coordinator. In his capacity as a YAP facilitator, Plaintiff communicated with youth brought into the facility by prison, school and community administrators (https://doccs.ny.gov/youth-assistance-program).   During these presentations, Plaintiff and fellow prisoners talked about (with the intent of teaching) a gambit of life skills ranging from dealing with peer pressure to techniques on how to avoid joining gangs.  After presentations made to the groups, each facilitator conducted one-on-one-communications with

youth interested in one-to-one-discussions. As the YAP coordinator, Plaintiff in conjunction with

the Facility Staff Advisor, were in charge of organizing the program, tailoring the presentations to

fit the needs of the youth brought into the facility, selecting and training new facilitators, and

maintaining the efficiency and integrity of the program.

21. On November 21, 2012, Plaintiff was released from incarceration. Based on Plaintiff's

educational accomplishments (acquired bachelors and Masters degrees) and his YAP activities

while incarcerated, Council for Unity, a 501(c)(3) non-for-profit organization whose mission is

to empower young people, individuals and groups with the skills necessary to promote unity,

safety, and achievement in schools, communities, and correctional facilities

(https://councilforunity.org/), hired him as a Youth Counselor in January 2013.[1]

22. From 2013 through 2015, Plaintiff worked in several Junior High Schools and High

Schools throughout Brooklyn, Bronx and Queens and taught various life skills to hundreds of

students, in particular gang affiliated youth and/or youth on the verge of joining a gang. Plaintiff

also worked in several community centers in Brooklyn and the Bronx facilitating life skills

workshops for after school programs. From 2016 to 2018, Plaintiff also worked in Rikers Island's

youth facilities, RNDC and GMDC, and taught life skills to various detained youth between the

age of 15 and 19. During these school, community center, and Rikers programs, Plaintiff

conducted countless one-on-one discussions with countless youth.

23. When Plaintiff was confronted with a disruptive participant in these programs, he

would wait until the session was completed, pull the youth to the side, and have a talk with them.

In addition, when it was evident that a young person was dealing with an issue that was interfering

---

[1] Plaintiff underwent numerous hours of training in the art of youth counseling, conflict resolution, violence
intervention, de-escalation tactics, techniques involving mentoring youth individually and in groups while using a
behavior management system to shape youth behavior, relationship building, effective communication skills, inter
alia.

with his or her ability to participate in the session, Plaintiff would pull the youth to the side and

have a one-on-one conversation to assist with the problem. Numerous youths also approached

Plaintiff seeking information regarding various issues they were dealing with which often required

confidential, one-on-one communications. Thus, Plaintiff had so many one-on-one

communications with youths it is virtually impossible to pinpoint a specific number of one-on-

one-interactions he had with young people between 2008 and 2018.

24. In May 2018, the perfect dream job opportunity from Plaintiff's perspective came into

existence when the New York City Administration for Children's Services (ACS) began hiring

Youth Development Specialists to work in youth detention centers.

25. On May 30, 2018, Plaintiff emailed a copy of his resume and cover letter to ACS

(careersatacs@acs.nyc.gov). In a response email dated June 1, 2018, ACS instructed Plaintiff to

"submit [his] resume online at www.nyc.gov/yds and click the Apply Now button." Plaintiff

resubmitted his resume and cover letter as instructed.

26. On June 1, 2018, Plaintiff received a phone call from an ACS official (212-341-2548)

who described the phone conversation as a "screening." Plaintiff was asked several questions

regarding how he found out about the YDS position, his educational background, and several

"what if" questions based on conflict resolution scenarios, dealing with at-risk youth in general,

etc. Before the phone call ended, the interviewer told Plaintiff that he had "done an excellent

phone screening" and assured Plaintiff that he would be included in the "pool" on June 9, 2018.

27. On June 9, 2018, Plaintiff attended the "pool" of potential candidates for the YDS

position at ACS's main office located at 150 William Street, New York, NY 10038. There were

hundreds of candidates seeking employment for this position and the line was so long it consumed

several city blocks. Plaintiff was interviewed by two ACS officials and was again asked a myriad

of questions applicable to the YDS job. These questions were tailored exclusively for individuals

that did youth counseling work as a livelihood.  After the interview, Plaintiff was informed that he

was selected, and placed in a waiting room along with others who were also selected; those who were not selected were asked to leave the premises.

28. Plaintiff was given a packet of employment documents; some he filled out on the spot and gave back to ACS officials and other documents he took home with him (i.e., NYCAPS New Hire Packet, Equal Employment Opportunity, Self-Identification Form, Substance Abuse Screening Voucher, etc.). Plaintiff was informed that he would be contacted by phone shortly thereafter.

29. On June 11, 2018, Plaintiff received a phone call from ACS to re-schedule his June 14, 2018 "medical appointment" to another date.  The medical appointment was re-scheduled for Wednesday, June 13, 2018 at 2:00 pm.

30. On June 11, 2018, Plaintiff underwent drug and alcohol tests at Partners In Safety & Medicine, PLLC, 408 West 45th Street, New York, NY 10036. Both drug and alcohol tests results were "negative."

31. On June 12, 2018, Plaintiff completed and submitted his CPD-B Affirmation.

32. On June 13, 2018, in accordance with the instructions he had received, Plaintiff purchased three Cashier Checks in the following amounts to the following agencies: $9.00 (The City Clerk of NY); $25.00 (NYC Office of Children & Family); and $87.00 (NYCDAS). This same day Plaintiff attended the rescheduled medical appointment; he underwent and passed a Physical (blood & urine tests), TB test, BMI, and Strength and Flexibility tests.

33. On June 14, 2019, Plaintiff received a phone call from ACS personnel Felix Wade (212-341-2543) and assisted Plaintiff with making several corrections to his on-line application and CPD-B Affirmation.

34. On June 15, 2018, at 9:00 am, Plaintiff attended his "Processing Appointment" at ACS's Office of Personnel Services – Candidate Processing Unit, 150 Williams St – 6th floor, NY, NY 10038. At this appointment, Plaintiff brought the following documents: Birth Certificate,

Social Security card, Driver's License, Passport, official High School Diploma, Bachelor's Degree transcripts, Master's Degree transcripts, Legal Assistant/Paralegal Diploma, two documents proving his address, and the three Cashier's Checks.

