# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: IAS MOTION PART 56

―――――――――――――――――――――――――――― X

In the Matter of the Application of
JOHN D. WHITFIELD,

                                        Petitioner,


                - against -                              **AMENDED VERIFIED PETITION**

CITY OF NEW YORK ADMINISTRATION                          Index No. 101407-19
FOR CHILDREN'S SERVICES,

                                        Respondent,      Judge John J. Kelley

For a Judgment Pursuant to Article 78
of the Civil Practice Law and Rules

―――――――――――――――――――――――――――― X

TO THE SUPREME COURT OF THE STATE OF NEW YORK FOR COUNTY OF NEW YORK:

## INTRODUCTORY STATEMENT

This Article 78 proceeding is brought to challenge and reverse the New York City Administration for Children's Services ("ACS") discriminatory decision denying Petitioner John D. Whitfield employment as a Youth Development Specialist ("YDS"). Respondent ACS refused to hire Petitioner because of a 30-year-old conviction for murder, a conviction that has no bearing on his ability to perform his duties as a Youth Development Specialist. Granting Petitioner employment as a YDS would not impose an unreasonable risk to the safety and welfare of the youth in detention centers, nor does it bear a direct relationship between the conviction and the employment.

Although Respondent proffered two reasons for not hiring Petitioner, those reasons were clearly a pretext for discrimination because they were not rationally based, were arbitrary and capricious, completely untrue, ignored critical information, were not supported by evidence, they rested entirely on subjective considerations, violated Petitioner's First and Fourteenth

Amendment rights to Freedom of Speech, were Defamatory Per Se, and were taken in violation of Article 23-A of the Correction Law (N.Y. Correction Law §§ 750, et seq.), the "New York State Human Rights Law" (N.Y. Executive Law § 296(15)), the "New York City Human Rights Law" (N.Y.C. Administrative Code § 8-107(10)) and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and its progeny.[1]

## JURISDICTION, VENUE, AND PARTIES

1. This Court has jurisdiction in this matter pursuant to § 7801, et seq. of the Civil Practice Law and Rules ("CPLR"), § 755 of New York Correction Law, and § 3001 of the CPLR.

2. Venue is properly set in New York County pursuant to CPLR §§ 7804(b) and 506(b) because Respondent's principal office is located at 150 William Street, New York, NY 10038, within this judicial district.

3. Petitioner, John D. Whitfield is over 18 years of age and his address is 10201 Flatlands Avenue # 52, Brooklyn, NY 11236. Cell # 347-355-9083. Email: johnwhitfield471@gmail.com.

4. Respondent, City of New York Administration of Children Services ("ACS"), is a New York City Agency that protects and promotes safety and well-being of New York City's children and families by providing child welfare, juvenile justice, and early care and education services. Respondent ACS is located at 150 William Street, New York, NY 10038.

---

[1] These laws were enacted to ensure that persons previously convicted of criminal offenses are considered fairly for employment. Respondent's failure to make an individualized determination, its refusal to weigh the eight factors listed in Correction Law § 753(1), and its subsequent pro forma refusal to hire Petitioner was a bad faith circumvention of statutory law, was arbitrary and capricious, an abuse of discretion, unlawful, constitutionally impermissible, and contrary to the legislative purpose of Correction Law Article 23-A.

EXHIBIT A

## STATEMENT OF FACTS

5. Petitioner incorporates all of the preceding paragraphs as if they were fully set forth again at this point.

6. Petitioner, Mr. Whitfield, is an African American man who spent 24 and a half years in prison for a murder he adamantly maintained and continues to maintain his innocence. Despite strong evidence of his innocence, he did not receive any redress in the courts, both state and federal. In 2003, with nowhere else to go, he decided to write a memoir based on the evidence of his innocence entitled *The Whitfield Files* with hopes of galvanizing the public to get involved in his case. In 2004, Mr. Whitfield entered the memoir into a national writing competition sponsored by PEN American Center (a nonprofit organization that works to defend and celebrate free expression in the United States and worldwide through the advancement of literature and human rights https://pen.org/about-us/). The memoir ultimately won an award.

7. From 2008 to 2012, while confined at Woodbourne Correctional Facility, Petitioner was a Youth Assistant Program (YAP) facilitator and coordinator. In his capacity as a YAP facilitator, Petitioner communicated with youth brought into the facility by prison, school and community administrators. During these presentations, Petitioner and fellow prisoners talked about a gambit of life skills ranging from dealing with peer pressure to techniques on how to avoid joining gangs. After presentations made to the groups, each facilitator conducted one-on-one-communications with youth interested in one-to-one-discussions. As the YAP coordinator, Petitioner in conjunction with the Facility Staff Advisor, were in charge of organizing the program, tailoring the presentations to fit the needs of the youth brought into the facility, selecting and training new facilitators, and maintaining the efficiency and integrity of the program.

EXHIBIT A

8. On November 21, 2012, Petitioner was released from incarceration. Based on Petitioner's YAP activities while incarcerated, Council for Unity, a 501(c)(3) non-for-profit organization whose mission is to empower young people, individuals and groups with the skills necessary to promote unity, safety, and achievement in schools, communities, and correctional facilities, hired him as a Youth Counselor. Petitioner underwent numerous hours of training in the art of youth counseling, conflict resolution, violence intervention, de-escalation tactics, relationship building, effective communication skills, inter alia.

9. From 2012 through 2015, Petitioner worked in several Junior High Schools and High Schools throughout Brooklyn, Bronx and Queens and taught various life skills to hundreds of students. Petitioner also worked in several community centers in Brooklyn and the Bronx facilitating life skills workshops for after school programs. From 2016 to 2018, Petitioner also worked in Rikers Island's youth facilities, RNDC and GMDC, and taught life skills to various detained youth between the age of 15 and 19. During these school, community center, and Rikers programs, Petitioner conducted countless one-on-one discussions with countless youth.