35. At this June 15, 2018 Processing Appointment, Plaintiff also completed and submitted the following documents: Emergency Contact Information Form, Form W-4 (Employee's Withholding Allowance Certificate), Designation of Beneficiary Form, Agreement under section 1127 of the NYC Charter, Notice pursuant to the Federal drug-free Workplace Act of 1998, Department of Homeland Security Employment Eligibility Verification form, certification of Dual Employment form, Conflict of Interest pamphlet, inter alia.

36. On June 25, 2018, Defendants sent Plaintiff's employer, Council for Unity (CFU) an "Employment Verification" form. On June 27, 2018, Plaintiff's Supervisor, Sean Johnson, Director of Program Marketing, completed the form and faxed it to investigator Bovell-John at 917-551-8106. In the form, Mr. Johnson stated that Plaintiff had been with CFU since "1/2013 to the present" and held the following positions/titles: "Youth Counselor, Gang & Violence Intervention Coordinator, Life Skills Coach, Youth Intervention Specialist and Office Assistant." Mr. Johnson further stated that Plaintiff's services were "satisfactory."

37. On July 3, 2018, Plaintiff called Susan Starker (212-341-2568). She informed Plaintiff of what was going to occur considering the fact he had criminal convictions. Ms. Starker indicated that there were three entities (Justice Center, DCAS & ACS) that would have to approve him before he could begin working for ACS. She also stated that once Plaintiff completed his fingerprinting the Justice Center would make its determination and then DCAS & ACS would make their decisions. Ms. Starker further made clear that the only issue at this point was Plaintiff's criminal background, since his character and other relevant issues were already considered, and he was deemed fit to work at ACS.

38. On July 5, 2018, Plaintiff went to IndentoGo Center, 1772 Flatbush Avenue, Brooklyn, 11210-4203, and was fingerprinted. Plaintiff paid $99 out of pocket for this fingerprint service.

39. On July 7, 2018, Plaintiff called ACS personnel Alicia (212-341-2725), inquiring about the status of his application and was informed that ACS was waiting for his fingerprints to return.

40. On July 9, 2018, Plaintiff called Ms. Starker and she informed him that the Justice Center told her that they were sending Plaintiff a certified letter instructing him on what he had to do upon receiving this letter. She also suggested that Plaintiff submit all copies of evidence showing the programs he took while incarcerated, any documents/proof that showed he was productive, rehabilitated, including noteworthy accomplishments as well as reference/character letters.

41. On July 18, 2018, Plaintiff called Felix Wade inquiring about the status of his application and was told that he had nothing to report and that he should call Ms. Starker. That same day, Plaintiff called Ms. Starker to inform her that he did not receive anything from the Justice Center. She did not answer her phone and Plaintiff left a voice mail requesting the contact information for the Justice Center.

42. On July 20, 2018, Ms. Starker called Plaintiff in response to the voice mail message he had left. She gave Plaintiff the email address for the Justice Center (cbc@justicecenter.ny.gov). That same day, Plaintiff emailed the Justice Center informing it that he did not receive the certified letter it had sent. At 2:30 pm, the Justice Center responded in an email informing Plaintiff that the letter was sent on July 12, 2018 via US Postal Services certified mail tracking # 9307 1699 0430 0048 4976 52. The Justice Center also informed Plaintiff that its investigation indicated that the certified mail was "awaiting a delivery scan." The Justice Center further stated

that the Post Office's "failure to deliver the letter to [Plaintiff] is completely under their control"

and gave Plaintiff the contact information to the entity he should contact at the Post Office.[2]

43. On August 2, 2018, the Justice Center re-mailed the July 12, 2018 certified letter,

which Plaintiff received on August 10, 2018.

44. On August 14, 2018, Plaintiff filed a certified letter with the Justice Center for the

Protection of People with Special Needs, Criminal Background Check Unit, P.O. Box 97, Delmar,

NY 12054. Plaintiff attached extensive proof of his rehabilitation and good conduct in the form of

ten reference letters along with his resume (Exhibit # 1), transcripts of his Master's degree in

Professional Studies, Bachelor's degree in Behavioral Science and Diploma for Paralegal/Legal

Studies (Exhibit # 2), four of his recently published novels via his Entertainment Company, three

novels, a short story and a play published while incarcerated and his five national writing awards,

including *The Whitfield Files* (Exhibit # 3), his AA and NA letters confirming completion of those

programs (Exhibit # 4), his Youth Assistance Program (YAP) Certificates (Exhibit # 5), his

Alternative to Violence Program (AVP) and Rehabilitation Through the Arts (RTA) Certificates

(Exhibit # 6), his COMPAS Reentry Risk Assessment (Exhibit # 7), a document regarding his

Certificate of Relief from Disabilities (Exhibit # 8), and several miscellaneous Certificates

(Exhibit # 9).

45. In September 2018, the Justice Center for the Protection of People with Special Needs,

approved Plaintiff to work as a Youth Development Specialist.

46. On September 27, 2018, unbeknownst to Plaintiff, the ACS "Personnel Review Panel"

that consisted of Defendants Cardieri, Skowyra, Fiellman and Rosen "briefed ACS Commissioner

David Hansell on the Panel's recommendation for [Plaintiff], including the bases of [their]

---

[2] On or about July 21, 2018, Plaintiff filed a complaint with the US Postal Services. In an email dated August 8, 2018, the US Postal Services (eCustomercare National) informed Plaintiff that it "was unable to locate" the certified letter.

recommendation" and "Commissioner Hansell agreed that [Plaintiff] . . . should not be hired as a

Youth Development Specialist" because of the statements he expressed in *The Whitfield Files*

(Cardieri's affidavit ¶¶ 63-67).

47. In a correspondence dated February 28, 2019, DCAS informed Plaintiff that it had

approved him to work as a Youth Development Specialist.

48. From December 2018 to March 2019, Plaintiff made numerous phone calls to various

ACS officials and left voice mail messages each time to find out whether ACS approved him for

the YDS job, and his phone calls were ignored. Because ACS officials had answered his phone

calls in the past, this was a clear indication that the Defendants were not going to hire him because

of his criminal convictions.