10. When Petitioner was confronted with a disruptive participant in these programs, he would wait until the session was completed, pull the youth to the side and have a talk with them. In addition, when it was evident that a youth was dealing with an issue that was interfering with his or her ability to participant in the session, Petitioner would pull the youth to the side and have a one-on-one conversation to assist with the problem. Numerous youth also approached Petitioner seeking information regarding various issues they were dealing with which often required confidential, one-on-one communications. Thus, Petitioner had so many one-on-one discussions with youth that it is virtually impossible to pinpoint a specific number of one-on-one interactions he had with young people between 2008 and 2018.

EXHIBIT A

11. Although Petitioner has great admiration for Council for Unity and the work it does
for young people, this non-for-profit organization is small and does not provide any benefits to
its employees such as medical, pension, overtime, periodic pay raises, hazard pay, night
differentials, etc.  Council for Unity is the type of job someone does because of a passion for
helping young people, not because of the money; this is the main reason Petitioner stayed at
Council for Unity for so many years, despite the lack of benefits and upward mobility. Petitioner
has been waiting patiently for a similar job, but with the necessary benefits and ability to allow
growth that would provide him with a quality of life.  In May 2018, that job opportunity came to
fruition when the New York City Administration for Children's Services (ACS) began hiring
Youth Development Specialists to work in youth detention centers.

12. On May 30, 2018, Petitioner emailed a copy of his resume and cover letter to ACS
(careersatacs@acs.nyc.gov). In a response email dated June 1, 2018, ACS instructed Petitioner to
"submit [his] resume online at www.nyc.gov/yds and click the Apply Now button." Petitioner
resubmitted his resume and cover letter as instructed.

13. On June 1, 2018, Petitioner received a phone call from an ACS official (212-341-
2548) who described the phone conversation as a "screening." Petitioner was asked several
questions regarding how he found out about the YDS position, and several "what if" questions
based on conflict resolution scenarios, etc.  Before the phone call ended, the interviewer told
Petitioner that he had "done an excellent phone screening" and assured Petitioner that he would
be included in the "pool" on June 9, 2018.

14. On June 9, 2018, Petitioner attended the "pool" of potential candidates for the YDS
position at ACS's main office located at 150 William Street, New York, NY 10038. There were
hundreds of candidates seeking employment for this position and the line was so long it

EXHIBIT A

consumed several city blocks. Petitioner was interviewed by two ACS officials and was again

asked a myriad of questions applicable to the YDS job.  After the interview, Petitioner was

informed that he was selected, and placed in a waiting room along with others who were also

selected; those you were not selected were asked to leave the premises.  Petitioner was given a

packet of employment documents; some he filled out on the spot and gave back to ACS officials

and other documents he took home with him (i.e., NYCAPS New Hire Packet, Equal

Employment Opportunity, Self-Identification Form, Substance Abuse Screening Voucher, etc.).

Petitioner was informed that he would be contacted by phone shortly thereafter.

15. On June 11, 2018, Petitioner received a phone call from ACS to re-schedule his June

14, 2018 "medical appointment" to another date.  The medical appointment was re-scheduled for

Wednesday, June 13, 2018 at 2:00 pm.

16. On June 11, 2018, Petitioner underwent drug and alcohol tests at Partners In Safety &

Medicine, PLLC, 408 West 45th Street, New York, NY 10036. Both drug and alcohol tests

results were "negative."

17. On June 12, 2018, Petitioner completed and submitted his CPD-B Affirmation.

18. On June 13, 2018, Petitioner purchased three Cashier Checks with ACS in the

following amounts to the following agencies: $9.00 (The City Clerk of NY); $25.00 (NYC

Office of Children & Family); and $87.00 (NYCDAS). This same day Petitioner attended the

rescheduled medical appointment and underwent a Physical (blood & urine tests), TB test, BMI,

and Strength and Flexibility tests.

EXHIBIT A

19. On June 14, 2019, Petitioner received a phone call from ASC personnel Felix Wade (212-341-2543) and assisted Petitioner with making several corrections to his on-line application and CPD-B Affirmation.

20. On June 15, 2018, at 9:00 am, Petitioner attended his "Processing Appointment" at ACS's Office of Personnel Services – Candidate Processing Unit, 150 Williams St – 6th floor, NY, NY 10038. At this appointment, Petitioner brought the following documents: Birth Certificate, Social Security card, Driver's License, Passport, official High School Diploma, Bachelor's Degree transcripts, Master's Degree transcripts, Legal Assistant/Paralegal Diploma, two documents proving his address, and the three Cashier's Checks.

21. At this June 15, 2018 Processing Appointment, Petitioner also completed and submitted the following documents: Emergency Contact Information Form, Form W-4 (Employee's Withholding Allowance Certificate), Designation of Beneficiary Form, Agreement under section 1127 of the NYC Charter, Notice pursuant to the Federal drug-free Workplace Act of 1998, Department of Homeland Security Employment Eligibility Verification form, certification of Dual Employment form, Conflict of Interest pamphlet, inter alia.

22. On June 25, 2018, Respondent sent Petitioner's employer, Council for Unity (CFU) an "Employment Verification" form. On June 27, 2018, Petitioner's Supervisor, Sean Johnson, Director of Program Marketing, completed the form and faxed it to investigator Bovell-John at 917-551-8106. In the form, Mr. Johnson stated that Petitioner had been with CFU since "1/2013 to the present" and held the following positions/titles: "Youth Counselor, Gang & Violence Intervention Coordinator, Life Skills Coach, Youth Intervention Specialist and Office Assistant." Mr. Johnson further stated that Petitioner's services were "satisfactory."

# EXHIBIT A

23. On July 3, 2018, Petitioner called Susan Starker (212-341-2568). She informed Petitioner of what was going to occur. Ms. Starker indicated that there were three entities (Justice Center, DCAS & ACS) that would have to approve him before he could begin working. She also stated that once he completed his fingerprinting the Justice Center would make its determination and then DCAS & ACS would make its decision.  Ms. Starker further made clear that the only issue at this point was Petitioner's criminal background, since his character and other relevant issues were already considered, and he was deemed fit to work at ACS.