49. Plaintiff's emotional distress, fear, and anxiety of being forced to come to grips with

the fact that his past was going to prevent him from ever getting a good job that would allow him

to prosper was extremely overwhelming and debilitating. On numerous occasions, Plaintiff

experienced mental anguish to the point he had cried several times and contemplated just giving

up. The stress, extreme sense of hopelessness, and despair caused Plaintiff intense difficulty

concentrating on work assignments and focusing at his current job. He also started re-experiencing

difficulty sleeping, recurring headaches, strange nightmares, was constantly losing his appetite,

and started developing unexplained aches, pains, and muscle tension.

50. On March 6, 2019, Plaintiff filed a complaint with the New York State Division of

Human Rights (NYSDHR) asserting that ACS discriminated against him because of a 30-year-old

conviction for murder. Plaintiff attached all the above-mentioned Justice Center and DCAS

documents to his complaint.

51. On June 24, 2019, in its NYSDHR verified answer, Defendants revealed to Plaintiff for

the first time that it refused to hire him as a Youth Development Specialist for two alleged

reasons: 1) because of Plaintiff's "strongly held views about the criminal justice system [expressed

in *The Whitfield Files*]"; and 2) because of "his lack of experience performing daily one-on-one
direct care with youth." According to the Defendants, Plaintiff's comments in *The Whitfield Files*
were "anti-law enforcement", "anti-prosecutorial" and "anti-establishment." The Defendants
further stated that if Plaintiff was allowed to work with youth in detention centers his presence
would cause "violence", "dissension" and "instability."

52. Defendants relied on statements in *The Whitfield Files* to punish Plaintiff that spoke
about the type of Police and Prosecutorial misconduct that causes wrongful convictions; the
protected speech relied upon to arrive at this determination is as follows:

> "[i]t is equally well known that a significant number of
> police and prosecutors are notorious for fabricating
> evidence, encouraging perjured testimony, and concealing
> and destroying exculpatory evidence" and "in a place where
> racism is so deeply entrenched in the social fabric, and with
> money being the driving force behind this prison industrial
> complex, convicting the innocent can only be expected"
> (ACS's NYSDHR verified answer, pg. 7).

The Defendants also relied upon Plaintiff's remarks on what could be done to prevent wrongful
convictions; that excerpt is as follows:

> "In light of the fact that police and prosecutors enjoy immunity
> (absolute for prosecutors and qualified for police), it is no small
> wonder they commit these crimes without batting an eye, and
> when it is done to minorities, they do it without losing a second's
> worth of sleep. Thanks to racism and the natural desire to remove
> cognitive dissonance, this behavior is looked upon as standard
> operating procedure. Indeed, anyone familiar with the legal system
> can attest to the large number of cases constantly being overturned
> for prosecutorial and police misconduct. In every city, in most
> courtrooms across the country, these violations occur and will
> continue to occur until violators are held accountable."
> (ACS's NYSDHR memo of law at pg. 6).

53. A perfunctory review of the above illustrated protected speech confirm conclusively
that the statements do not suggest, in any way, that Plaintiff has a hatred, dislike, resentment or
aversion for police and prosecutors, nor can such an inference be reasonably drawn from these

statements and the memoir in its entirety. There is nothing in this memoir that might arouse anger, alarm, civil disobedience, violence or antipathy towards police or prosecutors.[3]

54. After finding out that the Defendants were maliciously misrepresenting, mischaracterizing and misconstruing the content of his protected speech in *The Whitfield Files*, that addressed obvious matters of public concern, Plaintiff became even more distressed, fearful, terrified, regretful, embarrassed and humiliated. Plaintiff's heart nearly pounded its way out of his chest as he first read the Defendants' defamatory and false statements and started beating himself up for writing the memoir. Plaintiff started experiencing deep disappointment, anger, distress, and regret, almost daily, because this protected activity caused him to lose a job that he'd been preparing to acquire for a decade. Many years ago, Plaintiff vowed that upon his release he would dedicate his life to helping youth avoid the degradation, hardships and suffering of imprisonment, and the loss of the YDS job truly devastated him.

55. Plaintiff's realization that the Defendants' statements are now a matter of public record has put him in a constant state of fear, stress, depression, nervousness, anxiety, sadness, regret, and emotional and psychological turmoil. Because of the extreme emotional distress Defendants inflicted upon him, Plaintiff's difficulty sleeping at night, recurring headaches, nightmares, and loss of appetite increased substantially; he began consuming herbal treatments to help him with these health problems. Plaintiff's difficulty eating due to the emotional and psychological stress caused Plaintiff to lose weight, about 8 pounds, because of the loss of his appetite.[4]

---

[3] The above statements further confirm that Plaintiff was merely stating a well-known fact about the causes of wrongful convictions and what should occur when police and prosecutors cause wrongful convictions. Indeed, the above statements are supported by thousands, if not tens of thousands of cases where police and prosecutors across the country for decades have engaged in misconduct that resulted in wrongful convictions (https://en.wikipedia.org/wiki/List_of_wrongful_convictions_in_the_United_States). Furthermore, according to the National Registry of Exonerations (as of the date of this complaint) there are 2,625 Exonerations (http://www.law.umich.edu/special/exoneration/Pages/RecentlyAdded.aspx)

[4] In view of the hideous acts of violence that anti-establishment groups (terrorists) are engaging in all over the world, Plaintiff is justifiably horrified and scared out of his mind of the collateral consequences that will likely follow as a result of the Defendants' defamatory, false and malicious statements accusing him of being anti-establishment with a propensity for violence.

56. On July 3, 2019, Plaintiff filed his NYSDHR verified rebuttal, demonstrating that he was not anti-law enforcement, anti-prosecutorial nor anti-establishment, that ACS's statements constituted defamation of character, that ACS violated his First Amendment right to Freedom of Speech, and that the assertion that Plaintiff did not have one-on-one experience with at-risk youth was totally contradicted by the evidence in the record, and in any event, a lack of one-on-one experience was not a disqualifying prerequisite according to ACS's own notices and advertisements about the job.

57. Plaintiff presented evidence substantiating that he does consultant work for a Law Enforcement union called Law Enforcement Employees Benevolent Association ("LEEBA") as a website designer. He also demonstrated that he was a candidate to become a NYC Police officer in 1983. He showed that the Defendants' false and defamatory description of his protected speech (i.e., Plaintiff is "anti-law enforcement", "anti-establishment", and could cause "violence", "dissension" and "instability" in the environments he works) has not only caused additional severe emotional and psychological stress but has also put Plaintiff's business prospects with this Law Enforcement union in grave jeopardy.