24. On July 5, 2018, Petitioner went to IndentoGo Center, 1772 Flatbush Avenue, Brooklyn, 11210-4203, and was fingerprinted. Petitioner paid $99 out of pocket for this fingerprint service.

25. On July 7, 2018, Petitioner called ACS personnel Alicia (212-341-2725), inquiring about the status of his application and was informed that ACS was waiting for his fingerprints to return.

26. On July 9, 2018, Petitioner called Ms. Starker and she informed him that the Justice Center told her that they were sending Petitioner a certified letter instructing him on what he had to do upon receiving this letter. She also suggested that Petitioner submit any and all copies of evidence showing the programs he took while incarcerated, anything that shows he was productive and reference/character letters.

27. On July 18, 2018, Petitioner called Felix Wade inquiring about the status of his application and was told that he had nothing to report and that he should call Ms. Starker. That same day, Petitioner called Ms. Starker to inform her that he did not receive anything from the Justice Center.  She did not answer her phone and Petitioner left a voice mail requesting the contact information for the Justice Center.

EXHIBIT A

28. On July 20, 2018, Ms. Starker called Petitioner in response to the voice mail messages he had left. She gave Petitioner the email address for the Justice Center (cbc@justicecenter.ny.gov). That same day, Petitioner emailed the Justice Center informing it that he did not receive the certified letter it had sent.  At 2:30 pm, the Justice Center responded in an email informing Petitioner that the letter was sent on July 12, 2018 via US Postal Services certified mail tracking # 9307 1699 0430 0048 4976 52.  The Justice Center also informed Petitioner that its investigation indicated that the certified mail was "awaiting a delivery scan." The Justice Center further stated that the "failure to deliver the letter to [Petitioner] is completely under their control" and gave Petitioner the contact information to the entity he should contact at the Post Office.

29. On or about July 21, 2018, Petitioner filed a complaint with the US Postal Services. In an email dated August 8, 2018, the US Postal Services (eCustomercare National) informed Petitioner that it "was unable to locate" the certified letter.

30. On August 2, 2018, the Justice Center resent the July 12, 2018 certified letter, which Petitioner received on August 10, 2018.

31. On August 14, 2018, Petitioner filed a certified letter with the Justice Center for the Protection of People with Special Needs, Criminal Background Check Unit, PO Box 97, Delmar, NY 12054. Petitioner attached extensive proof of his rehabilitation and good conduct in the form of ten reference letters along with his resume (Exhibit # 1), transcripts of his Master's degree in Professional Studies, Bachelor's degree in Behavioral Science and Diploma for Paralegal/Legal Studies (Exhibit # 2), four of his recently published novels via his Entertainment Company, three novels, a short story and a play published while incarcerated and his writing awards, including *The Whitfield Files* (Exhibit # 3), his AA and NA letters confirming completion of those

EXHIBIT A

programs (Exhibit # 4), his Youth Assistance Program (YAP) Certificates (Exhibit # 5), his

Alternative to Violence Program (AVP) and Rehabilitation Through the Arts (RTA) Certificates

(Exhibit # 6), his COMPAS Reentry Risk Assessment (Exhibit # 7), a document regarding his

Certificate of Relief from Disabilities (Exhibit # 8), and several miscellaneous Certificates

(Exhibit # 9).

32. In September 2018, the Justice Center for the Protection of People with Special

Needs, approved Petitioner to work as a Youth Development Specialist. In a correspondence

dated February 28, 2019, DCAS informed Petitioner that it had also approved him to work as a

Youth Development Specialist.

33. From December 2018 to March 2019, Petitioner made numerous phone calls to

various ACS officials and left voice mail messages each time to find out whether or not ACS

approved him, and his phone calls were ignored. Because ACS officials had answered his phone

calls in the past, this was a clear indication that the Respondent was not going to hire him

because of his criminal convictions.

34. Petitioner's emotional distress, fear, and anxiety of being forced to come to grips with

the fact that his past was going to prevent him from ever getting a good job that would allow him

to prosper was extremely overwhelming and debilitating. On numerous occasions, once reality

had set in, Petitioner started experiencing mental anguish to the point he had cried several times

and contemplated just giving up. The stress, extreme sense of hopelessness, and despair caused

Petitioner intense difficulty concentrating on work assignments and focusing at his current job.

He also started having difficulty sleeping and was constantly losing his appetite.

35. On March 6, 2019, Petitioner filed a complaint with the New York State Division of

Human Rights asserting that the Respondent discriminated against him because of a 30-year-old

**EXHIBIT A**

conviction for murder.  Petitioner attached several documents to his complaint (Attorney Rita Dave's Letter, his August 14, 2018 certified letter to the Justice Center along with the nine exhibits, 10 Reference/Character Letters & his Resume, his December 20, 2018, Correspondence #: 1-1-1660068407 to DCAS, his February 25, 2019 complaint filed with Lisette Camilo, DCAS Commissioner, and the February 28, 2019 email from Kevin Williams, DCAS Senior Director of Investigations, indicating that DCAS did not disapprove him to work for ACS).

36. On June 24, 2019, in its verified answer, Respondent ACS revealed for the first time that it refused to hire Petitioner as a Youth Development Specialist for two reasons: 1) because of "Complainant's strongly held views about the criminal justice system [expressed in *The Whitfield Files*], the potential negative impact his views could have if shared with youth in the juvenile detention center"; and 2) because of "his lack of experience performing daily one-on-one direct care with youth."  According to the Defendant, Petitioner's comments in *The Whitfield Files* were "anti-law enforcement", "anti-prosecutorial" and "anti-establishment." The Respondent further stated that if Petitioner was allowed to work with youth in detention centers his presence would cause "violence", "dissension" and "instability."

37. Respondent relied on statements in *The Whitfield Files* to punish Petitioner that spoke about the type of Police and Prosecutor misconduct that causes wrongful convictions; the protected speech is as follows:

> "[i]t is equally well known that a significant number of
> police and prosecutors are notorious for fabricating
> evidence, encouraging perjured testimony, and concealing
> and destroying exculpatory evidence" and "in a place where
> racism is so deeply entrenched in the social fabric, and with
> money being the driving force behind this prison industrial
> complex, convicting the innocent can only be expected"
> (Respondent's NYSDHR verified answer, pg. 7).