58. From about July 2019 through August 2019, Plaintiff was confronted by several of the individuals who had submitted reference/character letters on his behalf, and others interested in the outcome, inquiring about the status of his new job. Plaintiff was extremely embarrassed, humiliated, and mortified by the fact he had to tell them that ACS had rejected him because they claimed that based on one of his writings he was "anti-law enforcement", "anti-prosecutorial", "anti-establishment" and that his presence in an ACS facility could cause "violence", "dissension", and "instability." Plaintiff's stress levels and psychological pain and suffering sky-rocketed to the point that his inability to concentrate and focus at work increased exponentially; his headaches,

loss of appetite, inability to sleep, nightmares, unexplained aches, pains, tense muscles, and an

extreme sense of hopelessness and despair grew constantly.[5]

59. On August 29, 2019, the New York State Division of Human Rights dismissed

Plaintiff's complaint on the grounds that it lacked jurisdiction pursuant to Correction Law § 755

and that Plaintiff "must seek relief in state court."

60. On September 11, 2019, Plaintiff commenced an Article 78 proceeding in New York

County Supreme Court on the grounds that the Defendants' determination was arbitrary,

capricious, and an abuse of discretion.

61. On October 4, 2019, Defendants filed in state court a cross-motion to dismiss the

petition on the ground of failure to state a cause of action, claiming that "ACS's decision not to

hire [Plaintiff] was rationally based and not arbitrary, capricious or in violation of the law" (Defts'

memo of law at pg. 10).[6]

62. In an affidavit in opposition to the motion to dismiss the petition, sworn to on the 28th

day of October 2019, Plaintiff demonstrated that, inter alia, ACS's decision not to hire him was in

violation of law because it violated his Constitutional right to Freedom of Speech.

63. On November 8, 2019, Plaintiff filed a FOIL request with ACS pursuant to Article 6 of

the Public Officers Law via OpenRecords email portal, seeking copies of, inter alia, "All training

manuals, guidelines, records, reports, documents, memorandums, etc., that articulate the training

ACS employees undergo before they are permitted to make hiring decisions . . . [and] that

articulate the training ACS employees undergo that ensure that its employees are aware of and

---

[5] The discomfort was so extreme he contemplated quitting his current job due to the intense shame, embarrassment and humiliation he was experiencing; the fear that his current employer, the youth he educates, and other affiliates he interacted with might react adversely towards him because of the Defendants' false and defamatory description of his protected speech was ever-present.

[6] According to [Defendants, they] "declined to hire [Plaintiff] because he lacked critical relevant experience and demonstrated a philosophy that did not align with the goals and needs of DYFI in maintaining a safe and secure environment for its youth residing in secure detention facilities."

incompliance with federal and state constitutional provisions." The request was designated: FOIL-2019-067-00128.

64. On November 12, 2019, Plaintiff filed with the state court and served on Defendants an addendum affidavit in support of his opposition to the cross-motion to dismiss a request for "leave to amend and replead his petition pursuant to CPLR 3025 (b)." Plaintiff's second cause of action asserted that "[Defendants] Violated [Plaintiff's] First and Fourteenth Amendment rights of the US Constitution and article 1 §§ 8, 9 of the NY Constitution when it refused to hire [Plaintiff] based on his Protected Speech expressed in his award-winning memoir *The Whitfield Files.*

65. On November 26, 2019, the State Supreme Court denied Defendants' cross motion to dismiss the petition and granted Plaintiff's request for leave to amend the verified petition. The next court appearance date was set for February 4, 2019.

66. On December 30, 2019, Defendants served their verified answer to the Plaintiff's amended verified petition. Attached to this verified answer were the affidavits of Defendants Cardieri, Skowyra, and Fiellman. In its verified answer the Defendants reiterated the alleged reasons they refused to hire Plaintiff.

67. In their verified answer, the Defendants admitted that they did not review all of the evidence attached to Plaintiff's letter dated August 14, 2018 to the Justice Center CBC Unit (¶ 162). Defendant Skowyra Affidavit (¶ 51), and Defendant Cardieri Affidavit (¶ 51), specifically listed the evidence they reviewed and acknowledged that they ignored several pieces of evidence that was clearly favorable to plaintiff, ranging from his being the owner and founder of his own business to the fact that he was quoted by the United Nations in its UN Report of the Special Rapporteur on the right of education of persons in detention. Thus, the Defendants did not "closely

review[] all documents submitted by [Plaintiff]" as they vehemently claim (Cardieri Aff. ¶ 57; Skowyra Aff. ¶ 52 & Fiellman Aff. ¶ 25).[7]

68. In their verified answer, the Defendants also insisted that Plaintiff had failed "to show that his protected speech was a motivating factor in [Defendants'] determination", that the "Amended Petition does not show that, but for [Plaintiff's] speech, he would have been offered employment as a YDS" because of "serious concerns regarding [Plaintiff's] qualifications to serve as a YDS", that its "prediction that [Plaintiff's] speech would be disruptive is reasonable", inter alia.

69. In their verified answer, the Defendants also condemned Plaintiff for submitting *The Whitfield Files* for consideration, claiming that "the Panel. . . 'expressed concern over [Plaintiff's] judgment in submitting *The Whitfield Files* for the agency's consideration, given the fact that it expressed clear anti-correctional statements as he sought a position counseling youth in a secure setting.'"[8]

70. In the afternoon of January 15, 2020, Plaintiff underwent a yearly physical and shared with his primary care provider the intense stress, anxiety, and depression he was experiencing. He also shared the list of symptoms, physical pains, and mental sufferings he was experiencing (i.e., loss of appetite, sleeplessness, on-going headaches, strange nightmares, aches, pains, tense muscles, upset stomach, anxiety attacks, and an overall sense of hopelessness, regret and sadness,

---

[7] The Defendants also did not "closely review" Plaintiff's Master's Degree in Professional Studies transcripts which demonstrated that Plaintiff had acquired higher educational training in conducting one-on-one communications to help people deal with their problems. Plaintiff's Master's Degree Transcript was attached to Defendants' verified answer as Exhibit D # 0041-0043, which demonstrated that Plaintiff acquired an "A" in his Counseling/Therapy class, an "A-" in his Pastoral Care class and an "A" in his Aftercare Seminary. Because these courses taught Plaintiff a spectrum of tactics and techniques to utilize when communicating one-on-one with suffering people, it was obvious that Plaintiff was virtually an expert in one-on-one communications. When the Defendants claimed Plaintiff did not submit proof that he had experience with conducting one-on-one communications with at risk youth, it was readily apparent that the Defendants completely ignored these master's degree courses, which exclusively involved teaching Plaintiff one-on-one communication skills.