EXHIBIT A

The Respondent also highlighted Petitioner's remarks on what could be done to prevent wrongful convictions; that excerpt is as follows:

> "In light of the fact that police and prosecutors enjoy immunity (absolute for prosecutors and qualified for police), it is no small wonder they commit these crimes without batting an eye, and when it is done to minorities, they do it without losing a second's worth of sleep. Thanks to racism and the natural desire to remove cognitive dissonance, this behavior is looked upon as standard operating procedure. Indeed, anyone familiar with the legal system can attest to the large number of cases constantly being overturned for prosecutorial and police misconduct. In every city, in most courtrooms across the country, these violations occur and will continue to occur until violators are held accountable."
> (Respondent's memo of law at pg. 6).

38. A perfunctory review of the above illustrated protected speech confirm conclusively that the statements do not suggest, in any way, that Petitioner has a hatred, dislike, resentment or aversion for police and prosecutors, nor can such an inference be reasonably drawn from these statements and the memoir in its entirety. There is nothing in this memoir that might arouse anger, alarm, violence or antipathy towards police or prosecutors.

39. The above statements further confirm that Petitioner was merely stating a well-known fact about the causes of wrongful convictions and what should occur when police and prosecutors cause wrongful convictions. Indeed, the above statements are supported by thousands, if not tens of thousands of cases where police and prosecutors across the country for decades have engaged in misconduct that resulted in wrongful convictions (https://en.wikipedia.org/wiki/List_of_wrongful_convictions_in_the_United_States). Furthermore, according to the National Registry of Exonerations there is currently 2,471 Exonerations http://www.law.umich.edu/special/exoneration/Pages/RecentlyAdded.aspx)

40. After finding out that the Respondent were maliciously misrepresenting and misconstruing the content of his protected speech in *The Whitfield Files*, Petitioner became even

# EXHIBIT A

more distressed, fearful, and terrified. Petitioner's heart nearly pounded its way out of his chest as he first read the Respondent's defamatory and false statements. It is evidently clear that as a way to prevent hiring Petitioner because of his murder conviction the Respondent is trying to make it appear that Petitioner is un-American, violent and hate Law enforcement and Prosecutors, even though there is nothing in *The Whitfield Files* to support such a malicious and baseless assertion. The Respondent is also maliciously trying to make it appear that Petitioner is an extremist, belonging to the fringe elements of society, a terrorist or some sort of unhinged person with a deep-set hatred for establishment with the potential for violence.

41. Because of the realization that the Respondent's statements are now a matter of public record, Petitioner is in a constant state of fear, stress, and emotional turmoil. As a result of the extreme emotional distress Respondent inflicted upon him, Petitioner's difficulty sleeping at night increased substantially and he began consuming herbal treatments to help him sleep. Petitioner's difficulty eating also increased due to the emotional and psychological stress; Petitioner has lost weight, about 12 pounds, because of the loss of his appetite. Indeed, after what terrorists did to the World Trade Center on 9/11/2001, Petitioner is justifiably horrified and scared out of his mind of the collateral consequences that will likely follow as a result of the Respondent's defamatory, false and malicious statements accusing him of being anti-establishment with a propensity for violence.

42. On July 3, 2019, Petitioner filed his verified rebuttal, demonstrating that the Respondent "did not have legitimate, non-discriminatory reasons for not hiring [him] for the YDS title, because the reasons were a pretext for discrimination" and that "[t]he evidence in this case demonstrates that ASC do not hire people with murder convictions, but will hire individuals convicted of much lesser serious homicides." Specifically, Petitioner presented evidence

confirming that he was not anti-law enforcement, anti-prosecutorial nor anti-establishment, that Respondent's statements constituted defamation of character, that Respondent violated his First Amendment right to Freedom of Speech, and that the assertion that Petitioner did not have one-on-one experience with at-risk youth was totally contradicted by the evidence in the record, and in any event, this alleged reason was not a disqualifying prerequisite according to the Respondent's own notices and advertisements about the job.

43. The evidence Petitioner presented to substantiate that he does consultant work for a Law Enforcement union called Law Enforcement Employees Benevolent Association ("LEEBA") was indisputable. The Respondent's defamatory statements (i.e., Petitioner is "anti-law enforcement", "anti-establishment", and could cause "violence", "dissension" and "instability" in the environments he works) has not only caused additional severe emotional and psychological stress but has also put Petitioner's business prospects with this Law Enforcement union in grave jeopardy. Indeed, it is evident that a Law Enforcement union will more than likely not want to affiliate itself with anyone who is believed to be "anti-law enforcement", "anti-establishment", and could cause "violence", "dissension" and "instability" in the environments he works.

44. On July 18, 2019, Petitioner filed an addendum/amendment to his verified rebuttal, raising an additional theory of the case (i.e., "the respondent discriminated against [him] because [he] had two criminal convictions [the murder conviction and a criminal possession of a control substance]" conviction).

45. From about July 19- July 30, 2019, Petitioner was confronted by several of the individuals that had submitted reference/character letters on his behalf, inquiring about the status of his new job. Also, other people whom Petitioner did not acquire character letters from were

# EXHIBIT A

also interested in the outcome of Petitioner's efforts to acquire a new job. Petitioner was extremely embarrassed, humiliated, and mortified by the fact he had to tell them that ACS had rejected him because they claimed he was "anti-law enforcement", "anti-prosecutorial", "anti-establishment" and that his presence in an ACS facility could cause "violence", "dissension", and "instability." Petitioner's stress levels and psychological pain and suffering sky-rocketed to the point that he couldn't concentrate and focus at work; the discomfort was so extreme he contemplated quitting his current job due to the intense shame he was experiencing, and because of the fear that his current employer might react adversely towards him because of the Respondent's defamatory statements.