[8] Besides the fact that the Defendants included another anti attitude (anti-correctional) to the list of other unsubstantiated anti-views (anti-law enforcement, anti-prosecutorial, anti-establishment), it again failed to explain exactly how this fifteen-year-old PEN award winning memoir was anti-correctional.

etc.). Plaintiff further explained that he had been experiencing some of these symptoms for many years but was afraid to seek medical treatment out of fear of the stigma attached to people that see psychiatrists. He further explained that his mental pain, suffering, and anguish was caused by his serving time in prison for a crime he did not commit and his inability to get a good paying job upon his release. He also informed her that his mental pain and suffering got substantially worse after ACS refused to hire him because of a memoir he wrote in 2003. With the help of family and friends who saw he was getting worse and adamantly encouraged him to seek treatment, Plaintiff put his pride and ego aside and decided to seek help. Plaintiff's primary care provider, Doctor Keisha Sinha, issued him a referral to see a mental health professional.

71. On January 18, 2020, Plaintiff served a copy of his verified reply to the Defendants' verified answer along with 10 exhibits.[9]

72. In reply to Defendants' assertion that the "Amended Petition does not show that, but for [Plaintiff's] speech, he would have been offered employment as a YDS" because of "serious concerns regarding [Plaintiff's] qualifications to serve as a YDS", Plaintiff demonstrated that this reason was baseless, arbitrary and capricious. Plaintiff also highlighted the Defendants' failure to consider obvious favorable evidence in the record (i.e., CFU Director Luis Brown's letter stating that he observed Plaintiff editing students' papers and giving them feedback for the past several years, YDS notices and job postings that confirmed conclusively that one-on-one communication experience was not required for the job, inter alia).

73. In reply to Defendants' assertion that its "prediction that [Plaintiff's] speech would be disruptive is reasonable", Plaintiff presented arguments and case law that confirmed Defendants'

---

[9] These exhibits consist of the affidavit of Joseph Rivers (Ex. # 1); nine (9) online news broadcast and online newspaper articles regarding the assault of a six year old boy by ACS employee Jacques Edwards (Ex. # 2-10); affidavits from Luis Brown (Ex. # 11), Wayne Harris (Ex. # 12), and Jeffrey Rivera (Ex. # 13); ACS Youth Development Specialist (YDS) Notice (Ex. # 14); NYC DCAS Notice of Examination for YDS (Ex. # 15); and Plaintiff's Certificate of Good Conduct that was issued on January 8, 2020 (Ex. # 16).

failed to consider the fact that the memoir was written and published over fifteen-years ago was

unreasonable, and failed to considered the fact that Plaintiff has an "unblemished record", despite

working as a Youth Counselor for the past ten years was irrational.

74. On January 21, 2020, Defendants filed a letter motion with the state court, requesting

permission to file a sur-reply on the grounds that Plaintiff's reply allegedly presented new matters

and requested that January 10, 2020 be the next court appearance date.  The state court granted

Defendants' request and set the next court appearance date to February 25, 2020.

75. On February 20, 2020, Plaintiff received the Defendants Sur-Reply, which challenged

Plaintiff's request for leave to file a late Notice of Claim with respect to his First Amendment and

Defamation claims.  Despite the fact Plaintiff presented his First Amendment and Defamation

claims in his NYSDHR Verified Rebuttal (¶ 12) and Memo of Law in support (Pgs. 6-9), the

Defendants falsely insisted that Plaintiff had not given them notice.

76. At the February 25, 2020 state court appearance, Defendants' attorney and Plaintiff

was given an opportunity to discuss the two reasons the defendants relied upon to deny Plaintiff

the YDS job.  The state court judge asked the defendant's attorney, "What type of writings or

political expression would disqualify somebody from this type of position?" and the defendant's

attorney said, "I don't think . . . there are any specific types of political or expressive writings that

would outright disqualify a person."

77. In response to the Defendants' attorney's assertion that it did not produce additional

evidence in support of its second reason for not hiring Plaintiff because it was not allowed

discovery, the state court judge adjourned the case for the Defendants to produce supplementary

evidence. The court instructed the Defendants' attorney to produce additional evidence that would

help the court to determine whether "one-on-one communication experience" was an absolute

requirement for acquiring the YDS position and gave the Defendants 45 days to produce this

evidence. The next court appearance date was scheduled for April 10, 2020.

78. In March 2020, Plaintiff was diagnosed for PTSD, depression, stress, and anxiety due to ACS's employment denial and for serving time in prison for a crime he did not commit. Plaintiff began a series of various treatments and therapies.

79. On April 28, 2020, the Defendants stated in response to Plaintiff's November 8, 2019 FOIL request (FOIL-2019-067-00128) that "[a] diligent search for records responsive to your request did not locate any such records."

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**42 U.S.C. § 1983 – infringement on Plaintiff's Freedom
of Speech in violation of the First Amendment**
(Against Defendants Cardieri, Skowyra, Fiellman, Rosen, and Hansell)

80. Plaintiff incorporates all other paragraphs of this Complaint as if fully set forth herein.

81. 42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

82. Plaintiff is a citizen of the United States and all of the individual Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

83. All individual Defendants to this claim, at all times relevant hereto, were acting under the color of state law in their capacity as ACS officers and their acts or omissions were conducted within the scope of their official duties or employment.

84. At the time of the complained of events, Plaintiff had a clearly established constitutional right under the First Amendment to be secure in his person from unreasonable punishment due to his constitutionally protected speech that addressed matters of public concern.

85. As far back as 1972 the Supreme Court made clear in *Perry v. Sindermann*, 408 U.S. 593 that it was well established that "the government . . . may not deny a benefit to a person on a basis that infringes his constitutionally protected interests . . . in freedom of speech." 408 U.S. at 597.