46. On August 29, 2019, the New York State Division of Human Rights dismissed Petitioner's complaint on the grounds that it lacked jurisdiction pursuant to Correction Law § 755 and that Petitioner "must seek relief in state court."

47. On September 11, 2019, Petitioner commenced this Article 78 proceeding in New York County Supreme Court on the grounds that the Respondent's' determination was arbitrary, capricious, and an abuse of discretion because the refusal to hire Petitioner as a YDS was discriminatory and violated Petitioner's federal and state constitutional rights not to be discriminated against. Petitioner attached to his petition the moving papers filed in the NYS Division of Human Rights as exhibits.

48. On October 4, 2019, Respondent moved to dismiss Petitioner's petition for failure to state a cause of action claiming that "ACS's decision not to hire [him] was rationally based and not arbitrary, capricious or in violation of the law." According to Respondent's, they "declined to hire [Petitioner] because he lacked critical relevant experience and demonstrated a philosophy

EXHIBIT A

that did not align with the goals and needs of DYFI in maintaining a safe and secure environment for its youth residing in secure detention facilities."

49. In an affidavit in opposition to the motion to dismiss the petition, sworn to on the 28th day of October 2019, Petitioner demonstrated that: 1) his pleading stated a cause of action for discrimination in violation of Human Rights Law § 296.15, Corrections Law, Article 23-A, and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and its progeny; 2) Respondent's' decision not to hire him was not rationally based and was arbitrary and capricious; and 3) Respondent's decision not to hire him was in violation of law because it violated his Constitutional right to Freedom of Speech.

50. On November 12, 2018, Petitioner filed an Addendum affidavit to his opposition to the Respondent's' motion to dismiss the petition along with a proposed amended verified petition.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Respondent's reasons for not hiring Petitioner were a Pretext for Discrimination because the reasons were not rationally based, they were arbitrary and capricious, not supported by evidence, rested entirely on subjective considerations, were completely untrue, ignored critical information and were outright baseless.**

51. Petitioner hereby incorporates all other paragraphs of this Petition as if fully set forth herein.

52. Petitioner has two criminal convictions (one for murder and the other for criminal possession of drugs) and is a member of the protected class pursuant to Human Rights Law § 296.15; Corrections Law, Article 23-A; the New York City Human Rights Law (N.Y.C. Administrative Code § 8-107(10)), and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and its progeny.

# EXHIBIT A

53. Petitioner has extensive experience working with youth (approximately 10 years [3 years while incarcerated and about 7 years after his release]); he has two degrees (bachelor's and master's); he met all the necessary minimum prerequisites as demonstrated by the fact he was hired for the YDS position pending the outcome of a criminal background check and therefore was qualified to hold the YDS position.

54. Petitioner suffered adverse employment action when Respondent refused to hire him for the YDS position for pretextual reasons.

55. The adverse employment action occurred under circumstances that give rise to an inference of discrimination because the two reasons relied upon were arbitrary and capricious because they were irrational and unjustified (see Petitioner's NYSDHR verified rebuttal [exhibit # 3] at ¶¶ 5-8, Petitioner's NYSDHR addendum [exhibit #4] at ¶4); not supported by evidence, unsubstantiated, unworthy of credence, rested entirely on subjective considerations, misrepresented Petitioner's constitutionally protected speech that dealt with matters of public concern (see Petitioner's NYSDHR verified rebuttal [exhibit # 3] at ¶¶ 9-13); were completely untrue, ignored critical information and was outright baseless (see Petitioner's NYSDHR verified rebuttal [exhibit # 3] at ¶¶ 14-17).

56. Respondent claimed there were two (2) reasons for not hiring Petitioner: 1) Petitioner had "anti-law enforcement", "anti-prosecutorial", and "anti-establishment" views as demonstrated by his protected speech in *The Whitfield Files* (Respondent's NYSDHR verified answer, pgs. 7, 10 & 14 & Pg. 7-8 of Respondent's memo of law in support of cross-motion to dismiss), and if he "were hired as a YDS, he might seek to influence impressionable and vulnerable youth under ACS's care in the juvenile detention center and" incite "violent [] confrontations", "dissension and instability in the facility" (Respondent's NYSDHR verified

# EXHIBIT A

answer, pg. 8, 15 & 16), and 2) Petitioner "did not have the appropriate experience counseling at-risk youth on a one to one [basis]" (Respondent's NYSDHR verified answer, pgs. 8-9).

57. Both reasons for not hiring Petitioner are clearly a pretext for discrimination.

58. The first reason is clearly a pretext for discrimination because it could not serve as a legal and lawful basis not to hire Petitioner. The Respondent's reliance upon Petitioner's protected speech that addressed matters of public concern is absolutely and unequivocally unconstitutional and must be rejected.

59. The first reason for not hiring Petitioner also gives rise to an inference of discrimination because there simply was nothing in this protected speech to even suggest that it contained anti-law enforcement, anti-prosecutorial, and anti-establishment views that indicate if Petitioner were allowed to work with youth in ACS detention centers his presence would cause "violence", "dissension", and "instability."

60. The first reason for not hiring Petitioner further gives rise to an inference of discrimination because it is factually false because Petitioner has great admiration for law enforcement as demonstrated by the fact that he made efforts to become a NYC Police Officer in 1983 and turned the job down because his family felt the job was too dangerous. Also, Petitioner currently does consultant work for a Law Enforcement union called LEEBA (Law Enforcement Employees Benevolent Association).

61. The first reason is also pretextual because the Respondent accused Petitioner of having the potential to incite "violence", "dissension", and "instability" without a single shred to proof that the Petitioner was capable of causing such criminal mischief. Except for Petitioner's murder conviction there is literally nothing in the record or in Petitioner's history (while incarcerated or

EXHIBIT A

otherwise) that would even suggest that Petitioner could enter a facility and cause "violence", "dissension", and "instability."