86. Any reasonable ACS employee knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

87. The Defendants' actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them and violated these First Amendment rights of Plaintiff.

88. Taking into account the content, form, and context of the statements expressed in *The Whitfield Files* as revealed by the whole record, this memoir consisted of speech on a matter of political, social, prosecuting and policing concerns to the community and was therefore protected by the First Amendment because this speech can be fairly characterized as constituting speech on matters of public concern.

89. This fifteen-year-old award-winning memoir, *The Whitfield Files*, that dealt with police and prosecutorial misconduct that causes wrongful convictions was an obvious matter of public concern. This speech was aimed at identifying and eradicating such misconduct in public institutions and was a subject of general interest and of value and concern to the public.

90. The speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest. Plaintiff's speech was made fifteen years before plaintiff sought employment with ACS. He acted as a private citizen, and the content of the memoir addressed matters of significant public concern completely unrelated to the YDS job.

91. The Defendants knew or should have known that Plaintiff's fifteen year old protected speech that spoke about the causes of wrongful convictions (i.e., police and prosecutorial misconduct) that was uttered to generate public discussion about these ongoing problems in the

community did not constitute "anti-law enforcement", "anti-prosecutorial", "anti-establishment" and "anti-correctional" views that could cause "violence", "dissension" and "instability" in an ACS detention center.

92. The Defendants knew or should have known that Plaintiff's protected speech expressed fifteen years ago could not lawfully be used as a basis to refuse to hire him. This act constituted a clear adverse employment action in violation of the First Amendment.

93. The refusal to hire Plaintiff because of his protected speech addressing matters of public concern constitutes "conduct which would deter a reasonable similarly situated individual from engaging in First Amendment protected activity." There is no doubt that Plaintiff was chilled in the exercise of his rights, because Plaintiff would not have made the speech had he known he would be denied a good job in the future as a result of that speech.[10]

94. The Defendants admitted that Plaintiff's protected speech was a substantial and motivating factor in Defendants' decision not to hire Plaintiff. On several occasions the Defendants stated, "the primary focus was" Plaintiff's views expressed in *The Whitfield Files* that compelled them not to hire Plaintiff.

95. A causal connection between Plaintiff's speech and the Defendants' refusal to hire him is conclusively established by Defendants' acknowledgment and repeated statements that "the primary focus of the Panel's discussion regarded [Plaintiff's] opinion published in *The Whitfield Files*." These statements are not only direct evidence of causation but is an admission that the main reason for not hiring Plaintiff was his protected speech.

96. The views expressed in *The Whitfield Files* did not contain any hostile, inflammatory, obscene, hateful, disrespectful, subversive, racist, vulgar, vile or violent language or content that

---

[10] Plaintiff was writing and contemplating publishing a follow up of *The Whitfield Files*, but after being punished for writing and publishing the first part of this memoir (denied a very good job) Plaintiff decided not to engage in this protected activity.

would justify a reasonable belief that "the speech would potentially interfere with or disrupt the government's activities."

97. The Defendants' assertion that the views expressed in *The Whitfield Files* could have caused "violence", "dissension" and "instability" in an ACS detention center (Defendants' "prediction of disruption") is not only unfounded but is also irrational.

98. Because "[t]he more the employee's speech touches on matters of significant public concern, the greater the level of disruption to the government that must be shown", the Defendants failed to carry their burden of proof.

99. Plaintiff's expression was clearly unlikely to disrupt the government's activities. The Defendants completely failed to present any reliable evidence to support their "prediction of disruption" as applied pursuant to *Pickering*'s balancing test, and therefore this prediction of disruption was insufficient to outweigh the value of the plaintiff's First Amendment expression.

100. The Defendants' alleged second reason for not hiring Plaintiff (i.e., he lacked one-on-one communication experience) could not serve as a lawful basis not to hire Plaintiff (nor as a motivating factor) because the Defendants completely ignored a myriad of evidence that proved their assertion was false, arbitrary, capricious and baseless.[11] Furthermore, in its verified answer to

_____

[11] The Defendants ignored evidence confirming that Plaintiff had been doing one-on-one communications with youth for approximately ten years (i.e., three years while incarcerated and seven years after his release). CFU Director of School Based Initiatives, Luis Brown, submitted a reference/character letter that stated he *observed* Plaintiff editing papers for countless youth and giving them feedback on a one-on-one basis over a span of several years. The Defendants also ignored Plaintiff's Master's degree in Professional Studies Transcripts showing that he acquired advanced higher learning with a "3.9662 GPA" regarding one-on-one communication skills (see above footnote # 7). Plaintiff also submitted transcripts of his bachelor's degree in behavioral science, where he acquired "As" in several courses that taught counseling in a social work context, which the Defendants ignored. Because these higher education courses taught Plaintiff how to expertly conduct one-on-one communications from a social worker's and human services provider's standpoint it was virtually impossible for the Defendants to genuinely believe Plaintiff did not have one-on-one communication experience. Of even greater significance, the Defendants' notices and job listings regarding the YDS job made noticeably clear that "one-on-one communication experience" was not required for the job, nor could such experience be reasonably inferred from these notices and listings. Indeed, these job advertisements stated that "working directly with juveniles or young adults . . . in a group . . . setting", in a "program performing recreational . . . work", and in an "athletic program" are "satisfactory experience." Because these type of youth workers do not specialize in one-on-one interaction with youth it is evident that the Defendants' use of an alleged lack of one-on-one communication experience as a ground to refuse to hire Plaintiff is clearly false, baseless, and could not rationally be used as a basis to refuse to hire Plaintiff, and therefore, is not a motivating factor in the decision not to hire Plaintiff.

Plaintiff's amended verified Article 78 petition, the Defendants' admitted that Plaintiff met the minimum experience requirements at the time when he was offered the YDS job, but this assessment changed after they read Plaintiff's protected speech. Since one-on-one communication experience was not an issue at that time, it is evident this reason was utilized to attempt to improperly bolster the refusal to hire plaintiff because of his protected speech.

101. In light of the baseless, arbitrary, capricious, non-sensical and irrational nature of the second reason for not hiring Plaintiff (see above footnote # 7 & 11), the Defendants cannot prove by a preponderance of the evidence that they would have made the adverse employment decision even in the absence of the protected conduct. This second reason was clearly not a substantial or motivating factor in the adverse employment action.