62. The second reason is clearly a pretext for discrimination because Petitioner has been a youth counselor for approximately ten (10) years and has engaged in so many one-on-one interactions with at-risk-youths to the point that it is almost impossible to identify a specific number because the sum would easily fall in to the range of hundreds, or even thousands.

63. The second reason for not hiring Petitioner further gives rise to an inference of discrimination because the Respondent repeatedly ignored obvious facts in the record. The Respondent knew that Petitioner has been a youth counselor for almost ten years and obviously knew or should have known that it is physically impossible to be a youth counselor and not have "experience counseling at-risk youth on a one to one [basis]."[2]

64. This second reason for not hiring Petitioner is clearly a pretext for discrimination because the Respondent failed to consider the indisputable fact that the lack of one-on-one experience counseling at-risk-youth on a one to one basis is simply not a disqualifying prerequisite (see Respondent's Exhibit E [Youth Development Specialist job posting] attached to its NYSDHR verified answer). As a result, this reason could not lawfully be used as a basis to deny Petitioner this employment.

65. The Respondent's above acts and omissions clearly indicate that it is trying to circumvent Corrections Law, Article 23-A. Indeed, the Respondent knew that it if it complied with Corrections Law it would be forced to hire Petitioner, so instead of complying with the law, the Respondent concocted false, baseless, non-sensical, irrational, defamatory, arbitrary,

---

[2] Of greater significance, the Respondent completely ignored the fact that Petitioner has not had one single negative incident while counseling youth over the past ten (10) years.

# EXHIBIT A

capricious and unconstitutional reasons not to hire Petitioner solely because it did not want someone with a murder conviction working for ACS.

66. Any reasonable ACS administrator knew or should have known that their actions violated Human Rights Law § 296.15; Corrections Law, Article 23-A; the New York City Human Rights Law (N.Y.C. Administrative Code § 8-107(10)), and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and its progeny.

67. Respondent engaged in the conduct described by this Petition willfully, maliciously, in bad faith, and in reckless disregard of Petitioner's state and federally protected rights.

68. The Respondent's actions violated the anti-discrimination provisions of Article 23-A of the Correction Law, §§ 750-755.

69. By violating Article 23-A of the Correction Law, Respondent committed an unlawful employment practice in violation of the New York State Human Rights Law, Executive Law § 296(15) and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and its progeny.

70. By violating Article 23-A of the Correction Law, Respondents committed an unlawful employment practice in violation of the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-107(a) and (b).

71. Pursuant to the *Williams v. New York City Hous Auth.*, 2009 NY Slip Op 440, 3-4 (N.Y. App. Div. 1st Dep't, Jan. 27, 2009), the Court must make an independent inquiry, apart from the inquiries under the above-mentioned state laws, into whether the ACS violated the City Human Rights Law.

72. The acts or omissions of the Respondent were moving forces behind Petitioner's injuries.

73. The acts or omissions of Respondent as described herein intentionally deprived Petitioner of his constitutional and statutory rights and caused him other damages.

74. As a proximate result of Respondent's unlawful conduct, Petitioner has suffered emotional pain, suffering and injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial.

## SECOND CAUSE OF ACTION

**Respondent Violated Petitioner's First and Fourteenth Amendment rights of the US Constitution and article 1 §§ 8, 9 of the NY Constitution when it refused to hire Petitioner based on his Protected Speech expressed in his memoir *The Whitfield Files*.**

75. Petitioner hereby incorporates all other paragraphs of this Petition as if fully set forth herein.

76. The Supreme Court in *Perry v. Sindermann*, 408 U.S. 593 (1972) had the following to say about infringements on the right to freedom of speech:

> "For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests — especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' *Speiser v. Randall*, 357 U.S. 513, 526. Such interference with constitutional rights is impermissible." *Perry v. Sindermann*, 408 U.S. at 597.

77. At the time of the complained of events, Petitioner had a clearly established constitutional right under the First and Fourteenth Amendments to be secure in his person from unreasonable punishment due to his constitutionally protected speech.

EXHIBIT A

78. The Respondent refused to hire Petitioner because of the statements he made in his award-winning memoir titled *The Whitfield Files*.

79. The Respondent claims it punished Petitioner because it believed the statements expressed in *The Whitfield Files* were anti-law enforcement, anti-prosecutorial, anti-establishment and if Petitioner were allowed to work with youth in ACS detention centers his presence would cause violence, dissension and instability.

80. The comments in *The Whitfield Files* that caused the Respondent to punish Petitioner dealt with Police and Prosecutorial misconduct that causes wrongful convictions and the actions that should be taken against anyone guilty of such misconduct that causes wrongful convictions.

81. The protected speech in *The Whitfield Files* clearly addressed matters of public concern.

82. There was nothing in *The Whitfield Files* that would even suggest that the statements relied upon or the memoir in its entirety conveyed anti-law enforcement, anti-prosecutorial, and anti-establishment views that could incite violence, dissension and instability.

83. By violating Petitioner's First and Fourteenth Amendment rights to freedom of speech by misrepresenting and misconstruing the content of Petitioner's protected speech in *The Whitfield Files*, Respondent engaged in a bad faith and malicious attempt to circumvent the protections afforded under Article 23-A of the Correction Law.

84. Respondent's actions as described herein, were also malicious and/or involved reckless, callous, and deliberate indifference to Petitioner's federal and state constitutionally protected rights. The deception and disingenuousness utilized by the Respondent to justify its refusal to hire Petitioner because of his murder conviction shocks the conscience and constitutes a premeditated violation of Petitioner's First and Fourteenth Amendment rights.

85. The acts or omissions of the Respondent were moving forces behind Petitioner's injuries.

86. Respondent engaged in these acts or omissions with shocking and willful indifference to Petitioner's rights and their conscious awareness that they would cause Petitioner severe emotional injuries.

87. The acts or omissions of Respondent as described herein intentionally deprived Petitioner of his federal and state constitutional rights to freedom of speech and caused him severe emotional and psychological damages.

88. As a proximate result of Respondent's unlawful conduct, Petitioner has suffered emotional pain, suffering and injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial.