102. A balancing between the interests of the Plaintiff (a potential employee), in his role as a citizen, in commenting on matters of public concern and the interest of the Defendants, in its role as a potential employer, in promoting the efficiency of the services it performs through its employees, require "that society's interest in [Plaintiff's] freedom of speech be weighed against [Defendant's alleged] interest in maintaining efficiency and discipline in the workplace."

103. Defendants' actions as described herein, were malicious and/or involved reckless, callous, and deliberate indifference to Plaintiff's federally protected rights. This infringement shocks the conscience and constitutes a premeditated violation of Plaintiff's First Amendment rights.

104. Defendants unlawfully punished Plaintiff by means of objectively unreasonable, arbitrary, capricious, and blatant disregard of the First Amendment rights to freedom of speech, thereby unjustly and premeditatedly infringing upon Plaintiff's constitutionally protected rights.

105. None of the Defendants took reasonable steps to protect Plaintiff from the objectively unreasonable infringement of his Freedom of Speech of other Defendants despite being in a

position to do so. They are each therefore liable for the injuries and damages resulting from the objectively unreasonable violation of the First Amendment of each other Defendant.

106. Each Defendant was personally involved in the violation of Plaintiff's First Amendment rights to Freedom of Speech: a) Defendants Cardieri, Skowyra, Fiellman and Rosen are personally involved because they were participants, representatives and members of the "Personnel Review Panel" that refused to hire Plaintiff because of his protected speech; and b) Defendant Hansell is personally involved because he was briefed about the decision not to hire Plaintiff; he agreed with the unconstitutional, baseless, arbitrary and capricious reasons for not hiring Plaintiff and facilitated this refusal to hire.

107. Defendants engaged in the conduct described by this Complaint willfully, maliciously, and in reckless disregard of Plaintiff's federally protected constitutional rights.

108. Defendants did so with shocking and willful indifference to Plaintiff's rights and their conscious awareness that they would cause Plaintiff severe emotional and psychological injuries and would chill his speech.

109. The acts or omissions of all individual Defendants were moving forces behind Plaintiff's injuries.

110. The Defendants acted in concert and joint action with each other.

111. The acts or omissions of Defendants as described herein intentionally deprived Plaintiff of his constitutional rights and caused him other damages.

112. The Defendants are not entitled to qualified immunity for the complained of conduct. The Defendants' conduct violated clearly established constitutional rights of which a reasonable person would have known. Indeed, the Defendants should have known that refusing to hire Plaintiff on the basis of the views expressed in *The Whitfield Files* that was uttered fifteen years ago, addressed obvious and significant matters of public concern, and was completely unrelated to the job would violate the First Amendment.

113. As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual emotional and psychological injuries, and other damages and losses as described herein entitling him to compensatory damages in the amount of two million dollars ($2,000,000.00).

114. In addition to compensatory and consequential damages, Plaintiff is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983 in the amount totaling five million dollars ($5,000,000.00), in that the actions of each of these individual Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

115. Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs, disbursements, and other litigation expenses as allowable by federal law. There may also be special damages for lien interests.

### SECOND CLAIM FOR RELIEF

**Violation of 42 U.S.C. § 1983 – The City of New York
failed to train ACS employees on the lawful use of
protected activities to deny employment which
caused the violation of Plaintiff's constitutional
right to Freedom of Speech in violation of
the First Amendment**
(Against City of New York)

116. Plaintiff incorporates all other paragraphs of this Complaint as if fully set forth herein.

117. Municipal bodies are liable for constitutional violations under 42 U.S.C. § 1983 when a city fails to properly train its employees amounting in a deliberate indifference to one's constitutional rights. See *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989).

118. At all times relevant, Defendant City of New York had a duty to properly train its employees and agents.

119. Defendant City breached that duty when it failed to train the individual Defendants on the lawful use of protected activities as a basis for denying a candidate employment, which resulted in the violation of plaintiff's First Amendment rights to Freedom of Speech.

120. Based on Defendants attorney's comments made at the February 25, 2020 state court appearance, the Defendant City acknowledged that it does not train its employees on how to avoid violating candidates First Amendment rights when making hiring decisions.

121. Based on the Defendants' response to Plaintiff's November 8, 2019 FOIL request, the Defendant City explicitly admits that it does not train its employees to ensure that they are aware of and incompliance with federal and state constitutional provisions before they are permitted to make hiring decisions.

122. The complete failure by ACS to train its hiring personnel on fulfilling First Amendment obligations constitutes deliberate indifference sufficient to give rise to 1983 municipal liability.

123. First, ACS knows to a moral certainty that ACS hiring and supervisory personnel will come in contact with potential employees that have made public statements in their past and with employees that make protected speech in connection with their employment (i.e., grievances, protests, complaints, negative opinions about the agency, etc.).

124. Second, in 2018, the First Amendment had been well-established for decades. However, because the law involving protected speech that may affect an employee's employment requires a complex balancing of the employee's and the agency's interests, this is not a situation that was so obvious to figure out and easy to apply.

125. Without training an employee with hiring power may assume that it has unlimited discretion to exclude candidates seeking employment on the basis of candidates' protected conduct if he or she has reason to do so. Specifically, an untrained supervisor might assume that it can punish an employee for engaging in protected speech solely because he or she is in an authority position and disagrees with the speech. These employees would not realize, unless informed through training, that there was a need to balance the interests of both sides before instituting adverse employment actions, as well as consider a series of other factors.

126. Had the individual Defendants undergone some type of training, it is very likely that they would have taken into consideration the fact that *The Whitfield Files* was written over fifteen years ago while Plaintiff was incarcerated ("Where and when the statements are made is certainly a factor to be considered in the overall assessment" *Pappas v. Giuliani*, 290 F.3d 143, 150 [2d Cir. 2002]). Likewise, had Defendants been trained they would have been compelled to consider the fact that Plaintiff had been a Youth Counselor for a decade without experiencing a single blemish to his record, which was favorable information that could not rationally be completely ignored. Indeed, with the appropriate training the Defendants would have known that these factors were extremely important and could not so cavalierly be ignored as was done in this case.