## THIRD CAUSE OF ACTION

**Respondent committed Defamation "Per Se" when it stated that Petitioner was anti-law enforcement, anti-prosecutorial, anti-establishment, that his presence in an ACS facility could cause violence, dissension and instability, and that Petitioner would commit the serious crimes of inciting to riot and the Unauthorized Practice of Law**

89. Petitioner hereby incorporates all other paragraphs of this Petition as if fully set forth herein.

90. The Respondent defamed the Petitioner by knowingly, intentionally, willfully, maliciously, or negligently publishing statements about the Petitioner which it knew or should have known to be false.

91. The Respondent made false statements that are Defamation *Per Se*, accusing Petitioner of being anti-law enforcement, anti-prosecutorial, and anti-establishment and that if

Petitioner were allowed to work with youth in ACS detention centers his presence would cause

violence, dissension and instability.  This is Libel *Per Se*.

92. These per se defamatory and false statements were made at ACS's main office

located at 150 William Street, New York, NY 10038, on or about June 24, 2019, and October 4,

2019. As Libel *Per Se*, Respondent's published the following statements about the Petitioner that

were knowingly false and defamatory:

> "Ms. Skowyra states that the Panel's discussion about [Petitioner]
> in late September 2018 primarily concerned his work experience
> and published works titled *"The Whitfield Files,"* in which
> [Petitioner] expressed anti-law enforcement views, and anti-
> prosecutorial views, and strongly biased opinions about what he
> termed the injustices of the criminal justice system (see
> Respondent's pg. 7 of its NYS DHR verified answer).

> "Ms. Skowyra states she expressed grave reservations and
> concerns that if [Petitioner] were hired as a YDS, he might seek to
> influence impressionable and vulnerable youth under ACS's care
> in the juvenile detention center with his strong views regarding the
> criminal justice system, which could incite dissension and create
> instability in the facility which strives to inculcate a stable
> environment, and promote messages that help youth heal, and
> work towards integrating back their communities" (see
> Respondent's pg. 8 of its NYS DHR verified answer).

> "As per Ms. Skowyra, when the Panel convened on or about
> September 26, 2018, the primary focus of the Panel's discussion
> regarded [Petitioner's] opinion published in *"The Whitfield Files,"*
> in which he expressed strong anti-law enforcement sentiments and
> opinions on the injustices of the criminal justice system." (see
> Respondent's pg. 14 of its NYS DHR verified answer).

> "Ms. Skowyra, the Panel's DYFJ representative, expressed valid
> concerns over the possibility for [Petitioner] to share his views
> with youth in the juvenile detention center, which could result in
> dissension and instability in the facility" (see Respondent's pg. 14
> of its NYS DHR verified answer).

> "[T]he Panel held very legitimate concerns regarding the risk of
> [Petitioner] sharing his prejudicial views on the criminal justice
> system with the youth, and the potential of it inciting violent or at

EXHIBIT A

least destabilizing confrontations between the Youth and YDS's, which is the complete opposite of the YDS's role within a juvenile detention center which is to de-escalate confrontations involving the youth." (see Respondent's pg. 16 of its NYS DHR verified answer).

The Respondent's claimed it has "concerns over anti-prosecutorial and anti-law enforcement sentiments expressed by [Petitioner] (see Pg. 2 of Respondent's memo of law in support of cross-motion to dismiss the Article 78 petition).

"The Panel's discussion focused primarily on [Petitioner's] essay, *The Whitfield Files*", which it perceived to contain anti-law enforcement and anti-prosecutorial sentiments" (see Pg. 6 of Respondent's memo of law in support of cross-motion to dismiss the Article 78 petition).

"Members of the Panel, including ACS representative Kathleen Skowrya . . . expressed grave concerns regarding [Petitioner's] ability to effectively guide and mentor youth given the strong anti-establishment views set forth in *The Whitfield Files*," . . . Ms. Skowrya expressed her apprehension that [Petitioner] would seek to influence the impressionable and vulnerable youth in ACS's care with his strongly-held views of the criminal justice system, potentially creating dissension and instability in a facility. . ." (see Pg. 7-8 of Respondent's memo of law in support of cross-motion to dismiss the Article 78 petition).

". . . his negative perspective on the criminal justice system." (see Pg. 12 of Respondent's' memo of law in support of cross-motion to dismiss the Article 78 petition).

" . . . [Petitioner] . . . demonstrated a philosophy that did not align with the goals and needs of DTFJ in maintaining a safe and secure environment for its youth residing in secure detention facilities" (see Pg. 12 of Respondent's memo of law in support of cross-motion to dismiss the Article 78 petition).

93. Among other accusations, the Respondent falsely stated that Petitioner's presence in a youth detention center could cause violence, dissension and instability as a result of his anti-law enforcement, anti-prosecutorial, and anti-establishment views; in other words, the Respondent

accused Petitioner of having the propensity to commit the crime of inciting to riot in violation of

New York State Penal Law § 240.08, which states:

> A person is guilty of inciting to riot when he urges ten or more
> persons to engage in tumultuous and violent conduct of a kind
> likely to create public alarm. Inciting to riot is a class A
> misdemeanor.

94. The Respondent also falsely stated that Petitioner was capable of committing the

crime of "**Unlawful Practice of the Law**" **in violation of** Judiciary Law § 476 (A) and Judiciary

Law § 485 (A), **which is an** E Felony when they stated:

> "Ms. Skowyra states she expressed concern that based on the
> material he submitted, [Petitioner] might misinterpret the job
> function of the YDS title, and attempt to advise-at-risk youth as to
> decision making with regard to their pending (not yet adjudicated)
> juvenile delinquency cases in court." (see Respondent's pg. 9 of its
> NYS DHR verified answer).

> "The Panel's legitimate concern for [Petitioner's] views of the
> criminal justice system as it relates to a YDS job function, might
> also improperly influence the youth's legal decisions on their court
> cases." (see Respondent's pg. 16 of its NYS DHR verified
> answer).