127. Training, of some sort, would have compelled Defendants to consider facts and circumstances similar to those the court considers when viewing a First Amendment claim. Without training the employees would not know that "the content, form, and context of a statement . . . as revealed by the whole record" and when, where, why and under what circumstances was the statement made must be considered. With appropriate training the Defendants would have known it was necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said. Basic training would have compelled an employee to consider these factors and would have further known that these factors must be considered in order to render a fair, reasonable and rational adverse employment decision.

128. An additional factor that required extensive training to implement without violating citizens' rights to freedom of speech was the motivation factor, which required a series of complex evaluations before adverse action can be taken. For example, "It is true that the fact that an employee's speech touches on matters of public concern will not render that speech protected where the employee's motive for the speech is private and personal." However, "The fundamental question is whether the employee is seeking to vindicate personal interests or bring to light a matter of political, social, or other concern to the community." In addition, without training, an

employee would not know that "the mere fact that a government employee takes a personal interest in the subject matter of the speech at issue does not remove it from the protection of the First Amendment." In light of the detailed, complex, legalistic, and seemingly contradictory nature of the various legal factors to be applied to First Amendment rights issues, it is virtually guaranteed that a completely untrained employee will most definitely violate citizens' constitutional rights.[12]

129. There is causation between the Defendant City's failure to train and Plaintiff's injuries in view of the fact that Plaintiff's injuries would have been avoided had the individual Defendants been trained on the legitimate approach to utilizing protected speech as a basis for refusing to hire an employment candidate.

130. A properly trained, high-ranking official with the power to trample over citizens' constitutional rights under the color of law would have certainly hesitated to punish Plaintiff by refusing to hire him considering the facts and circumstances in this case.[13]

131. In light of the duties and responsibilities of ACS administrators responsible for hiring employees to work for ACS, the need for specialized training regarding First Amendment rights is so obvious, and the inadequacy of training is so likely to result in the violation of constitutional

---

[12] Furthermore, without training, an employee with hiring and firing authority, would have no idea that "False speech, as well as hyperbole, is still entitled to First Amendment protection, as long as it is not made with knowledge or reckless disregard of its falsity."

[13] As demonstrated by the numerous First Amendment lawsuits commenced against various New York City agencies, it is further evident that the Defendant City systematically refuses to train its employees on the proper handling of citizens' protected speech. *Reuland v. Hynes*, 460 F.3d 409 (2d Cir. 2006)(Discussing whether speech was protected by First Amendment in employee speech context); *Bernheim v. Litt*, 79 F.3d 318 (2d Cir. 1996)(Noting that negative reviews and false accusations could constitute adverse employment actions) *Griffin v. City of New York*, 880 F. Supp. 2d 384 (E.D.N.Y. 2012)("There is no dispute that plaintiff has sufficiently alleged that adverse employment action was taken against him and that a 'causal connection exist' between the speech and such action"); *Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396 (S.D.N.Y. 2014); *Harman v. The City of New York*, 140 F.3d 111 (2nd Cir. 1998)(Court held that "Executive Orders 101 and 641 to be unconstitutional infringements on the First Amendment rights of city employees"); *Bermudez v. the City of N.Y.*, 783 F. Supp. 2d 560 (S.D.N.Y. 2011), inter alia.

rights such as those described herein that the failure to provide such specialized training is deliberately indifferent to those rights.

132. The deliberately indifferent training provided by Defendant City resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant City were moving forces in the constitutional violation injuries complained of by Plaintiff.

133. Thus, Defendant City's policy, custom, or practice of refusing to train its employees on the lawful actions to take when making adverse employment decisions based on citizens' protected speech caused the violation of the Plaintiff's First Amendment rights.

134. As a direct and proximate cause of the actions of the Defendant City, Plaintiff has suffered actual emotional and psychological injuries, and other damages and losses as described herein entitling him to compensatory damages for two million dollars ($2,000,000.00).

135. Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs, disbursements, and other litigation expenses as allowable by federal law.

## VI. PRAYER FOR RELIEF

136. Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and grant:

A. compensatory and consequential damages, including damages for emotional and psychological distress, humiliation, shame, regret, and other pain and suffering on all claims allowed by law in the amount of two million dollars ($2,000,000.00) against the individually liable Defendants; and two million dollars ($2,000,000.00) against the Municipal Defendant;

B. economic losses on all claims allowed by law;

C. special damages in an amount to be determined at trial;

D. punitive damages on all claims allowed by law against individual Defendants in the amount of five million dollars ($5,000,000.00);

E. attorneys' fees and the costs, disbursements, and other litigation expenses associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

F. pre-and post-judgment interest at the lawful rate; and,

G. any further relief that this court deems just and proper, and any other appropriate relief at law and equity.

**PLAINTIFF REQUESTS A TRIAL BY JURY.**

Respectfully submitted this 11th day of June 2020.


John D. Whitfield, Plaintiff, Pro Se
10201 Flatlands Ave # 52
Brooklyn, NY 11236
Email: johnwhitfield471@gmail.com
Phone #: 347-355-9083

## VERIFICATION OF COMPLAINT

STATE OF NEW YORK        )
                         ) ss
COUNTY OF KINGS          )

John D. Whitfield, being duly sworn, deposes and says that deponent is the Plaintiff in the

above-encaptioned proceeding, that he has read the foregoing Complaint and knows the contents

thereof, that the same is true to deponent's own knowledge, except as to matters therein stated

upon information and belief, which matters deponent believes to be true.


John D. Whitfield, Plaintiff, Pro Se
10201 Flatlands Ave # 52
Brooklyn, NY 11236
Email: johnwhitfield471@gmail.com
Phone #: 347-355-9083


Sworn to before me this

_____ day of June 2020

_____
NOTARY PUBLIC



Munaza Ra Wejuli El
Notary Public, State of New York
No. 01WE6371054
Qualified in Kings County
My Commission Expires Feb 26, 20__



John D. Whitfield
10201 Flatlands Ave #52
Brooklyn, NY 11236

CERTIFIED MAIL



7017 0660 0000 2970 5509

  

U.S. POSTAGE PAID
FCM LG ENV
BROOKLYN, NY
11221
JUN 11, 20
AMOUNT
$4.55
R2304H108059-13
1000        10087

Pro Se Intake Unit
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street - Room 200
New York, NY 10007

USM P3
SDNY

S.D. OF N.Y.
2020 JUN 16 PM 6:37
SDNY PRO SE OFFICE
RECEIVED