> "[T]his also raised concerns that he might misinterpret the role of
> the YDS and attempt to give at-risk-youth legal advice or guide
> their decision-making in their own pending cases." (see Pg. 8 of
> Respondent's memo of law in support of cross-motion to dismiss
> the Article 78 petition).

According to Judiciary Law § 476 (A) and Judiciary Law § 485 (A), the unlawful practice of law

is clearly a serious crime:

> The attorney-general may maintain an action . . . against any
> person . . . who commits any act or engages in any conduct
> prohibited by law as constituting the unlawful practice of the law.
> . . ., or any other act forbidden by law to be done by any person not
> regularly licensed and admitted to practice law in this state.
> Judiciary Law § 476 (A).

> Any person who violates the provisions of the sections . . . of
> this article is guilty of a class E felony when he or she: (1) falsely

# EXHIBIT A

> holds himself or herself out as a person . . . who can provide
> services that only attorneys are authorized to provide; and (2)
> causes another person to suffer monetary loss or damages
> exceeding one thousand dollars or other material damage resulting
> from impairment of a legal right to which he or she is entitled.
> Judiciary Law § 485 (A).

95. The Respondent's false and defamatory statements are Per Se Defamation because they charged Petitioner with the propensity to commit serious crimes, which the New York State Court of Appeals has held are Defamatory per se. *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992).

96. The Respondent knew that its public statements about the Petitioner would cause severe damage to the reputation, business opportunities, employment prospects, social relationships, and the career of the Petitioner.

97. The Respondent's false and defamatory statements were published with the intent to harm Petitioner's good name and reputation by falsely accusing Petitioner of being anti-law enforcement, anti-establishment, capable of inciting acts of violence, likely to incite youth to riot (i.e., cause "dissension and instability"), and engage in the unlawful practice of law.

98. The Respondent's published these false and defamatory statements with actual malice, bad faith and knowledge that the statements were false, or with reckless disregard of whether they were false or not.

99. The Respondent published these false and defamatory statements in an effort to justify not hiring Petitioner because of a 30-year-old conviction for murder in which Petitioner maintains his innocence and therefore relied upon these false and defamatory statements as a pretext for employment discrimination and a bad faith effort to circumvent the protections afforded pursuant to Article 23-A of the Corrections Law.

# EXHIBIT A

100. A statement is per se defamatory if it consist of statements (i) charging Petitioner with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that Petitioner has a loathsome disease; or (iv) imputing unchastity to a woman.

101. These statements are per se defamatory because they falsely impute to Petitioner conduct charging him with serious crimes. Penal Law § 240.08, Inciting to Riot is an A misdemeanor and are clearly statements "which tends to expose a person to hatred, contempt, or aversion or to induce an evil or unsavory opinion in the minds of a substantial number of people in the community."

102. These statements are also per se defamatory because they falsely impute to Petitioner conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, profession and livelihood; in other words, they tended to injure Petitioner in his business where he is the Website designer for a Law Enforcement union and his profession as a Youth Counselor.  As a person who works with a law enforcement union, Respondent's falsely stating that Petitioner is "anti-law enforcement" and "anti-establishment" has severely damaged Petitioner's reputation and has put his business in jeopardy.

103. In carrying out the aforementioned conduct, the Respondent acted negligently, willfully, maliciously, with reckless indifference to the consequences of their actions against Petitioner, and in a grossly irresponsible manner.

104. In carrying out the aforementioned conduct, the Respondent acted without due regard for the standards of information gathering and dissemination ordinarily followed by responsible parties involving similar matters.

105. As a direct and proximate result of Respondent's' intentional and malicious

EXHIBIT A

publication of false and defamatory statements, Petitioner have been and will continue to be damaged and injured in his respective character and reputation.

106. As a direct and proximate result of Respondent's intentional and malicious publication of false and defamatory statements, Petitioner has suffered severe mental, emotional and psychological pain, suffering and discomfort as illustrated above.

107. No previous application has been made for the requested relief.

WHEREFORE, the Petitioner prays that a judgment under CPLR Article 78 and Correction Law § 755 be granted:

1. VACATING and setting aside Respondent's determination of June 24, 2019, denying Petitioner employment as a Youth Development Specialist (YDS) because of his prior criminal convictions because the underlying reasons for denying him the job were discriminatory, pretextual, irrational, arbitrary, capricious, unconstitutional, defamatory, and is null and void;

2. DIRECTING Respondent to hire Petitioner as a YDS immediately, provide Petitioner all back pay, benefits, privileges, and all other resulting advantages as of July 2018 and restore Petitioner in all respects to the status he would have enjoyed prior to the discriminatory, unconstitutional, and defamatory actions;

3. ORDERING Respondent to pay Petitioner compensatory damages for violating his rights not to be discriminated against, for violating his constitutional right to freedom of speech, for publishing false, defamatory and damaging statements, for emotional and psychological pain, suffering and distress, and for loss of all other benefits, advantages and rights;

4. AWARDING Petitioner costs, disbursements, expenses and other litigation costs reasonably incurred by the Petitioner, pursuant to CPLR 8101, 8201(1), 8301, and 8404;

5. AWARDING Petitioner attorney's fees; and

EXHIBIT A

5. GRANTING such other and further relief as the Court may deem just and proper.

Dated: November 11, 2019
   New York, New York

John D. Whitfield, Petitioner Pro se

EXHIBIT A

## VERIFICATION OF PETITION

VERIFICATION
STATE OF NEW YORK          )
                          ) ss
COUNTY OF KINGS           )

John D. Whitfield, being duly sworn, deposes and says that deponent is the Petitioner in

the above-encaptioned proceeding, that he has read the foregoing petition and knows the contents

thereof, that the same is true to deponent's own knowledge, except as to matters therein stated

upon information and belief, which matters deponent believes to be true.

_John D. Whitfield_

Sworn to before me this

_11_ day of November 2019

_NOTARY PUBLIC_

Shileen Paula Jefferson
Notary Public State of New York
No. 01JE6279967
Qualified in Kings County
My Commission Expires April 15, 20_21_