## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

JOHN D. WHITFIELD

       Plaintiff,

v.

CITY OF NEW YORK, officially
JOSEPH CARDIERI, individually;
KATHLEEN SKOWYRA, individually;
JENNIFER FIELLMAN, ESQ, individually;
PHOEBE ROSEN, individually;
DAVID A. HANSELL, individually;

       Defendants.

Civil Action No. 20 CV 4674 (JMF)

Demand for Jury Trial

---

### AMENDED VERIFIED COMPLAINT - REQUEST FOR JURY TRIAL

Plaintiff John D. Whitfield, Pro Se, complains against Defendants and requests trial by jury as follows:

### I. INTRODUCTION

1. This is an action brought by John D. Whitfield to vindicate profound deprivations of his: 1) First Amendment right to Freedom of Speech caused by Defendants' refusal to hire him because of protected speech he expressed fifteen years ago that dealt with matters of public concern and was unrelated to the job; 2) Fourteenth Amendment right to Equal Protection of the Law caused by Defendants' selective treatment that was motivated by an intention to discriminate on the basis of Plaintiff's criminal conviction, by a desire to punish Plaintiff for exercising his First Amendment right to freedom of speech, and was a bad faith intent to injure Plaintiff , and 3) State law right to be free of discrimination in violation of New York State Human Rights Law (N.Y. Executive Law § 296[15]), New York City Human Rights Law (N.Y.C. Administrative Code § 8-107[10]), and Article 23-A of the Correction Law (N.Y. Correction Law §§ 750, et seq.) caused by the Defendants' refusal to hire Plaintiff because of a 30 year old murder conviction.

2. On or about May 29, 2018, Plaintiff applied to the New York City Administration for Children's Services (ACS) for employment as a Youth Development Specialist (YDS) to work in youth detention centers.

3. On June 9, 2018, Plaintiff was interviewed by Eulena Hall-Leader, an Investigator for ACS's Candidate Processing Unit, and received an offer to start the Youth Development Specialist (YDS) position pending the outcome of a criminal background check.

4. Plaintiff's criminal background investigation was conducted by the NYS Justice Center and NYC Department of Citywide Administrative Services (DCAS). Both agencies performed the eight-factor statutory analysis in accordance with Correction Law, Article 23-A and approved Plaintiff to be considered for the YDS job, despite his criminal convictions.

5. On August 3, 2018, ACS employee Jacques Edwards assaulted a 6-year-old boy at The Nicholas Scoppetta Children's Center (an ACS facility).  Because Mr. Edwards served 28 years in prison for murder and had been working for ACS for the past four years, the media and community were outraged.

6. On August 7, 2018, in response to this massive media coverage of the assault, Defendant ACS Commissioner David Hansell made statements to various newspapers and TV news stations, assuring the public that he instituted a new "hiring protocol" (with approval from the mayor's office) that would prevent such an assault on a child by an individual with a murder conviction from ever happening again (i.e., by systematically excluding any and all employment candidates with murder convictions from the ACS workforce).

7. On September 26, 2018, Defendants Cardieri, Skowyra, Fiellman and Rosen formulated a "Personnel Review Panel" to determine whether to hire Plaintiff for the YDS job.

8. In an apparent effort to facilitate Defendant Hansell's and the mayor's office's new "hiring protocol", the Defendants manufactured two reasons for refusing to hire Plaintiff: 1) Based on the protected speech in his 2003 award-winning memoir entitled, *The Whitfield Files,* they pretextually claimed Plaintiff would cause violence, dissension and instability in an ACS detention center, and 2) because they believed Plaintiff did not possess the required skills and experience.

## II. JURISDICTION, VENUE, AND NOTICE

9. This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988. The Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

10. This case is instituted in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

## III. PARTIES

11. At all times relevant hereto, Plaintiff John D. Whitfield was a resident of the State of New York and a citizen of the United States of America.

12. Defendant City of New York, hereinafter "Defendant City" is a New York municipal corporation and is the legal entity responsible for itself and for the NYC Administration for Children's Services (ACS). This Defendant is also the employer of the individual Defendants and is a proper entity to be sued under 42 U.S.C. § 1983.

13. At all times relevant hereto, Defendant Joseph Cardieri was a citizen of the United States and a resident of the State of New York and was acting under color of state law in his capacity as General Counsel of ACS employed by the City of New York and/or ACS. Defendant Cardieri is sued individually.

14. At all times relevant hereto, Defendant Kathleen Skowyra was a citizen of the United States and a resident of the State of New York and was acting under color of state law in her capacity

as a NYC Division of Youth and Family Justice administrator employed by the City of New York and/or the NYC Division of Youth and Family Justice and/or ACS. Defendant Skowyra is sued individually.

15. At all times relevant hereto, Defendant Jennifer Fiellman, Esq., was a citizen of the United States and a resident of the State of New York and was acting under color of state law in her capacity as Assistant Commissioner of Accountability and Audit for ACS employed by the City of New York and/or ACS. Defendant Fiellman is sued individually.

16. At all times relevant hereto, Defendant Phoebe Rosen was a citizen of the United States and a resident of the State of New York and was acting under color of state law in his capacity as Chief of Staff to First Deputy Commissioner of ACS employed by the City of New York and/or ACS. Defendant Rosen is sued individually.

17. At all times relevant hereto, Defendant David A. Hansell was a citizen of the United States and a resident of the State of New York and was acting under color of state law in his capacity as the Commissioner of ACS employed by the City of New York and/or ACS. Defendant Hansell is sued individually.

## IV. STATEMENT OF FACTS

18. Plaintiff incorporates all preceding paragraphs as if they were fully set forth again at this point.

19. Plaintiff is an African American man who spent 24 and a half years in prison for a homicide he adamantly maintained and continues to maintain his innocence. Despite strong evidence of his innocence, he did not receive any redress in the courts.  In 2003, with nowhere else to go, he wrote a memoir based on the evidence of his innocence entitled, *The Whitfield Files,* with hopes of compelling the public to take a serious look at police and prosecutorial misconduct that causes wrongful convictions and to galvanize the public to get involved in his case. In 2004, Plaintiff entered the memoir into a national writing competition sponsored by PEN American Center (a nonprofit

organization that works to defend and celebrate free expression in the United States and worldwide through the advancement of literature and human rights [https://pen.org/about-us/]). The memoir ultimately won a national award (https://pen.org/prison-writing-award-winners-2004-2005/).[1]

20. From 2008 to 2012, while confined at Woodbourne Correctional Facility, Plaintiff was a Youth Assistant Program (YAP) facilitator and coordinator. In his capacity as a YAP facilitator, Plaintiff communicated with youth brought into the facility by prison, school and community administrators (https://doccs.ny.gov/youth-assistance-program).  During these presentations, Plaintiff and fellow prisoners talked about (with the intent of teaching) a gambit of life skills ranging from dealing with peer pressure to techniques on how to avoid joining gangs.  After presentations made to the groups, each facilitator conducted one-on-one-communications with youth interested in one-to-one-discussions. As the YAP coordinator, Plaintiff in conjunction with the Facility Staff Advisor, were in charge of organizing the program, tailoring the presentations to fit the needs of the youth brought into the facility, selecting and training new facilitators, and maintaining the efficiency and integrity of the program.

21. On November 21, 2012, Plaintiff was released from incarceration.  Based on Plaintiff's educational accomplishments (acquired bachelors and master's degrees) and his YAP activities while incarcerated, Council for Unity, a 501(c)(3) non-for-profit organization whose mission is to empower young people, individuals and groups with the skills necessary to promote unity, safety, and achievement in schools, communities, and correctional facilities (https://councilforunity.org/), hired him as a Youth Counselor in January 2013.[2]

---

[1] Because the Defendants have consistently submitted to the state court a blurred, distorted, and virtually unreadable copy of the memoir, Plaintiff is attaching a clear copy of the protected speech, and making it a part of this amended verified complaint.

[2] Plaintiff underwent numerous hours of training in the art of youth counseling, conflict resolution, violence intervention, de-escalation tactics, techniques involving mentoring youth individually and in groups while using a behavior management system to shape youth behavior, relationship building, effective communication skills, inter alia.

22. From 2013 through 2015, Plaintiff worked in several Junior High Schools and High Schools throughout Brooklyn, Bronx and Queens and taught various life skills to hundreds of students, in particular, gang affiliated youth and/or youth on the verge of joining a gang. Plaintiff also worked in several community centers in Brooklyn and the Bronx facilitating life skills workshops for after school programs.  From 2016 to 2018, Plaintiff also worked in Rikers Island's youth facilities, RNDC and GMDC, and taught life skills to various detained youth between the age of 15 and 19.  At this time, Plaintiff was put in charge of CFU's "Speakers Bureau", and the "Rikers Program" (https://councilforunity.org/staff/). During these school, community center, and Rikers programs, Plaintiff conducted countless one-on-one discussions with countless youth.[3]

23. In May 2018, the perfect dream job opportunity from Plaintiff's perspective came into existence when the New York City Administration for Children's Services (ACS) began hiring Youth Development Specialists (YDS) to work in youth detention centers.

24. On May 30, 2018, Plaintiff emailed a copy of his resume and cover letter to ACS (careersatacs@acs.nyc.gov). In a response email dated June 1, 2018, ACS instructed Plaintiff to "submit [his] resume online at www.nyc.gov/yds and click the Apply Now button." Plaintiff resubmitted his resume and cover letter as instructed.

25. On June 1, 2018, Plaintiff received a phone call from an ACS official (212-341-2548) who described the phone conversation as a "screening." Plaintiff was asked numerous questions regarding his educational background, his experience with youth counseling, and several "what if" questions based on conflict resolution scenarios, dealing with at-risk youth in general, etc.  Before the

---

[3] When Plaintiff was confronted with a disruptive participant in these programs, he would wait until the session was completed, pull the youth to the side, and have a talk with them. In addition, when it was evident that a young person was dealing with an issue that was interfering with his or her ability to participate in the session, Plaintiff would pull the youth to the side and have a one-on-one conversation to assist with the problem. Numerous youths also approached Plaintiff seeking information regarding various issues they were dealing with which often required confidential, one-on-one communications. Thus, Plaintiff had so many one-on-one communications with youths it is virtually impossible to pinpoint a specific number of one-on-one-interactions he had with young people between 2008 and 2018.

phone call ended, the interviewer told Plaintiff that he had "done an excellent phone screening" and assured Plaintiff that he would be included in the "pool" on June 9, 2018.

26. On June 9, 2018, Plaintiff attended the "pool" of potential candidates for the YDS position at ACS's main office located at 150 William Street, New York, NY 10038. There were hundreds of candidates seeking employment for this position and the line was so long it consumed several city blocks. Plaintiff was interviewed by two ACS officials and was again asked a myriad of questions applicable to the YDS job. These questions were tailored exclusively for individuals that did youth counseling work as a livelihood.  After the interview, Plaintiff was informed that he was selected, and placed in a waiting room along with others who were also selected; those who were not selected were asked to leave the premises.

27. Plaintiff was given a packet of employment documents; some he filled out on the spot and gave back to ACS officials and other documents he took home with him (i.e., NYCAPS New Hire Packet, Equal Employment Opportunity, Self-Identification Form, Substance Abuse Screening Voucher, etc.). Plaintiff was informed that he would be contacted by phone shortly thereafter.

28. During the month of June 2018, Plaintiff attended a "medical appointment" (Wednesday, June 13, 2018 at 2:00 pm),  underwent and passed drug and alcohol tests (June 11, 2018), completed and submitted his CPD-B Affirmation (June 12, 2018), underwent and passed a Physical [blood & urine tests], TB test, BMI, and Strength and Flexibility tests (June 13, 2018), and attended the Employment "Processing Appointment" at ACS's Office of Personnel Services – Candidate Processing Unit (June 15, 2018, at 9:00 am), where he submitted various documentation, cashier's checks for processing fees, and the Employment documents he had previously received.

29. On June 25, 2018, Defendants sent Plaintiff's employer, Council for Unity (CFU) an "Employment Verification" form. On June 27, 2018, Plaintiff's Supervisor, Sean Johnson, Director of Program Marketing, completed the form and faxed it to investigator Bovell-John at 917-551-8106. In the form, Mr. Johnson stated that Plaintiff had been with CFU since "1/2013 to the present", held

the following positions/titles: "Youth Counselor, Gang & Violence Intervention Coordinator, Life Skills Coach, Youth Intervention Specialist and Office Assistant", and when asked what were the "Specific Duties [Plaintiff] Performed" he stated, "Teaching effective communications skills, Strategies to prevent youth from participating in criminal street activity."  Mr. Johnson further stated that Plaintiff's services were "satisfactory."

30. During the month of July 2018, Plaintiff made numerous phone calls to ACS employees Susan Starker (212-341-2568), Felix Wade (212-341-2343), and Alicia (212-341-2725) regarding the status of his employment with ACS.  Ms. Starker informed Plaintiff of what was going to occur considering the fact he had criminal convictions. She indicated that three entities (Justice Center, DCAS & ACS) would have to approve him before he could begin working for ACS. She also stated that once Plaintiff completed his fingerprinting the Justice Center would make its determination and then DCAS & ACS would make their decisions.  Ms. Starker further made clear that the only issue at this point was Plaintiff's criminal background, since his character and other relevant issues were already considered, and he was deemed fit to work at ACS.[4]

31. On July 9, 2018, Plaintiff called Ms. Starker and she informed him that the Justice Center was sending him a certified letter instructing him on what he had to do upon receiving this letter. She also suggested that Plaintiff submit all copies of evidence showing the programs he took while incarcerated, any documents/proof that showed he was productive, rehabilitated, including noteworthy accomplishments as well as reference/character letters.

32. On August 14, 2018, Plaintiff filed a certified letter with the Justice Center for the Protection of People with Special Needs, Criminal Background Check Unit, P.O. Box 97, Delmar, NY 12054. Plaintiff attached extensive proof of his rehabilitation and good conduct in the form of ten reference letters along with his resume (Exhibit # 1), transcripts of his Master's degree in

---

[4] On July 5, 2018, Plaintiff went to IndentoGo Center, 1772 Flatbush Avenue, Brooklyn, 11210-4203, and was fingerprinted. Plaintiff paid $99 out of pocket for this fingerprint service.

Professional Studies, Bachelor's degree in Behavioral Science and Diploma for Paralegal/Legal

Studies (Exhibit # 2), four of his recently published novels via his Entertainment Company, three

novels, a short story and a play published while incarcerated and his five national writing awards,

including *The Whitfield Files* (Exhibit # 3), his AA and NA letters confirming completion of those

programs (Exhibit # 4), his Youth Assistance Program (YAP) Certificates (Exhibit # 5), his

Alternative to Violence Program (AVP) and Rehabilitation Through the Arts (RTA) Certificates

(Exhibit # 6), his COMPAS Reentry Risk Assessment (Exhibit # 7), a document regarding his

Certificate of Relief from Disabilities (Exhibit # 8), and several miscellaneous Certificates (Exhibit #

9). Plaintiff also send a copy of this letter and attached exhibits to Susan Starker as per her request.

33. On August 3, 2018, ACS employee Jacques Edwards was captured on a video slamming a

six-year-old child against an office file cabinet at The Nicholas Scoppetta Children's Center (an ACS

facility).  Because Mr. Edwards served 28 years in prison for murder and had been working for ACS

for the past four years, the media and community were outraged.

34. Numerous newspapers, online news broadcasts and news outlets published numerous

stories about the assault, including *The New York Times*

(https://www.nytimes.com/2018/08/07/nyregion/murder-counselor-boy-assault.html). Every news

article, broadcast, and media outlet consistently and vigorously pounded the fact that they were in

awe that a person with a murder conviction was working for ACS.[5]

---

[5] https://pix11.com/2018/08/07/acs-worker-formerly-convicted-of-murder-charged-with-assaulting-6-year-old-boy-police/
(ACS worker and former murder convict charged with assaulting 6-year-old boy in Manhattan: police);;
https://www.ny1.com/nyc/all-boroughs/news/2018/08/07/acs-worker-previously-convicted-of-murder-accused-of-assaulting-6-year-old-boy (City Child care Worker Charged With Assaulting Young Boy Had Served 28 Years for
Murder); https://www.nbcnewyork.com/news/local/ACS-Worker-Arrested-Attacking-Child-NYC-490225421.html (ACS
Worker Who Served Time for Murder Accused of Attacking, Injuring 6-Year-Old Boy in His Care: Cops);
https://newyork.cbslocal.com/2018/08/07/acs-worker-charged-in-alleged-child-assault/ (ACS Worker Previously
Convicted Of Murder Charged In Alleged Child Assault); https://www.nydailynews.com/news/ny-metro-acs-worker-murder-assault-20180807-story.html (ACS employee paroled on murder charge eight years before arrest for assaulting 6-year-old); https://nypost.com/2018/08/07/acs-worker-arrested-for-assaulting-child/ (ACS worker who served time for
murder arrested for assaulting child); https://nypost.com/2018/08/09/acs-ignored-background-check-law-for-years-officials/amp/ (ACS ignored background check law for years: officials); https://www.nydailynews.com/new-york/ny-metro-acs-convict-attacked-other-kid-20180901-story.html (EXCLUSIVE: Convicted murderer hired by ACS and then
arrested for assaulting child in his care also attacked teen, boasted about criminal record: sources).

35. Unbeknownst to Plaintiff, on August 7, 2018, Defendant ACS Commissioner David Hansell made the following statements to the media and community to minimize the damage to ACS's reputation and to calm down the outrage:

> "Within ACS we are reviewing the circumstances that lead this individuals hiring here some years ago. . . But I can tell you that today we have hiring protocols in place that are much stricter in regards to hiring and vetting staff for positions involving working with children and working with young people . . . Under those reviews, I don't believe this person would have been hired today."
> https://www.nbcnewyork.com/news/local/ACS-Worker-Arrested-Attacking-Child-NYC-490225421.html

> "We will get a thorough understanding of how that happened . . . It's obviously a very serious crime and we will review the circumstances under which he was hired."
> https://www.nytimes.com/2018/08/07/nyregion/murder-counselor-boy-assault.html

36. Furthermore, on an CBS video news broadcast Defendant Hansell can be seen on TV as he tried "to answer the question of the day" https://www.youtube.com/watch?v=7s_UQcOAAlM. Defendant Hansell was specifically asked by a CBS news personnel, "can you tell us whether a convicted murderer should've been hired to work with children?" Defendant Hansell reiterated the fact that ACS had a new "hiring protocol" and assured the reporter that if Mr. Edwards had applied for the job today, he would not be hired.

37. Of greater significance, Eric Phillips, spokesperson for the mayor's office, also made similar comments to the media:

> "It's awful and unacceptable and we've *ordered* ACS to figure out how it could have happened so *it never happens again*"
> https://www.nydailynews.com/news/ny-metro-acs-worker-murder-assault-20180807-story.html

As a result, the mayor's office not only endorsed Commissioner Hansell's creation of this new hiring policy that excluded individuals with murder convictions from the ACS workforce, but in fact "ordered" it.

38. In September 2018, the Justice Center for the Protection of People with Special Needs, approved Plaintiff to work as a Youth Development Specialist (YDS).[6]

39. On September 27, 2018, the ACS "Personnel Review Panel" that consisted of Defendants Cardieri, Skowyra, Fiellman and Rosen "briefed ACS Commissioner David Hansell on the Panel's recommendation for [Plaintiff], including the bases of [their] recommendation" and "Commissioner Hansell agreed that [Plaintiff] . . . should not be hired as a Youth Development Specialist" allegedly because of the statements he expressed in *The Whitfield Files*, and because he allegedly "did not demonstrate sufficient relevant experience" (Cardieri's affidavit ¶¶ 63-67).

40. From December 2018 to March 2019, Plaintiff made numerous phone calls to various ACS officials and left voice mail messages each time in an effort to find out whether ACS approved him for the YDS job, and his phone calls were ignored. Because ACS officials had answered his phone calls in the past, this was a clear indication that the Defendants were not going to hire him because of his criminal convictions.

41. Plaintiff's emotional distress, fear, and anxiety of being forced to come to grips with the fact that his past was going to prevent him from ever getting a good job that would allow him to prosper was extremely overwhelming and debilitating. On numerous occasions, Plaintiff experienced mental anguish to the point he had cried several times and contemplated just giving up.  The stress, extreme sense of hopelessness, and despair caused Plaintiff intense difficulty concentrating on work assignments and focusing at his current job. He also started re-experiencing difficulty sleeping, recurring headaches, strange nightmares, was constantly losing his appetite, and started developing unexplained aches, pains, and muscle tension.

42. On March 6, 2019, Plaintiff filed a complaint with the New York State Division of Human Rights (NYSDHR) asserting that ACS discriminated against him because of a 30-year-old conviction

---

[6] In a correspondence dated February 28, 2019, DCAS informed Plaintiff that it had approved him to work as a Youth Development Specialist.

for murder and that the reasons proffered to justify not hiring him was a pretext for discrimination. Plaintiff attached all the above-mentioned Justice Center and DCAS documents to his complaint.[7]

43. On June 24, 2019, in its NYSDHR verified answer, Defendants revealed to Plaintiff for the first time that they refused to hire him as a Youth Development Specialist (YDS) for two alleged reasons: 1) because of Plaintiff's "strongly held views about the criminal justice system [expressed in *The Whitfield Files*]"; and 2) because of "his lack of experience performing daily one-on-one direct care with youth."  According to the Defendants, Plaintiff's comments in *The Whitfield Files* were "anti-law enforcement", "anti-prosecutorial" and "anti-establishment." The Defendants further stated that they believed if Plaintiff was allowed to work with youth in detention centers his presence would cause "violence", "dissension" and "instability."

44. After finding out that the Defendants were maliciously misrepresenting, mischaracterizing and misconstruing the content of his protected speech in *The Whitfield Files*, that addressed obvious matters of public concern, Plaintiff became even more distressed, fearful, terrified, regretful, embarrassed and humiliated. Plaintiff's heart nearly pounded its way out of his chest as he first read the Defendants' defamatory and false statements and started beating himself up for writing the memoir. He wished he could go back in time and not had written or published the memoir. Plaintiff was so upset by the current punishment for writing the memoir, he had deleted the file from his computer and discontinued writing the remaining parts of the story. Plaintiff started experiencing disappointment, anger, distress, and deep regret, almost daily, because this protected activity caused him to lose a job that he'd been preparing to acquire for decades. Many years ago, Plaintiff vowed that upon his release he would dedicate his life to helping youth avoid the degradation, hardships and suffering of imprisonment, and the loss of the YDS job truly devastated him.

---

[7] At the time, Plaintiff was unaware of the Jacques Edwards assault and of the fact that Defendant Hansell with approval from the mayor's office had instituted a new "hiring protocol" that excluded candidates with murder convictions from the ACS workforce.

45. Plaintiff's realization that the Defendants' statements are now a matter of public record has put him in a constant state of fear, stress, depression, nervousness, anxiety, sadness, regret, and emotional and psychological turmoil. Because of the extreme emotional distress Defendants inflicted upon him, Plaintiff's difficulty sleeping at night, recurring headaches, nightmares, and loss of appetite increased substantially; he began consuming herbal treatments to help him with these health problems. Plaintiff's difficulty eating due to the emotional and psychological stress caused Plaintiff to lose weight, about 8 pounds, because of the loss of his appetite.[8]

46. On July 3, 2019, Plaintiff filed his NYSDHR verified rebuttal, demonstrating that he was not anti-law enforcement, anti-prosecutorial nor anti-establishment, that ACS's statements constituted defamation of character, that ACS violated his First Amendment right to Freedom of Speech, and that the assertion that Plaintiff did not have one-on-one experience with at-risk youth was totally contradicted by the evidence in the record, and in any event, a lack of one-on-one experience was not a disqualifying prerequisite according to ACS's own notices, listings, and advertisements about the job.

47. Plaintiff presented evidence substantiating that he does consultant work for a Law Enforcement union called Law Enforcement Employees Benevolent Association ("LEEBA") as a website designer. He also demonstrated that he was a candidate to become a NYC Police officer in 1983. He showed that the Defendants' false and defamatory description of his protected speech (i.e., Plaintiff is "anti-law enforcement", "anti-establishment", and could cause "violence", "dissension" and "instability" in the environments he works) has not only caused additional severe emotional and psychological stress but has also put Plaintiff's livelihood as a youth counselor and his business prospects with this Law Enforcement union in grave jeopardy.

---

[8] In view of the hideous acts of violence that anti-establishment groups (terrorists) are engaging in all over the world, Plaintiff is justifiably horrified and terrified of the collateral consequences that will likely follow as a result of the Defendants' defamatory, false and malicious statements accusing him of being anti-establishment with a propensity for violence.

48. From about July 2019 through August 2019, Plaintiff was confronted by several of the individuals who had submitted reference/character letters on his behalf, and others interested in the outcome, inquiring about the status of his new job. Plaintiff was extremely embarrassed, humiliated, and mortified by the fact he had to tell them that ACS had rejected him because they claimed that based on one of his writings in the past he was "anti-law enforcement", "anti-prosecutorial", "anti-establishment" and that his presence in an ACS facility could cause "violence", "dissension", and "instability." Plaintiff's stress levels and psychological pain and suffering sky-rocketed to the point that his inability to concentrate and focus at work increased exponentially; his headaches, loss of appetite, inability to sleep, nightmares, unexplained aches, pains, tense muscles, and an extreme sense of hopelessness and despair grew constantly.[9]

49. On August 29, 2019, the New York State Division of Human Rights dismissed Plaintiff's complaint on the grounds that it lacked jurisdiction pursuant to Correction Law § 755 ("In relation to actions by public agencies, the provisions of this article shall be enforceable by a proceeding brought pursuant to article seventy-eight of the civil practice law and rules") and stated that Plaintiff "must seek relief in state court."

50. On September 11, 2019, Plaintiff commenced an Article 78 proceeding in New York County Supreme Court as per the statutory command of Correction Law § 755 on the grounds that the Defendants' determination was arbitrary, capricious, and an abuse of discretion.

51. On October 4, 2019, Defendants filed in state court a cross-motion to dismiss the petition on the ground of failure to state a cause of action, claiming that "ACS's decision not to hire [Plaintiff] was rationally based and not arbitrary, capricious or in violation of the law" (Defendants' memo of law at pg. 10).

---

[9] The discomfort was so extreme he contemplated quitting his current job due to the intense shame, embarrassment and humiliation he was experiencing; the fear that his current employer, the youth he educates, and other affiliates he interacted with might react adversely towards him because of the Defendants' false and defamatory description of his protected speech was ever-present.

52. In an affidavit in opposition to the motion to dismiss the petition, sworn to on the 28th day of October 2019, and in a memorandum of law in support, Plaintiff demonstrated that, inter alia, ACS's decision not to hire him was in violation of law because it violated his Constitutional right to Freedom of Speech.

53. On November 8, 2019, Plaintiff filed a FOIL request with ACS pursuant to Article 6 of the Public Officers Law via OpenRecords email portal, seeking copies of, inter alia, "All training manuals, guidelines, records, reports, documents, memorandums, etc., that articulate the training ACS employees undergo before they are permitted to make hiring decisions . . . [and] that articulate the training ACS employees undergo that ensure that its employees are aware of and incompliance with federal and state constitutional provisions." The request was designated: FOIL-2019-067-00128.

54. On November 12, 2019, Plaintiff filed with the state court and served on Defendants an addendum affidavit in support of his opposition to the cross-motion to dismiss a request for "leave to amend and replead his petition pursuant to CPLR 3025 (b)." Plaintiff's first cause of action was for discrimination, his second cause of action was for violating Plaintiff's First and Fourteenth Amendment rights of the US Constitution and article 1 §§ 8, 9 of the NY Constitution when it refused to hire him based on his Protected Speech expressed in his award-winning memoir *The Whitfield Files,* and his third cause of action was for defamation.

55. On November 26, 2019, the state court denied Defendants' cross motion to dismiss the petition and granted Plaintiff's request for leave to amend the verified petition.  The next court appearance date was set for February 4, 2019.

56. On December 30, 2019, Defendants served their verified answer to the Plaintiff's amended verified petition sworn to on the 11th day of November 2019. Attached to this verified answer were the affidavits of Defendants Cardieri, Skowyra, and Fiellman.  In its verified answer the Defendants reiterated the alleged reasons they refused to hire Plaintiff.

57. In their verified answer, the Defendants admitted that they did not review all of the evidence attached to Plaintiff's verified letter dated August 14, 2018 to the Justice Center CBC Unit (¶ 162). Defendant Skowyra Affidavit (¶ 51), and Defendant Cardieri Affidavit (¶ 51), specifically listed the evidence they reviewed and acknowledged that they ignored several pieces of evidence that was clearly favorable to Plaintiff, ranging from his being the owner and founder of his own business to the fact that he was quoted by the United Nations in its UN Report of the Special Rapporteur on the right of education of persons in detention. Thus, the Defendants did not "closely review[] all documents submitted by [Plaintiff]" as they vehemently claimed (Cardieri Aff. ¶ 57; Skowyra Aff. ¶ 52 & Fiellman Aff. ¶ 25).[10]

58. In their verified answer, the Defendants reiterated their arguments made in response to Plaintiff's New York State Division of Human Rights (NYSDHR) complaint and vigorously condemned Plaintiff for submitting *The Whitfield Files* for consideration, claiming that "the Panel. . . 'expressed concern over [Plaintiff's] judgment in submitting *The Whitfield Files* for the agency's consideration, given the fact that it expressed clear anti-correctional statements as he sought a position counseling youth in a secure setting.'"[11]

59. In the afternoon of January 15, 2020, Plaintiff underwent a yearly physical and shared with his primary care provider the intense stress, anxiety, and depression he was experiencing.  He also shared the list of symptoms, physical pains, and mental sufferings he was experiencing (i.e., loss

---

[10] The Defendants also did not "closely review" Plaintiff's Master's Degree in Professional Studies transcripts which demonstrated that Plaintiff had acquired higher educational training in conducting one-on-one communications to help people deal with their problems. Plaintiff's Master's Degree Transcript was attached to Defendants' verified answer as Exhibit D # 0041-0043, which demonstrated that Plaintiff acquired an "A" in his Counseling/Therapy class, an "A-" in his Pastoral Care class and an "A" in his Aftercare Seminary.  Because these courses taught Plaintiff a spectrum of tactics and techniques to utilize when communicating one-on-one with suffering people, it was obvious that Plaintiff was virtually an expert in one-on-one communications.  When the Defendants claimed Plaintiff did not submit proof that he had experience with conducting one-on-one communications with at risk youth, it was readily apparent that the Defendants completely ignored these master's degree courses, which exclusively involved teaching Plaintiff one-on-one communication skills.

[11] Besides the fact the Defendants included another anti attitude (anti-correctional) to the list of other unsubstantiated anti-views (anti-law enforcement, anti-prosecutorial, anti-establishment), it again failed to explain exactly how this fifteen-year-old PEN award winning memoir was anti-correctional.

of appetite, sleeplessness, on-going headaches, strange nightmares, aches, pains, tense muscles, upset

stomach, anxiety attacks, and an overall sense of hopelessness, regret and sadness, etc.). Plaintiff

further explained that he had been experiencing some of these symptoms for many years but was

afraid to seek medical treatment out of fear of the stigma attached to people that see psychiatrists.  He

further explained that his mental pain, suffering, and anguish was caused by his serving time in

prison for a crime he did not commit and his inability to get a good paying job upon his release. He

also informed her that his mental pain and suffering got substantially worse after ACS refused to hire

him because of a memoir he wrote in 2003 and because of the things they were saying about him in

public records.  With the help of family and friends who saw he was getting worse and adamantly

encouraged him to seek treatment, Plaintiff put his pride and ego aside and decided to seek help.

Plaintiff's primary care provider, Doctor Keisha Sinha, issued him a referral to see a mental health

professional.

60. On January 18, 2020, Plaintiff served a copy of his verified reply to the Defendants'

verified answer along with 10 exhibits. At this point, Plaintiff had finally found out about Defendant

Hansell's and the mayor's office's new "hiring protocol" and submitted the evidence and arguments

in support of this fact to the state court.[12]

61. In reply to Defendants' assertion that the "Amended Petition does not show that, but for

[Plaintiff's] speech, he would have been offered employment as a YDS" because of "serious concerns

regarding [Plaintiff's] qualifications to serve as a YDS", Plaintiff demonstrated that this reason was

baseless, arbitrary and capricious. Plaintiff also highlighted the Defendants' failure to consider

obvious favorable evidence in the record (i.e., CFU Director Luis Brown's letter stating that he

observed Plaintiff editing students' papers and giving them feedback for the past several years, YDS

---

[12] These exhibits attached to the reply consisted of the affidavit of Joseph Rivers (Ex. # 1); nine (9) online news broadcast and online newspaper articles regarding the assault of a six year old boy by ACS employee Jacques Edwards (Ex. # 2-10); affidavits from Luis Brown (Ex. # 11), Wayne Harris (Ex. # 12), and Jeffrey Rivera (Ex. # 13); ACS Youth Development Specialist (YDS) Notice (Ex. # 14); NYC DCAS Notice of Examination for YDS (Ex. # 15); and Plaintiff's Certificate of Good Conduct that was issued on January 8, 2020 (Ex. # 16).

notices and job postings that confirmed conclusively that one-on-one communication experience was not required for the job, inter alia).

62. In reply to Defendants' assertion that its "prediction that [Plaintiff's] speech would be disruptive is reasonable", Plaintiff presented arguments and case law that confirmed Defendants' failed to consider the fact that the memoir was written and published over fifteen-years ago was unreasonable, ignored the fact that the speech was not offensive or contained any hostile language, and failed to considered the fact that Plaintiff has an "unblemished record", despite working as a Youth Counselor for the past ten years was irrational.

63. On January 21, 2020, Defendants filed a letter motion with the state court, requesting permission to file a sur-reply on the grounds that Plaintiff's reply allegedly presented new matters and requested that January 10, 2020 be the next court appearance date.  The state court granted Defendants' request and set the next court appearance date to February 25, 2020.

64. On February 20, 2020, Plaintiff received the Defendants Sur-Reply, which solely challenged Plaintiff's request for leave to file a late Notice of Claim with respect to his First Amendment and Defamation claims.  Despite the fact Plaintiff presented his First Amendment and Defamation claims in his NYSDHR Verified Rebuttal (¶ 12) and Memo of Law in support (Pgs. 6-9), the Defendants falsely insisted that Plaintiff had not given them notice. Of greater importance, the Defendants did not respond to or refute, in any way, the submission of the evidence exposing the new "hiring policy" that singled out candidates with murder convictions, and under state and federal law, this act deemed this issue admitted.

65. At the February 25, 2020 state court appearance, the state court judge asked the defendants' attorney, "What type of writings or political expression would disqualify somebody from this type of position?" and the defendants' attorney said, "I don't think . . . there are any specific types of political or expressive writings that would outright disqualify a person."  The state court also made the following statement:

"I mean, you know, I'm happy to, you know, to give ACS the deference
that it's due.  And I'm not suggesting that anything was done
inappropriately, but it does kind of smack of a little bit suspicious on it
because he does seem to have experience" (see pg. 4 of 2/25/2020
Transcripts).

66. Ultimately, the state court judge adjourned the case for the Defendants to produce

supplementary evidence. The court instructed the Defendants' attorney to produce additional

evidence that would help the court to determine whether "one-on-one communication experience"

was an absolute requirement for acquiring the YDS position and gave the Defendants 45 days to

produce this evidence. The next court appearance date was scheduled for April 10, 2020.

67. In March 2020, Plaintiff was diagnosed for PTSD, depression, stress, and anxiety due to

ACS's employment denial and for serving time in prison for a crime he did not commit. Plaintiff

began a series of various treatments and therapies.

68. On April 28, 2020, the Defendants stated in response to Plaintiff's November 8, 2019

FOIL request (FOIL-2019-067-00128) that "[a] diligent search for records responsive to your request

did not locate any such records."

69. On or about June 11, 2020, Plaintiff filed this 1983 lawsuit in Federal court, after finding

out via additional research of the law dealing with Article 78 petitions, and discovered that this

particular proceeding was extraordinarily and shockingly inadequate to safeguard his right to at least

one meaningful opportunity to get "his day in court."

70. On June 30, 2020, the state court issued an Interim Order stating: "At a previous court

appearance, the respondent was directed to submit a supplemental filing for the court's *in camera*

*review*." On July 1, 2020, Plaintiff submitted an objection "to the in-camera review of the

supplemental material on the grounds that such a review will deny petitioner his due process right to

know what is being submitted to the court, and this portion of the order conflicts with this court's

ruling made on February 25, 2020."  Plaintiff attached the transcripts proving that the state court

never indicated that the review would be in camera, nor could such a conclusion be reasonably inferred from his statements.

71. On July 30, 2020, Plaintiff filed and served an affidavit in support of his "response to the [Defendants'] supplemental submission that was filed with the court on or before July 30, 2020."

72. On August 26, 2020, the state court denied the petition and dismissed the Article 78 proceeding on grounds that clearly confirmed Plaintiff's research regarding the blatant inadequacies of Article 78 proceedings. Among other things, plaintiff explicitly made a request for leave to file a late notice of claim, and the state court completely ignored the issue.

73. On September 8, 2020, Plaintiff filed a Notice of Appeal in the Appellate Division First Department and on October 6, 2020 the Appellate Division assigned the appeal a Case/Docket number (2020-04033).

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### 42 U.S.C. § 1983 – infringement on Plaintiff's Freedom
#### of Speech in violation of the First Amendment
(Against Defendants Cardieri, Skowyra, Fiellman, Rosen, and Hansell)

74. Plaintiff incorporates all other paragraphs of this Complaint as if fully set forth herein.

75. 42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

76. Plaintiff is a citizen of the United States and all of the individual Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

77. All individual Defendants to this claim, at all times relevant hereto, were acting under the color of state law in their capacity as ACS officers and their acts or omissions were conducted within the scope of their official duties or employment.

78. At the time of the complained of events, Plaintiff had a clearly established constitutional right under the First Amendment to be secure in his person from unreasonable punishment due to his constitutionally protected speech that addressed matters of public concern.

79. As far back as 1972 the Supreme Court made clear in *Perry v. Sindermann*, 408 U.S. 593 that it was well established that "the government . . . may not deny a benefit to a person on a basis that infringes his constitutionally protected interests . . . in freedom of speech." 408 U.S. at 597. There have been hundreds, maybe even thousands of cases in courts all across the country, and specifically in the Second Circuit, that repeatedly and clearly state that it is unconstitutional to punish a citizen based on his or her protected speech.

80. In the face of this overwhelming precedent, an attempt on Defendants' part to argue that the right to freedom of speech was not clearly established because no court had specifically addressed whether an employer might refuse to hire an employment candidate on the basis of his speech, is in effect, an irrational belief that they can act as they choose until there is a case on all fours. Numerous courts have rejected such jural insouciance. The Defendants should have known their actions were illegal from the numerous decisions reproving closely analogous conduct.

81. Any reasonable ACS employee knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.  This is confirmed by the fact Defendant Cardieri stated, "the Panel had much discussion about the First Amendment right for [Plaintiff] to express his beliefs" (Cardieri Aff ¶ 58).

82. Taking into account the content, form, and context of the statements expressed in *The Whitfield Files* as revealed by the whole record, this memoir consisted of speech on a matter of political, social, criminal justice, prosecuting and policing concerns to the community and was therefore protected by the First Amendment because this speech can be fairly characterized as constituting speech on matters of public concern.

83. This fifteen-year-old award-winning memoir, *The Whitfield Files*, that dealt with police and prosecutorial misconduct that causes wrongful convictions was an obvious matter of public concern.[13] Plaintiff's speech was aimed at identifying and eradicating such misconduct in public institutions and was a subject of general interest and of value and concern to the public.

84. Plaintiff's speech was made fifteen years before Plaintiff sought employment with ACS. He acted as a private citizen, and the content of the memoir addressed matters of significant public concern completely unrelated to the YDS job.  Indeed, nowhere in this protected speech did Plaintiff talk about youth counseling, nor did the protected speech provide any indication as to how Plaintiff would conduct himself if he had become a youth counselor in the future.

85. The Defendants knew or should have known that Plaintiff's fifteen year old protected speech that spoke about the causes of wrongful convictions that was uttered to generate public discussion about these ongoing problems in the community did not constitute "anti-law enforcement", "anti-prosecutorial", "anti-establishment" and "anti-correctional" views that could cause "violence", "dissension" and "instability" in an ACS detention center.  Indeed, the statements Defendants relied upon do not suggest, in any way, that Plaintiff has a hatred, dislike, resentment or aversion for police and prosecutors, nor can such an inference be reasonably drawn from these statements and the memoir in its entirety.  There is simply nothing in this memoir that might arouse anger, alarm, civil disobedience, violence or antipathy towards police or prosecutors.[14]

---

[13] Police and Prosecutorial misconduct are obvious matters of public concern because they affect virtually everyone in society and are topics that are talked about all across the country. https://eji.org/news/prosecutors-failing-constitutional-duty-to-disclose-police-officer-misconduct. Likewise, it is clear the public is extremely interested in knowing how and why wrongful convictions occur. https://www.nbcnews.com/news/us-news/more-exonerations-are-driven-police-prosecutor-misconduct-n856626.

[14] Simply stated, Plaintiff was merely stating a well-known fact about the causes of wrongful convictions and what should occur when police and prosecutors cause wrongful convictions.  Indeed, this conclusion is supported by thousands, if not tens of thousands of cases where police and prosecutors across the country for decades have engaged in misconduct that resulted in wrongful convictions (https://en.wikipedia.org/wiki/List_of_wrongful_convictions_in_the_United_States). Furthermore, according to the National Registry of Exonerations (as of the date of this amended complaint) there are 2,678 Exonerations (http://www.law.umich.edu/special/exoneration/Pages/RecentlyAdded.aspx)

86. The Defendants' actions, as described below and herein, were objectively unreasonable in light of the facts and circumstances confronting them and violated these First Amendment rights of Plaintiff:

87. There is no doubt that the Defendants cited two excerpts in *The Whitfield Files* to justify not hiring Plaintiff.  In affidavits and moving papers in the state court, the Defendants claimed that based on their reading of this protected speech, as Defendant Cardieri states it, "[we had] deep concerns about the sentiments expressed by Petitioner in *The Whitfield  Files*, authored by Petitions, and that [Plaintiff] may misinterpret his role and articulate to vulnerable youth his strong opinions regarding the criminal justice system failings, anti-police bias, as reflected in his writings in 2006 . . ." (see Cardieri Aff ¶ 53, see also Skowyra Aff ¶¶ 57-59 & Feillman Aff  ¶ 28).

88. The Defendant Cardieri further stated the following in support of their belief that the content of *The Whitfield Files* justified not hiring Plaintiff:

> "In Petitioner's package submitted to the Justice Center and shared with ACS were statements expressing strong anti-law enforcement views, anti-prosecutorial views, and definitive positions related to perceived injustices in the criminal justice system. Petitioner noted in The Whitfield Files, that " . . . it is equally well known that a significant number of police and prosecutors are notorious for fabricating evidence, encouraging perjured testimony, and concealing and destroying exculpatory evidence" and "in a place where racism is so deeply entrenched in the social fabric, and with money being the driving force behind the prison industrial complex, convicting the innocent can only be expected". The Panel, while taking no position on the accuracy of his commentary, did not believe that Petitioner's views - if expressed by him, or discovered by discerning youth - would help advance ACS' mission to support and rehabilitate vulnerable youth, involved in the criminal justice system" (Cardieri Aff ¶ 54, see also, Skowyra Aff ¶¶ 59-63 & Fiellman Aff ¶ 35).

89. The Defendants added that because the writing involved Plaintiff maintaining his innocence, they did not believe that he was a "Credible Messenger" who "admits fault and has the ability to reflect on personal responsibility, [and that] *The Whitfield Files* demonstrated a lack of reflection and a desire to shift blame to outside forces."  The Defendants also insisted that "the substance and tone of Petitioner's writings, including his claim decades later that he never committed

the murder he was duly convicted of, brought up concerns that he may create dissension and unease in the juvenile detention facilities, undermining facility goals for the youth, and that his strongly-held positions about the deficits of criminal justice system might adversely affect (either consciously or unconsciously) his interactions with the youth he would be supervising" (see Cardieri Aff ¶ 55; see also Skowyra Aff ¶ 32 ).

90. Defendant Fiellman also stated, "there were concerns that, because he was so outspoken regarding his belief that he was wrongfully convicted . . . he might try to convince the youth that they were also wrongfully convicted" (Feillman Aff ¶ 28). Even more shockingly, Defendant Skowyra stated, "I was concerned that the message he might send to youth was that because the system was "rigged" against them they did not need to play by the rules" (Skowyra Aff ¶ 58).

91. Besides the fact the Defendants' actions, assumptions, speculations, and unfounded beliefs are based on pure conjecture, surmise, unsupported guess work, and rests on entirely subjective considerations, inter alia, it misrepresented the content of this protected speech when it insisted that it exhibited "anti" police, prosecutorial, establishment and correctional views without specifically explaining how the two excerpts, and the memoir as a whole, support such an extreme conclusion. Considering the fact Plaintiff has been doing youth counseling work for over a decade, any reasonable and fair minded person would conclude that the Defendants' defamatory statements are saturated with a hidden agenda (i.e., the new "hiring protocol" that systematically excludes candidates with murder convictions from ACS's workforce).

92. Throughout this entire process the Defendants have not once demonstrated how these statements are "anti" or hostile. Every time the Defendants comment on this issue to substantiate that the speech is hostile and inappropriate, they simply highlight the two excerpts, without explaining how these non-aggressive statements are hostile, as though these statements are so extremely vile and straightforwardly derogatory as to conclusively establish their hostile nature without doing anything

else.  The failure to at least explain the alleged unacceptable nature of these statements is evidence of the fact that there is nothing inappropriate about this protected speech.

93. Since Defendants have consistently failed to explain how these excerpts could potentially disrupt their operations, there is a need to dissect them, paragraph by paragraph, sentence by sentence, word by word, to find out how the Defendants could have arrived at the conclusion that these statements are so extremely hostile, potentially disruptive and could have caused violence, dissention, and instability in their detention centers. The first excerpt Defendants insisted they relied upon is as follows:

> "[i]t is equally well known that a significant number of police and prosecutors are notorious for fabricating evidence, encouraging perjured testimony, and concealing and destroying exculpatory evidence" and "in a place where racism is so deeply entrenched in the social fabric, and with money being the driving force behind this prison industrial complex, convicting the innocent can only be expected" (ACS's NYSDHR verified answer, pg. 7).

The second excerpt they relied upon is as follows:

> "In light of the fact that police and prosecutors enjoy immunity (absolute for prosecutors and qualified for police), it is no small wonder they commit these crimes without batting an eye, and when it is done to minorities, they do it without losing a second's worth of sleep.  Thanks to racism and the natural desire to remove cognitive dissonance, this behavior is looked upon as standard operating procedure. Indeed, anyone familiar with the legal system can attest to the large number of cases constantly being overturned for prosecutorial and police misconduct. In every city, in most courtrooms across the country, these violations occur and will continue to occur until violators are held accountable." (ACS's NYSDHR memo of law at pg. 6).

94. The first excerpt is basically one paragraph with two compound sentences. The first sentence obviously states a fact that could not possibly support the end results Defendants are insisting. This sentence basically lists some of the well-known misconduct some police and prosecutors commit.  No reasonable and fair-minded person could honestly deny the fact that this statement is not hostile, inappropriate, or potentially harmful to ACS's interests by simply stating that some police and prosecutors engage in misconduct.  In fact, this information is actually public

domain information that the average citizen is fully aware of, and most of all, it is an unequivocal fact
(https://www.justice.gov/crt/law-enforcement-misconduct).  No reasonable person could possibly feel
threaten or uncomfortable, if they heard this statement, even if it were yelled at the top of someone's
voice.

95. The second sentence in this first excerpt appears the be the section Defendants are most
concerned with because it is the statement repeatedly cited in state court in support of their assertion
that the speech is "anti" police, prosecutorial, establishment, and correctional. Stating that "in a place
where racism is so deeply entrenched in the social fabric" is merely an observation supported by
undeniable facts.https://www.washingtonpost.com/nation/2020/06/08/understanding-racism-
inequality-america/?arc404=true).  Unfortunately, it is an undisputable fact that our country has, for
centuries, treated people of color very harshly and unjustly, even legally deeming black people
second class citizens after claiming slavery was abolished
(https://www.loc.gov/exhibits/brown/brown-segregation.html). Since the issue of racism has an
impact on virtually every aspect, institution, and component of society it could not possibly be
deemed a hostile statement with the potential of causing a disruption in an ACS detention center,
especially because it is a sad reality.  More importantly, it is completely irrational to believe Plaintiff
(with ten years of experience as a youth counselor) would enter an ACS facility and spark up a
discussion about racism when that issue has absolutely nothing to do with youth counseling.

96. The second section of this second sentence in this first excerpt, stating "with money being
the driving force behind this prison industrial complex . . . " is likewise based on facts
(https://en.wikipedia.org/wiki/Prison%E2%80%93industrial_complex) and does not implicate or
promote any violence, hostility or offensiveness towards police or prosecutors. No reasonable and
impartial person can genuinely deny the fact that millions or even billions of dollars are intricately
interwoven with this country's prison systems (i.e., courts, lawyers, prison staff, food, clothing,
health care, vehicles, gas, medical supplies and equipment, etc.). Whether we like it or not,

incarcerating people provides jobs and economic stability for various regions throughout the country (https://www.pbs.org/independentlens/blog/prison-economy-how-do-prisons-affect-the-places-we-live/). When both sentences and the realities they exhibit, are viewed in conjunction with each other they can produce a strong force that could contribute to people being wrongfully convicted.

97. The second excerpt consist of four sentences, and just like the first excerpt, states a series of facts and observations of Plaintiff that could not possibly support the end results that Defendants are predicting.  The first statement explains the type of immunity police and prosecutors are afforded and points out that because these public officers have this immunity they are more likely to disregard the rights of the citizens they are supposed to protect and serve, especially those without social, political and economic power (https://www.business.com/articles/psychology-of-power-abuse/).  It is basic human behavior for certain people to continue engaging in inappropriate conduct when they know there will be no consequences (https://iep.utm.edu/conseque/).

98. The second sentence in this excerpt talks about the social reality of our country and human behavior; this component addresses the issue of racism and human's natural attempt to justify obvious wrongs by convincing themselves that they are not doing wrong, even though subconsciously they know it is wrong (i.e., remove cognitive dissonance: https://www.simplypsychology.org/cognitive-dissonance.html).  Again, merely stating a fact does not exhibit hostility, nor can it be reasonably concluded that this statement is "anti", even if the author expresses these facts in an opinionated fashion. This is so because Plaintiff is not using offensive, disrespectful, violent, vulgar, or derogatory language to express this point, nor can it be inferred that there is hostility by the tone of the speech. Noteworthy is the fact that both excerpts mention racism and the Defendants consistently placed a spotlight on this word.

99. The third sentence in this excerpt, "anyone familiar with the legal system can attest to the large number of cases . . ." is obviously innocuous commentary designed to enlighten the reader that it is an undeniable fact that courts are constantly reversing cases because of misconduct

(https://www.nytimes.com/2020/05/30/us/derek-chauvin-george-floyd.html).  The fourth and final sentence merely reaffirms the third sentence and closes out with an opinion that one way to stop these wrongs is to make those who commit them accountable. Considering these excerpts in their totality, it would not be unreasonable to conclude that a reasonable and fair minded person would be left scratching their heads trying to figure out how the Defendants could honestly believe these excerpts and the memoir as a whole could hurt their interests, or that they are "anti"/hostile protected speech offensive enough to punish someone that uttered such speech over fifteen years ago.

100. To accuse a person of having anti views for expressing these statements, the accuser must be carefully scrutinized for an apparent hidden agenda, since there is nothing offensive, derogatory or hostile about expressing facts and articulating an opinion about those facts with a desire to bring about a solution to a societal problem that is destroying lives.  The irrational, illogical, unreasonable, and non-sensical nature of the Defendants' accusations unjustly accusing Plaintiff of being hostile towards law enforcement are self-evident and any reasonable and unbiased person will more than likely agree. Indeed, no fair-minded and rational person would believe these statements could possibly cause a disruption to ACS's detention centers, even if the topic were discussed.[15]

101. Any reasonable person reading the two excerpts in this memoir with an unbiased and non-ulterior motive-laden eye would certainly pause before vigorously asserting that these statements are inappropriate, derogatory, and contain hostile views towards police and prosecutors powerful

---

[15] This objectively unreasonable attack on Plaintiff's speech also demonstrates that the Defendants are improperly superimposing hostility on to this protected speech by means of conjecture, surmise, and unsupported suspicion. It is likely that the Defendants may be attempting to put themselves in Plaintiff's shoes and imagining how they would feel if they were incarcerated for a crime they did not commit while assuming that because they may have been filled with hostility, they are unjustly speculating that Plaintiff was exhibiting hostility in his speech, even though no such hostility was displayed in *The Whitfield Files*.  This conclusion is supported by the statement, "the substance and tone of Petitioner's writings . . . brought up concerns that he may create dissension and unease in the juvenile detention facilities, undermining facility goals for the youth."  In other words, the Defendants are assuming that Plaintiff is filled with hostility and would spew this hostility onto the youth he works with; this outlandish conclusion is being drawn even though the evidence before them confirmed that Plaintiff has been a youth counselor for approximately a decade without experiencing a single negative incident, and worked on Rikers Island for years with the same youth he would be working with as a YDS if the Defendants had hired him.  Of even greater significance, except for Plaintiff's murder conviction there is literally nothing in the record or in Plaintiff's history (while incarcerated or otherwise) that would even suggest that Plaintiff could enter an ACS facility and cause "violence", "dissension", and "instability."

enough to cause a person to lose a very good job.   Based on the undeniable nonaggressive content of these political comments such a reasonable person would hesitate, out of common sense fear of embarrassment, because such over exaggerated fervor would only make them sound bigoted, closed-minded, unreasonably insensitive to obvious racial inequalities, desperate and utterly irrational, since there is nothing in this protected speech that supports their over-embellished description.

102. Based on the Defendants' continual highlighting of Plaintiff's statements that contain the word "racism", it was objectively unreasonable for them to believe that merely because Plaintiff mentioned the word "racism" and alluded to the fact that these miscarriages of justice occur primarily because of this racism, this has transformed the protected speech into hostile speech, even though the memoir expressed a series of facts.  The current worldwide civil unrest is proof of the fact that racism is a serious and pervasive matter of public concern. Any reasonable and open-minded person confronted with these facts would be perplexed by Defendants' behavior and would be compelled to wonder how they arrived at their extreme conclusion (i.e., violence, dissension & instability) based on the non-violent and dispassionate content of this speech which merely mentioned the word "racism" in the context of explaining why wrongful convictions occur.[16]

103. Based on Defendants' statements as they relate to the content of these excerpts it would not be illogical for a rational person to conclude that the actual reason the Defendants are unreasonably attacking Plaintiff's speech is because the speech suggest that Plaintiff is willing to speak out against injustices. The Defendants' unjustified attack on this speech strongly indicate that this is something they do not want the youth in ACS to learn how to do, even though it is perfectly legal, logical and therapeutically empowering to speak out against injustices when being mistreated. Plaintiff simply mentioned the word "racism" without any hostility or anger in the speech, and

---

[16] Also objectively unreasonable is the fact that the Defendants glosses over the fact that in the memoir Plaintiff quoted an excerpt from the introduction of the book Actual Innocence by Barry Scheck, Peter Neufeld, and Jim Dwyer where the authors spoke about virtually every issue Plaintiff commented on, including the statement, "Racism trump the truth" (See pg. 3 of *The Whitfield Files*), yet the Defendant reacted as if Plaintiff engaged in conduct that could cause destructive behavior in an ACS detention center merely by mentioning the word "racism."

automatically the Defendants arrived at the conclusion that based solely on these statements made over fifteen years ago, Plaintiff would cause violence, dissension and instability in an ACS detention center.[17]

104. Additional facts that show Defendants' actions were objectively unreasonable when they punished Plaintiff for making the statements in *The Whitfield Files* on the grounds that his speech expressed anti/hostile views towards police, prosecutors, and the criminal justice system is the fact that expressing an opinion about the criminal justice system does not automatically mean the person has an animosity towards the system to the point of exclusion from ACS's workforce. People all over the country, and even worldwide, for years have been speaking out against police and prosecutorial misconduct. https://en.wikipedia.org/wiki/Prosecutorial_misconduct (Prosecutorial Misconduct); https://www.themarshallproject.org/records/1798-police-misconduct (Police Misconduct). There is no reason to believe the authors of these articles are hostile towards police and prosecutors solely because they wrote articles addressing matters of police and prosecutorial misconduct, and if their writings are not considered hostile, Plaintiff's memoir should not be considered hostile as well.

105. The Defendants' attack on Plaintiff's protected speech that addressed obvious matters of public concern was also actually directed at his criminal conviction, even though the Defendants claim otherwise.  If Plaintiff did not have a criminal conviction, it is very unlikely they would have accused Plaintiff of being hostile solely for insisting that police and prosecutors should be held accountable for committing misconduct that causes wrongful convictions.[18]  There are countless

---

[17] This conclusion is support by the fact the Defendants asserted that "[Plaintiff] may misinterpret his role and articulate to vulnerable youth his strong opinions regarding the criminal justice system failings, anti-police bias"  (Cardieri Aff ¶ 53). Since Plaintiff has been doing youth counseling work for a decade and worked on Rikers Island with the same youth the Defendants are referring to without experiencing any problems, it was objectively unreasonable for the Defendants to speculate that Plaintiff would become a YDS, miraculously misinterpret the objective of a youth counselor, and for the first time in his decade long career, engage in conduct that could cause destructive outcomes.

[18]  It is obvious the Defendants were aware that Plaintiff was convicted of murder, and there is no doubt they were aware that murder is a violent crime.  One of the Defendants acknowledged this fact, but claimed the conviction was not a topic of "discussion" (Fiellman Aff ¶ 34). It would not be unreasonable to believe that most people react adversely to people convicted of violent crimes.  The Defendants are attempting to paint a picture of violence, dissension and instability, which could only be arrived at by merging Plaintiff's criminal conviction for murder into this descriptive equation, since

articles written by numerous citizens insisting that police and prosecutors should be held accountable for misconduct that causes harm to others. https://www.themarshallproject.org/2018/03/13/let-s-put-an-end-to-prosecutorial-immunity (Let's Put an End to Prosecutorial Immunity – *The time has come to create some level of accountability for prosecutors* by Frederic Block);

https://www.innocenceproject.org/holding-prosecutors-accountable/ (Hold Prosecutors Accountable);

http://bostonreview.net/law-justice/kate-levine-joanna-schwartz-hold-prosecutors-accountable-too (Hold Prosecutors Accountable, too), inter alia. Again, if these articles are not deemed hostile towards police and prosecutors, Plaintiff's memoir should not be labeled as hostile as well.

106. In the UCDavis Law Review Article entitled, *Prosecutorial Shaming: Naming Attorneys to Reduce Prosecutorial Misconduct* by Adam M. Gershowitz,

https://lawreview.law.ucdavis.edu/issues/42/4/articles/42-4_gershowitz.pdf, the author (an Associate Professor of Law) opened this legal commentary with the following statement:

> "This Article explores the *unfortunately large number of instances in which appellate courts reverse convictions for serious prosecutorial misconduct* but do not identify the names of the prosecutors who committed that misconduct. Because judges are reluctant to publicly shame prosecutors whose cases are reversed, this Article advocates that a neutral set of third parties undertake the responsibility of publicly identifying prosecutors who have committed serious misconduct. The naming of prosecutors will shame bad actors, provide a valuable pedagogical lesson for junior prosecutors, and signal to trial judges that certain prosecutors must be monitored more closely to avoid future misconduct."

107. The questions Plaintiff propose by citing this article are: Does publishing this article make Mr. Gershowitz anti-prosecutorial, anti-police and anti-establishment solely because he published a writing that highlights misconduct with the intent of preventing future miscarriages of justice? Is Mr. Gershowitz attempting to cause violence, dissension, and instability in environments where people are discussing this topic?   Is there any difference from what Mr. Gershowitz is doing in

---

the content of *The Whitfield Files* does not support such an extreme and violent prediction of disruption. In other words, where are they getting these images of violence from?

this Article than what Plaintiff did in *The Whitfield Files*? The answers to these questions are apparent.

108. Another objectively unreasonable assumption the Defendants made upon allegedly reading *The Whitfield Files* is that they "did not feel that [Plaintiff] was expressing a message of positivity and accountability that would transform destructive thinking and attitudes [and he was not a] Credible Messenger [who] admits fault and has the ability to reflect on personal responsibility, *The Whitfield Files* demonstrated a lack of reflection and a desire to shift blame to outside forces." (Cardieri ¶ 55; see also, Skowyra Aff ¶¶ 59-60 & Fiellman Aff ¶¶ 28 & 35).

109. This defamatory comment makes clear that the Defendants are claiming that because this memoir depicts the events that led up to Plaintiff's wrongful conviction, they believe he is not taking responsibility (i.e., through self-reflection on personal accountability) and based on pure unmitigated speculation, he would share this alleged not taking responsibility attitude with the at-risk youth in ACS detention centers, which they believe would cause massive chaos.

110. The assumption that Plaintiff is not taking responsibility is false and is evidence of the fact that the Defendants apparently did not read *The Whitfield Files* in its entirety, or read it with an unreasonably closed mind, or with a hidden agenda in mind. In the memoir, the moment Plaintiff appears in the writing, he is clearly taking responsibility for possession of drugs and was moping over the fact that he was turning himself in to start a 1 to 3 year prison sentence.  The excerpt confirming this fact is as follows:

> "In exactly two months, on May 25, 1988, he had to turn himself in to begin a one to three-year prison sentence for possession of a controlled substance. After 23 years on this planet, he had fallen victim like so many others. This was his first bid and he was scared to death. The thought of running obviously crossed his mind, but so did his future. He'd gave up selling drugs immediately after he got caught, and now he wished he had had a similar rude awakening before he got arrested." (Pg. 6 of *The Whitfield Files*).

111. In light of the fact Plaintiff pled guilty, took responsibility for possessing drugs and was turning himself in to start his sentence, the Defendants' above defamatory statements about Plaintiff

not taking responsibility and not being a "Credible Messenger" is completely false, arbitrary, capricious and was apparently made in bad faith; the Defendants knew or should have known, that if a person has the capacity to take responsibility when he has done wrong, if that person does not take responsibility for something he did not do, it is objectively unreasonable to only focus on the instance when he allegedly didn't take responsibility while ignoring when he did.[19]

112. Had the Defendants read the entire memoir without a bias, ulterior motive laden, closed-minded attitude, they would have realized that this memoir presented a positive message that indicates that someone could be involved in what is perceived as minor, low level criminal activities and end up going to prison for a serious crime they did not commit. This is a powerful message that strongly resonates with gang affiliated youth and has a greater productive impact on young people, than someone sharing with them the fact that they served time for a crime they committed, got out and is doing the right thing; any well informed youth worker knows that young people hang out with the wrong crowds, and often believe that because they themselves are not involved in serious crimes, they have nothing to worry about.  Plaintiff's situation proves to these youngsters that when they hang out with the wrong crowds or get involved in criminality in general, they can become guilty by association, and could wind up going to prison for a serious crime they did not commit.

113. The Defendants' arbitrary, capricious, closed minded, hidden agenda laden, and unreasonable reading of this memoir overlooked the huge benefit that a young person could receive by hearing that if they surround themselves with the wrong people, they can, and more than likely will, become a victim of crime (i.e., imprisoned for crimes they didn't commit, assaulted, robbed, murdered, etc.).   Even a perfunctory reading of the memoir shows that Plaintiff acknowledges that he

---

[19] Another objectively unreasonable act on Defendants' part is the fact that they are completely ignoring the fact Plaintiff has maintained in his innocence from the moment he was accused, throughout the entire criminal court proceeding, during sentencing, throughout his incarceration, during a special parole board hearing ordered by Governor Spitzer to examine his claim of innocence, and during his scheduled parole board hearing, and was released only because he had convinced the parole board to review the evidence supporting his innocence. Had the Defendants read the memoir without a hidden agenda, these facts would have been obvious. The utter refusal to consider the fact that Plaintiff completed the sentence for the crime (regardless whether he did the crime or not) and should not be punished for the rest of his life, is further evidence of the objectively unreasonable nature of the Defendants' violation of Plaintiff's First Amendment right to freedom of speech.

was involved in criminal activities and that it was his poor judgment that ultimately caused his unfortunate situation (i.e., if Plaintiff wasn't involved in any criminal activity it would have been less likely to be wrongfully convicted). Clearly, this constituted taking responsibility and completely contradicts what the Defendants are claiming.  This is further evidence of the defendant's bad faith propensity for misrepresenting the facts and concocting fraudulent situations in a disingenuous attempt to create issues that bolster their claims.  To claim that the content in *The Whitfield Files* indicate that Plaintiff refused to take responsibility shows that the Defendants are making false, irrational arguments without regards to the facts.

114. Based on the Defendants' warped reading of this memoir they have apparently deemed themselves a sentencing judge or a prison warden and has sentenced Plaintiff to exclusion from the ACS workforce based solely on these statements that they believe indicate Plaintiff has not gone "through self-reflection on personal accountability." This is clearly an illegal, unjustified, malicious, and unconstitutional punishment based exclusively on their distorted, faulty and bad faith reading of this memoir, which has severely punished and injured Plaintiff, even though he has served the entire sentence (paid in full his alleged debt to society).  A reasonable and fair minded person confronted with these facts will likely view Defendants' conduct as a bad faith violation of Plaintiff's First Amendment right to freedom of speech because this content and viewpoint-based punishment stems directly and solely from their erroneous, reckless and bad faith reading of *The Whitfield Files*.

115. The Defendants' objectively unreasonable handling of this protected speech is also evident by the fact they accused Plaintiff of not being a "Credible Messenger" while simultaneously ignoring overwhelmingly favorable evidence that under-minded this derogatory accusation. The Defendants admitted in affidavits filed in state court in support of their answer to the amended verified petition (Cardieri Aff. ¶ 57; Skowyra Aff. ¶ 52 & Fiellman Aff. ¶ 25) that they refused to consider the following evidence during their panel review when concluding that Plaintiff was not a Credible Messenger:

1) The fact that Plaintiff is the owner and founder of his own business, Divine G Entertainment, which he got up and running within six months of his release from incarceration. He attached his Business Certificate and the IRS Letter showing the issuance of is Employer Identification Number (Ex. # 3 of Justice Center Letter);

2) Plaintiff's three audio books produced and distributed by his company. He attached an advertisement and his Amazon.com page (Ex. # 3 of Justice Center Letter);

3) Plaintiff's eight published novels, a short story, and a Play; five of the novels were produced and distributed by his company; three novels were published while he was incarcerated. The short story and Play were published while he was incarcerated. With regard to the novels he attached an advertisement and his Amazon.com page (Ex. # 3 of Justice Center Letter);

4) Plaintiff's COMPAS ReEntry Risk assessment, where the parole board determined that his "overall risk potential" was exceptionally low (Ex. # 3 of Justice Center Letter);

5) The fact that Plaintiff had produced, directed, and starred in his debut short film production entitled *Enigma of Love* that was entered into various mainstream Film Festivals. He provided a YouTube link;

6) Plaintiff won four PEN American Center Awards (including *The Whitfield Files*) and the 2008 Tacenda Literary Award for best play. He provided PEN documents and a Tacenda Certificate; and

7) Plaintiff was quoted by the United Nations in its UN Report of the Special Rapporteur on the right of education of persons in detention (A/HRC/11/8, pg. 6, ¶ 11-2 April 2009).

116. Because these accomplishments were extraordinary and if shared with ACS youth would have a tremendously positive and inspiring impact on them to show them if they apply themselves there is nothing they can't do, even with a felony conviction, it was objectively unreasonable to claim Plaintiff was not a Credible Messenger while ignoring these achievements that show otherwise.

117. Another objectively unreasonable act on the Defendants' part is that they did not even attempt to contact Plaintiff to get additional information regarding their alleged "concerns" (issues that were not a part of the record) before making a decision that would trample over Plaintiff's precious right to freedom of speech.  There is no doubt the Defendants had all of Plaintiff's contact information, including cell phone numbers, email address, mailing address, etc.  There was no rule, regulation or law forbidding them from contacting Plaintiff.  This refusal to at least inquire before making such a harsh and unconstitutional decision was unreasonable and is further evidence of the

fact that the Defendants were bent on denying Plaintiff the job solely because they disagreed with the content of the speech that was erroneously read in bad faith. In view of all the evidence in this case, it would not be unreasonable to conclude that the Defendants did not contact Plaintiff because they had no intentions of giving him any benefit of the doubt.

118. Another objectively unreasonable act on the Defendants' part occurred when they completely ignored the fact that *The Whitfield Files* won an award from one of the most prestigious writing organizations in the world. It is beyond dispute that PEN America "stands at the intersection of literature and human rights to protect free expression in the United States and worldwide." (https://pen.org/about-us/).  The Defendants are unreasonably condemning Plaintiff for submitting *The Whitfield Files* for consideration; according to the Defendants, "the Panel. . . 'expressed concern over Petitioner's judgment in submitting *The Whitfield Files* for the agency's consideration, given the fact that it expressed clear anti-correctional statements as he sought a position counseling youth in a secure setting'" (see Defendants' Article 78 Verified Answer ¶ 183; see also Cardieri Aff. ¶ 66). Besides the fact this bad faith tactic demonstrates the Defendants' irrational obsession with trying to paint *The Whitfield Files* as containing "anti" views while accusing Plaintiff of having poor "judgment", it also ignores the fact that any sane person trying to show a significant accomplishment would obviously submit such a unique and extraordinary achievement for consideration.  There are not many people, professional writers or otherwise, who can say that a world renown writing organization deemed their writing worthy of an award and acknowledged that their work was worthy of recognition. If a person had such an accomplishment in his or her repertoire, and did not use it to prove rehabilitation, that would constitute very poor judgment.[20]

---

[20] This objectively unreasonable attack on Plaintiff's integrity is also evident by the fact that it should have been apparent to the Defendants that no world-renown writing organization is going to jeopardize its reputation for excellence, promoting human rights and bringing people together by awarding a writing that promotes hostility, hate, confusion, disharmony, and division. The mere fact that PEN deemed *The Whitfield Files* worthy of an award is further evidence that the memoir does not contain offensive speech that has the potential to cause a disruption in an ACS detention center.

119. An additional objectively unreasonable act on the Defendants' part occurred when they ignored and/or downplayed the fact that *The Whitfield Files* was written over 15-years ago. The time that has elapsed since this memoir was written and published is clearly significant. The Defendants' illogical attempt to ignore this huge amount of time that has elapsed defies common sense and violates fundamental principles of due process. Consideration of the time that has elapsed when evaluating issues involving human behavior is obvious because with time people mature, grow physically and mentally, and see things differently as they grow older. All rational laws connected to human conduct has a component that require consideration of the time that has elapsed since the conduct in question. For example, ACS has a time provision when allowing candidates with violent criminal convictions to work as a YDS.  According to ACS, a person that has "[a] felony conviction within the past *ten* years involving violence" would have to wait until after ten years has elapsed before they can apply for the YDS job. Likewise, Correction Law, Article 23-A has a time provision that states: "In making a determination pursuant to section seven hundred fifty-two of this chapter, the public agency or private employer shall consider . . . the time which has elapsed since the occurrence of the criminal offense or offenses." See Correction Law § 753 (d).  It defies logic, common sense, due process and basic notions of fair play to say that a person with a violent criminal conviction has to wait ten years and then that particular crime will no longer be used adversely against him, but if this person makes a political statement fifteen years ago, this protected speech will be used harmfully against him for the rest of his life.

120. It was objectively unreasonable and illogical speculation for the Defendants to believe that Plaintiff would enter an ACS detention center and spark up a discussion about his wrongful conviction and the police and prosecutorial misconduct that caused it, especially in light of the fact Plaintiff has been a youth counselor for a decade, worked on Rikers Island with the same youth that were transferred to ACS, never experienced a single negative situation throughout his entire youth

counseling career, and there was no evidence to support an assumption that Plaintiff would cause any disruption in any facility he would work.

121. It is an undeniable fact that the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest. Plaintiff's main reason for writing and publishing *The Whitfield Files* was to bring light to the causes of wrongful convictions with hopes of making a difference in his life, and the lives of similarly situated individuals. Although Plaintiff wanted to bring some attention to his wrongful conviction, evidence of the fact that his main objective was to help others can be gleaned from the following statement in the memoir:

> "Honestly, I do not expect much to come about as a result of this endeavor, however, the mere process of exposing these dirty little secrets known only to a few, *and knowing that the proceeds from this book may help prevent others from experiencing such an ordeal (my royalties are being donated to the Innocence Project)* gives me some piece of mind as I rough ride the remainder of this brutal 25 years to life sentence" (Pg. 4 of *The Whitfield Files*).

122. The Defendants knew or should have known that Plaintiff's protected speech expressed fifteen years ago could not lawfully be used as a basis to refuse to hire him. This act constituted a clear adverse employment action in violation of the First Amendment.

123. The refusal to hire Plaintiff because of his protected speech addressing matters of public concern constitutes "conduct which would deter a reasonable similarly situated individual from engaging in First Amendment protected activity." There is no doubt that Plaintiff was chilled in the exercise of his rights. Plaintiff immediately started beating himself up and deeply regrets writing and entering the memoir in the PEN contest. He would not have made the speech had he known he would be denied a good job in the future because of this protected speech.[21]

124. A causal connection between Plaintiff's speech and the Defendants' refusal to hire him is established by Defendants' repeated acknowledgment that "the *primary* focus of the Panel's

---

[21] Plaintiff was writing and making efforts to publish a follow up of *The Whitfield Files*, but after being punished for writing and publishing the first part of this memoir (denied a very good job), Plaintiff decided not to engage in this protected activity. In fact, Plaintiff discarded the files on his computer and has decided not to publish the remaining parts of *The Whitfield Files*, solely because of the Defendants' refusal to hire him because of this memoir.

discussion regarded [Plaintiff's] opinions published in *The Whitfield Files*" (Respondent's NYSDHR Verified Answer at pg. 14); see also page 6 of Defendants' memo of law in support of cross-motion to dismiss the Article 78 petition ("The Panel's discussion focused *primarily* on [Plaintiff's] essay, '*The Whitfield Files*'").  These statements are not only direct evidence of causation but is an admission that the main reason for not hiring Plaintiff was his protected speech.

125.  Because "[t]he more the employee's speech touches on matters of significant public concern, the greater the level of disruption to the government that must be shown", the Defendants failed to carry their burden of proof as a matter of law.  As demonstrated above and herein, the Defendants' based their prediction of disruption on a false, reckless and bad faith reading of the protected speech, and the evidence in this case completely contradicted their assertion that Plaintiff would enter an ACS facility and "create dissension and unease in the juvenile detention facilities, undermining facility goals for the youth, and that his strongly-held positions about the deficits of criminal justice system might adversely affect (either consciously or unconsciously) his interactions with the youth he would be supervising." (Cardieri Aff ¶ 58; see also Skowyra Aff. ¶¶ 57-60 & Fiellman Aff. ¶ 35).  Because the Defendants came to these conclusions based on no evidence at all, and ignored clear evidence that contradicted their assumptions, no reasonable and fair minded person will interpret the Defendants' prediction of disruption as anything other than sheer speculation.

126.  Even more absurd and further proof that their prediction of disruption is irrational, can be gleaned from Defendant Fiellman's statement, "there were concerns that, because he was so outspoken regarding his belief that he was wrongfully convicted . . .  he might try to convince the youth that they were also wrongfully convicted" (Feillman Aff ¶ 28). Besides the fact this statement ignored the fact that Plaintiff took responsibility for his drug possession conviction, it also glosses over the fact that it is universally inappropriate for a youth counselor to discuss the crimes a youth is facing.  Even more shockingly, Defendant Skowyra stated, "I was concerned that the message he might send to youth was that because the system was "rigged" against them they did not need to

play by the rules" (Skowyra Aff ¶ 58).  This alleged prediction of disruption is so amazingly

baseless, absurd, and irrational there is no need for any extended elaboration. Simply put,

nowhere in the memoir did Plaintiff indicate or even suggest that "the system was 'rigged.'"   As

noted, it is obviously not in a youth counselor's job description to discuss the crimes of the

youth he or she is counseling (i.e., a youth counselor is not a lawyer). Moreover, to encourage a

youth to not "play by the rules" would most definitely get a youth counselor fired from the job.

No sane youth counselor with ten years' experience would engage in the above-mentioned

conduct and the Defendants know this.

127. The Defendants made a series of additional irrational predictions of disruption in the

NYSDHR and state court proceedings that indicated Plaintiff would likely commit the crime of

Unlawful Practice of the Law in violation of Judiciary Law § 476 (A) and Judiciary Law § 485 (A),

when they stated the following:

> "Ms. Skowyra states she expressed concern that based on the material
> he submitted, [Plaintiff] might misinterpret the job function of the YDS
> title, and attempt to advise-at-risk youth as to decision making with
> regard to their pending (not yet adjudicated) juvenile delinquency cases
> in court." (see Respondent's pg. 9 of its NYS DHR verified answer).

> "The Panel's legitimate concern for [Plaintiff's] views of the criminal
> justice system as it relates to a YDS job function, might also
> improperly influence the youth's legal decisions on their court cases."
> (see Respondent's pg. 16 of its NYS DHR verified answer).

> "[T]his also raised concerns that he might misinterpret the role of the
> YDS and attempt to give at-risk-youth legal advice or guide their
> decision-making in their own pending cases." (see Pg. 8 of
> Respondent's memo of law in support of cross-motion to dismiss the
> Article 78 petition).

128. Besides the fact that any informed youth counselor knows he is not interacting with

youth to give them legal advice and that the giving of legal advice is a crime when the person is not

an attorney, these alleged predictions overlook the fact there was not a single shred of evidence in the

record before them to support such a wild and outlandish belief.

129. In view of the above, the Defendants completely failed to present any reliable evidence to support their "prediction of disruption" as applied pursuant to *Pickering*'s balancing test, and therefore this prediction of disruption based solely on a faulty and irresponsible reading of the speech (while laboring under pressure from the Commissioner to facilitate the new "hiring protocol"), and then made a forecast based exclusively on pure unfounded speculation was insufficient to outweigh the value of Plaintiff's First Amendment expression.

130. The Defendants admitted that Plaintiff's protected speech was a substantial and motivating factor in Defendants' decision not to hire Plaintiff. The Defendants adamantly stated, "the primary focus was" Plaintiff's views expressed in *The Whitfield Files* that compelled them not to hire Plaintiff. Also, a perfunctory consideration of the Defendants' affidavits show that the bulk of their arguments in support of not hiring Plaintiff was dedicated to Plaintiff's speech and the second reason was nothing more than a minor issue that was merely tossed in for good measures.

131. The Defendants' alleged second reason for not hiring Plaintiff (i.e., he lacked one-on-one communication skills and experience) could not serve as a lawful basis not to hire Plaintiff (nor as a motivating factor) because the Defendants completely ignored a myriad of evidence that proved their assertion was false, arbitrary, capricious and totally baseless.[22]

132. Defendants' arguments in support of this second reason for not hiring Plaintiff was that he "had experience as a motivational speaker, his materials did not evidence any extended one-on-one daily experiences counseling or working with youth" (Cardieri Aff ¶ 56). Defendant Cardieri further stated, "Despite two letters provided by representatives from the Council on Unity, it appeared to our reading that [Plaintiff's] involvement with that organization was mostly limited to interacting with youth in larger group settings, motivational speech presentations, and group

---

[22] At paragraph 53 of the Defendants' verified answer to Plaintiff's amended verified Article 78 petition, the Defendants admitted that Plaintiff "met the minimum experience and education requirements" at the time when he was offered the YDS job, but this assessment changed after they read Plaintiff's protected speech (in reality after ACS employee Jacques Edwards assaulted a 6-year old child, which sparked the creation of the new "hiring protocol"). Since one-on-one communication skills and experiences was not an issue at that time, it is evident this reason was utilized to attempt to improperly bolster the refusal to hire Plaintiff because of his protected speech.

discussions. Daily, one-to-one interaction, supervision, and counselling was not apparent in those roles." Defendant Skowyra went so far as to assert that "the YDS position is distinct from that of a community organizer" (Skowyra Aff ¶ 55) disingenuously attempting to create the illusion that Plaintiff was not a youth counselor, but was some kind of community activist, even though there was not a shred of evidence to support such a conclusion or even an inference. The evidence in this case demonstrate that these statements were not only false, but arbitrary, capricious, illogical and was apparently uttered without regard to the facts.

133. First, Defendants ignored the fact that if Plaintiff did not possess the required one-on-one communication skills and experience it is readily apparent that their colleague, Eulena Hall-Leader, would not have offered him the job after the extensive and meticulous face-to-face interview. No one can seriously doubt the fact that Ms. Hall-Leader assessed Plaintiff's character, made an assessment that he met all requirements for the job, and made the job offer because she determined that Plaintiff would be a good fit for the job. This assessment obviously included whether Plaintiff had the required "daily, one-on-one interaction, supervision, and counseling" at-risk youth experience. Simply put, it is obvious if Plaintiff had the required skills and experience during the interview with Ms. Hall-Leader, there is no logical reason to believe he miraculously did not have those skills and experience after the Defendant stumbled on to *The Whitfield Files* (as well as after the creation of Defendant Hansell's and the mayor's office's new "hiring protocol"). This sudden change in its position regarding Plaintiff's skills and experience is a classic arbitrary and capricious determination since the Defendants overruled Ms. Hall-Leader's determination and did not "indicate its reasons for reaching a different result on essentially the same facts." *Tall Trees Constr. Corp. v. Zoning Bd. Of Appeals*, 97 N.Y.2d 86, 93 (2001)("A decision of an administrative agency which neither adheres to its own prior precedent nor indicates its reasons for reaching a different result on essentially the same facts is arbitrary and capricious").

134. Second, any reasonable and impartial person who had reviewed Plaintiff's master's degree in Professional Studies transcripts would have known that it would be completely absurd and outrageous to claim he lacked one-on-one communications skills when he had completed several master's degree courses that specifically taught him how to conduct one-on-one therapy, counseling, pastoral care and aftercare sessions. It is apparent the Defendants ignored Plaintiff's Master's degree in Professional Studies Transcripts showing that he acquired advanced higher learning with a "3.9662 GPA" regarding one-on-one communication skills (see above footnote # 10).

135. Third, another fact that corroborates the fact Plaintiff was virtually overqualified for the YDS job is the fact Plaintiff was in charge of the CFU Speakers Bureau, which coordinated the Rikers Island program.  The Defendants' deliberately ignored Edward Harrison's letter, which confirmed that Plaintiff worked on Rikers Island for several years with the very same youth that were eventually transferred from Rikers Island to ACS (Cardieri Aff ¶¶ 8-20; Skowyra Aff. ¶¶ 8-21 & Fiellman Aff. ¶¶ 7-9). In fact, during the face to face interview with Eulena Hall Leader, the fact that Plaintiff worked with the same youth on Rikers Island for years that were being transferred to ACS and Plaintiff was in charge of the CFU Rikers Program, was the decisive element that compelled these ACS hiring officials to offer Plaintiff the YDS job.

136. Fourth, the Defendants apparently ignored the Employment Verification form, where they had asked Plaintiff's supervisor, Mr. Sean Johnson, to list the "Specific duties [Plaintiff] Performed", and he stated: "Teaching effective communication skills . . ."  Obviously, since Plaintiff teaches "effective communication skills," it should have been evident to the Defendants that to allege he does not possess such skills is grossly irrational. The Defendants make much out of the fact that Plaintiff has engaged in motivational speaking and places tremendous emphasis on this particular skill as though it was the only skill he possessed in connection with his youth counseling work.  This is clear evidence that they completely ignored Plaintiff's supervisor's statements in the Employment Verification form where he specifically informed them that Plaintiff held the following

positions/titles: "Youth Counselor, Gang & Violence Intervention Coordinator, Life Skills Coach, Youth Intervention Specialist and Office Assistant."  Obviously, not all of these position/titles involve "motivational speaking" and, in fact, most of them require "Daily, one-to-one interaction, supervision, and counselling."[23]

137. Fifth, the Defendants claimed they reviewed Mr. Luis Brown's letter that specifically stated that he observed Plaintiff communicating with students one-on-one, helping them with their writings over a span of several years, which is obvious one-on-one communication experience. In this letter Mr. Brown, Director of Council for Unity's School Based Initiative, stated:

> "John is one of the most effective writers I have had the opportunity to work with. I observed John assist young people with their writing needs when they visited our office. In fact, on days when John was in the office, he spent a substantial amount of time with our young people editing their papers and giving invaluable feedback."

There is no doubt that editing papers for youth (in a school setting) on a continual basis is a one-on-one activity because it is virtually impossible to engage in group writing feedback sessions. Of greater significance, when Plaintiff is in an office editing papers for youth, he is obviously supervising these children. Thus, the Defendants apparently ignored this clearly favorable evidence in the record.

138. Sixth, the Defendants also ignored the fact that their YDS job listings and notices make unequivocally clear that one-on-one communication skills and experience is not an absolute requirement to the point that if a candidate lacked such skill it would warrant automatic disqualification.  These job advertisements made noticeably clear that "one-on-one communication experience" was not required for the job, nor could such experience be reasonably inferred from these notices and listings.  Indeed, these job advertisements stated that "working directly with juveniles or young adults . . . in a group . . . setting", in a "program performing recreational . . . work", and in an

---

[23] A significant and critical fact the Defendants completely disregarded is the fact that for the past seven years working for Council for Unity (CFU), Plaintiff has gotten up every morning, left his house to go to work, and upon arriving at work, interacted with young people, because he is a youth counselor. To claim Plaintiff lacked the required skills and experience under these circumstances is insanely absurd.

"athletic program" are "satisfactory experience."  Because these type of youth workers do not

specialize in one-on-one interaction with youth it is evident that the Defendants' use of an alleged

lack of one-on-one communication experience as a ground to refuse to hire Plaintiff is clearly false,

baseless, and could not rationally be used as a basis to refuse to hire Plaintiff.[24]

139.  In sum, the Defendants' assertion that Plaintiff did not possess "one-on-one daily

experiences counseling or working with youth" is the equivalent of asserting (without any evidentiary

proof) that a Judge licensed to practice law does not read, interpret and apply case law to the facts of

cases he or she decides. Merely because a person makes this statement does not make it true or a fact,

especially when the Judge has degrees that prove he has undergone the required legal training to

interpret and apply case law to cases and is actually deciding cases.  When this scenario is compared

to the case at bar, the Defendants' assertion that Plaintiff did not have one-on-one communication

skills and experience, even though he has a master's degree in a Human Services/Social workers field

where he was taught how to conduct one-on-one therapy, counseling, pastoral care and aftercare

sessions (i.e., one-on-one communication training), presented documentation demonstrating that he

taught effective communication skills for years, and has applied this skill as a Youth counselor for

over a decade, the Defendants' assertion should be rejected in the same manner as one would

automatically reject the above Judge/case law scenario.

140.  In light of the baseless, arbitrary, capricious, non-sensical and irrational nature of the

second reason for not hiring Plaintiff, the Defendants cannot prove by a preponderance of the

evidence that they would have made the adverse employment decision even in the absence of the

protected conduct. Had they done so, such a completely unsubstantiated and utterly unreasonable

---

[24] It must also be noted that the YDS job listings and notices establish that a candidate with a master's degree would need little to no "satisfactory experience working directly with juveniles or young adults."  Indeed, these job listings and notices confirm that the required satisfactory experience working directly with juveniles or young adults consistently decreases in increments of nine (9) months when the candidate has a higher degree of education. For example, "[a] four year high school Diploma . . . two years of full-time satisfactory experience." A candidate with "[a]n associate degree . . . one year and three months." A candidate with "[a] baccalaureate degree . . . at least six months." A master's degree is not even mentioned or listed which indicate that a candidate with a master's degree would be considered as having the satisfactory work experience just by possessing a master's degree.

determination would have been deemed unlawful and erroneous as a matter of law. This second reason was clearly not a substantial or motivating factor in the adverse employment action.

141. A balancing between the interests of Plaintiff (a potential employee), in his role as a citizen, in commenting on matters of public concern and the interest of the Defendants, in its role as a potential employer, in promoting the efficiency of the services it performs through its employees, require "that society's interest in [Plaintiff's] freedom of speech be weighed against [Defendant's alleged] interest in maintaining efficiency and discipline in the workplace."

142. Defendants' actions as described herein, were malicious and/or involved reckless, callous, bad faith, and deliberate indifference to Plaintiff's federally protected rights. This infringement shocks the conscience and constitutes a premeditated violation of Plaintiff's First Amendment rights.

143. Defendants unlawfully punished Plaintiff by means of objectively unreasonable, arbitrary, capricious, and blatant disregard of the First Amendment right to freedom of speech, thereby unjustly and premeditatedly infringing upon Plaintiff's constitutionally protected rights.

144. None of the Defendants took reasonable steps to protect Plaintiff from the objectively unreasonable infringement of his Freedom of Speech of other Defendants despite being in a position to do so. They are each therefore liable for the injuries and damages resulting from the objectively unreasonable violation of the First Amendment of each other Defendant.

145. Each Defendant was personally involved in the violation of Plaintiff's First Amendment rights to Freedom of Speech: a) Defendants Cardieri, Skowyra, Fiellman and Rosen are personally involved because they were participants, representatives and members of the "Personnel Review Panel" that refused to hire Plaintiff because of his protected speech; and b) Defendant Hansell is personally involved because he was briefed about the decision not to hire Plaintiff; he agreed with the unconstitutional, baseless, arbitrary and capricious reasons for not hiring Plaintiff and facilitated and encouraged this refusal to hire.

146. Defendants engaged in the conduct described by this Complaint willfully, maliciously, and in reckless disregard of Plaintiff's federally protected constitutional rights.

147. Defendants did so with shocking and willful indifference to Plaintiff's rights and their conscious awareness that they would cause Plaintiff severe emotional and psychological injuries and would chill his speech.

148. The acts or omissions of all individual Defendants were moving forces behind Plaintiff's injuries.

149. The Defendants acted in concert and joint action with each other.

150. The acts or omissions of Defendants as described herein intentionally deprived Plaintiff of his constitutional rights and caused him other damages.

151. The Defendants are not entitled to qualified immunity for the complained of conduct. The Defendants' conduct violated clearly established constitutional rights of which a reasonable person would have known.  Indeed, the Defendants should have known that refusing to hire Plaintiff on the basis of the views expressed in *The Whitfield Files* that was uttered fifteen years ago, addressed obvious and significant matters of public concern, and was completely unrelated to the job would violate the First Amendment.

152. As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual emotional and psychological injuries, and other damages and losses as described herein entitling him to compensatory damages in the amount of two million dollars ($2,000,000.00).

153. In addition to compensatory and consequential damages, Plaintiff is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983 in the amount totaling five million dollars ($5,000,000.00), in that the actions of each of these individual Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

154. Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs, disbursements, and other litigation expenses as allowable by federal law. There may also be special damages for lien interests.

## SECOND CLAIM FOR RELIEF

### 42 U.S.C. § 1983 – Selective Enforcement - infringement on Plaintiff's right to equal protection of the law in violation of the Fourteenth Amendment
(Against Defendants Cardieri, Skowyra, Fiellman, Rosen, Hansell and the City)

155. Plaintiff incorporates all prior paragraphs of this Complaint as if fully set forth herein.

156. The Defendants violated Plaintiff's fundamental right to be free of selective enforcement of the law when they treated him differently from other similarly situated individuals seeking employment with ACS. This differential treatment was based on Plaintiff's criminal conviction for murder which was an impermissible consideration under various state laws, was based on an intent to punish Plaintiff for exercising his constitutional right to freedom of speech, and was done with a bad faith intent to injure Plaintiff in order to facilitate Defendant Hansell's and the mayor's office's new "hiring protocol."

157. In the NYSDHR complaint and the moving papers in state court, the Defendants repeatedly insisted that they hired YDS candidates that had criminal convictions. They had even attached a computer readout sheet that listed numerous candidates that had criminal convictions, where some got the job, and others declined to accept the job. One individual they identified as HW who had a conviction for manslaughter was hired.

158. The Defendants treated Plaintiff differently solely because he had a conviction for murder while the other candidates they selected did not. Although a murder conviction would appear to be different, (i.e., murder is the worst kind of homicide) but under the law a felony is a felony regardless of the nature of the felony, and therefore, Plaintiff, the candidates listed in the computer readout, and HW were similarly situated. They all, including Plaintiff, had criminal convictions; they

all applied for the YDS job, they would all perform the same tasks on the job, and would all receive the same salary, same benefits, same retirement pension and same opportunities for upward mobility.

159. This selective treatment was also based on the Defendants' reliance upon Plaintiff's protected speech in which they misrepresented the content of *The Whitfield Files*. According to the Defendants', one of the reasons they denied Plaintiff the YDS job was because they believed Plaintiff was not taking responsibility for the crime he was convicted of, and apparently hired the other candidates because Defendants believed those individuals did accept responsibility for their crimes. This clearly demonstrated a bad faith intent to punish Plaintiff for exercising his First Amendment right and was an inherently erroneous determination as a matter of law because Plaintiff did accept responsibility for his possession of drugs conviction.

160. The Defendants' selective enforcement of New York State laws that forbid discrimination on the basis of a criminal conviction was done with a bad faith intent to injure Plaintiff in order to facilitate Defendant Hansell's and the mayor's office's new "hiring protocol." There is no doubt that this new hiring protocol focused exclusively on preventing candidates that had convictions for murder from becoming YDS, and it was clear that they would do whatever it took to exclude such candidates from the ACS workforce.[25] The statements of Defendant Hansell and Eric Phillips, spokesperson for the mayor's office, were clear, unequivocal and undeniable (i.e., any and all candidates with murder convictions would no longer be permitted to work with youth under ACS's care and supervision).

161. The Defendants' selective treatment also demonstrated that they had taken these unconstitutional actions against Plaintiff to promote their personal animus and

---

[25] The Defendants unjustly and unreasonably accused Plaintiff of being anti police, anti-prosecutorial, anti-establishment, and anti-correctional, and insisted that if Plaintiff were permitted to work with youth under ACS supervision, he would cause violence, dissension, and instability. These false and defamatory statements not only constitute a malicious and damaging attack on Plaintiff's reputation as a youth counselor, but they also had the potential to severely injure his consultant work as a website designer for the law enforcement union he works with. Because these false, defamatory, and degrading statements were uttered to facilitate the new hiring policy, it was apparent the Defendants engaged in these dishonest, hate-driven and unscrupulous tactics with a bad faith intent to injure Plaintiff.

desire to exploit the Jacques Edwards assault.  The media, community and ACS officials were totally outraged at the fact Jacques Edwards had assaulted a defenseless six-year-old child and appeared to be out for blood.  As demonstrated by the tone and content of the numerous news broadcasts and newspaper articles, Defendant Hansell set in motion what can reasonably be described as a "witch hunt."  Indeed, according to the New York Times article, Defendant Commissioner Hansell vowed he was going to clean house of anyone working for ACS that had a murder conviction (see above paragraphs 34-37).

162. This type of response to an isolated incident suggest that Defendant Hansell was unjustly and unreasonably utilizing this issue to gain a personal benefit by creating the public image that he was "tough" on those who had committed violent crimes in their past, even though the individuals already working for ACS despite their criminal convictions had absolutely nothing to do with the Jacques Edwards assault, and most of all, had already paid their debt to society. This is further evidence that Plaintiff had gotten caught up in this witch hunt fervor and the Defendants' intent to exploit the incident when he was denied the YDS job because of his murder conviction. Moreover, the series of defamatory, derogatory and degrading public statements the Defendants launched against Plaintiff to facilitate their agenda to rid ACS of individuals with murder convictions (i.e., anti-police, prosecutorial, establishment & correctional, could cause violence, dissension & instability, likely to engage in the unauthorized practice of law, propensity for not taking responsibility, etc.), is further evidence of the fact this selective treatment was done maliciously with a bad faith intent to injure Plaintiff.

163. In view of the facts and circumstances of this case, Defendants have acted with such an impermissible motivation and with such blatant disregard of Plaintiff's clearly established

constitutional right to equal protection of the law that Defendants' actions cannot reasonably be characterized as being in good faith.

164. The Defendants are not entitled to qualified immunity for the complained of conduct. The Defendants' conduct violated clearly established constitutional rights of which a reasonable person would have known.  Indeed, the Defendants should have known that singling out Plaintiff solely because he had a conviction for murder, and then concocting two bogus reasons to justify the institution of a new hiring protocol designed to rid ACS of any and all individuals with murder convictions would violate the Fourteenth Amendment right to equal protection of the law.

165. As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual emotional and psychological injuries, and other damages and losses as described herein entitling him to compensatory damages in the amount of two million dollars ($2,000,000.00).

166. In addition to compensatory and consequential damages, Plaintiff is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983 in the amount totaling five million dollars ($5,000,000.00), in that the actions of each of these individual Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

167. Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs, disbursements, and other litigation expenses as allowable by federal law. There may also be special damages for lien interests.

### THIRD CLAIM FOR RELIEF

**State Claim – State Pendent Jurisdiction - infringement
on Plaintiff's right to be free of discrimination in violation
of the New York State Human Rights Law (N.Y. Executive
Law § 296[15]), the New York City Human Rights Law
(N.Y.C. Administrative Code § 8-107[10]), and Article 23-A
of the Correction Law (N.Y. Correction Law §§ 750, et seq.)**
(Against Defendants Cardieri, Skowyra, Fiellman, Rosen, and Hansell)

168. Plaintiff incorporates all other paragraphs of this Complaint as if fully set forth herein.

169. Pursuant to 28 U.S.C. § 1367(a), in any civil action in which the district court has original jurisdiction, the district court "shall have supplemental jurisdiction over all other claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III [of the Constitution]."

170. Although "once judicial power exists under § 1367(a), retention of supplemental jurisdiction over state law claims under 1367(c) is discretionary." In any event, this court should retain this discrimination claim because (1) the claim does not raise a novel or complex issue of State law. There is obviously nothing new, unique or unusual about an agency engaging in discriminatory actions towards a potential employee; (2) the claim does not substantially predominate over the claims over which this district court has original jurisdiction; this discrimination claim is merely one of four causes of action Plaintiff raise, and in fact, was included because it merely bolsters the federal claims; and  (3) there are no exceptional circumstances, or any compelling reasons for declining jurisdiction.

171. Considering the facts and circumstances in this case, Plaintiff has a cause of action for discrimination in violation of Human Rights Law § 296.15, N.Y.C. Administrative Code § 8-107[10]), and Corrections Law, Article 23-A, and their progeny.

172. Plaintiff has two felony convictions; one for possession of drugs and the other for murder in the second degree, thus confirming that he is a member of the protected class in question.

173. Plaintiff was virtually overqualified for the YDS job in light of his possession of a master's degree in professional studies, his decade long career as a youth counselor, and his working on Rikers Island for several years with the very same youth that were ultimately transferred from Rikers to ACS detention centers and therefore was more than qualified to hold the YDS position.

174. There is no doubt that Plaintiff suffered an adverse employment action when Defendants refused to hire him as a YDS, and as demonstrated above, this adverse employment action occurred under circumstances that give rise to an inference of discrimination.  Indeed, the reliance upon

Plaintiff's innocuous protected speech in *The Whitfield Files* and upon the unsubstantiated allegation that Plaintiff did not possess the required skills and experience were textbook pretextual assertions. Considering the evidence in this case, no reasonable person could arrive at the conclusion that Defendants were justified when they refused to hire Plaintiff on the grounds they relied upon.

175. Discrimination in violation of the above stated anti-discrimination laws was established in this case based on Defendant David Hansell's numerous comments made to the media indicating that he and the mayor's office had instituted a new hiring policy that systematically excluded all candidates with murder convictions from the ACS work force (see above Paragraphs 34-37).

176. Although there were about a dozen newspaper articles, TV broadcasts, etc., Plaintiff would like to place strenuous emphasis on the CBS news video recording of Defendant Hansell where he specifically reiterated exactly what the numerous newspaper articles claimed he had told the news reporters, but during this presentation, the words came directly out of Defendant Hansell's mouth. This video displays his image, his voice, his statements, his "new hiring protocol"/policy. https://www.youtube.com/watch?v=7s_UQcOAAlM ("Under our current protocols, I do not believe he would have been hired today").

177. Defendant Hansell's statements are direct evidence of discrimination. There is little doubt that this new "hiring protocol" in response to the Jacques Edwards assault on a 6-year-old boy had a direct and immediate impact on Plaintiff's employment prospects.  On August 8, 2018, Defendant Commissioner Hansell stated that he was "reviewing the circumstances that lead this individual's hiring here some years ago" and at this same time Plaintiff's application was being reviewed (see Defendants' Verified Answer at ¶ 160-172).   Jacques Edwards and Plaintiff both have murder convictions.  Obviously, because Defendant Hansell felt there was a problem with hiring Jacques Edwards, he would evidently have a problem with hiring Plaintiff.

178. Because the content of Defendant Commissioner Hansell's statements clearly indicate that he believes it is inappropriate for a person convicted of murder to work with youth, this is

direct and undeniable evidence of the fact that Plaintiff is being punished (discriminated against) because of Defendant Hansell's position on this matter.  In light of the evidence in this case, the discrimination is occurring in a conspiratorial, bad faith, covert, fraudulent, dishonest, deceptive and pervasive manner.  This is so because the two reasons relied upon to deny Plaintiff the YDS job were completely unfounded, false, nonsensical, arbitrary, capricious, taken without regards to the facts, and were unequivocally pretextual because they were apparently manufactured to facilitate the new hiring policy.[26]

179. This new "hiring protocol" evidence strongly undermines the Defendants' assertion that the two reasons for denying Plaintiff the YDS job were conceived in good faith.  Defendant Commissioner Hansell's statements also strongly indicate that the other Defendants concocted the two reasons for not hiring Plaintiff solely because they were obeying and facilitating his new hiring policy that singles out candidates with murder convictions.

180. Defendant Joseph Cardieri attempted to improperly bolster the decision not to hire Plaintiff when he stated:

> "[O]n September 27, 2018, the Panel briefed ACS Commissioner David
> Hansell on the Panel's recommendation for Petitioner, including the
> bases of our recommendation. Briefing the Commissioner, the top
> executive officer of ACS, an agency with over 7,000 employees, about
> an individual hiring decision is clear evidence of how much deliberation
> and consideration Petitioner's application was given." Cardieri Affidavit
> ¶ 64; see also Defendants' Verified Answer ¶ 183.

181. In light of Defendant Hansell's unequivocal statements that confirmed the implementation of a new hiring policy that singles out candidates with murder convictions, Defendant Cardieri's statements are perjurious because the actual reason for the Commissioner's

---

[26] It must also be noted that the Defendants also discriminated against another YDS candidate, Mr. Jeffrey Rivera.  Mr. Rivera's situation is similar to the case at bar in that Mr. Rivera served time for a murder conviction, he received an offer for employment after an extensive face to face interview, and never received a response from the Defendants. Just like Plaintiff, Mr. Rivera's interview occurred before the Jacques Edwards assault, and after the institution of the new "hiring protocol" the Defendants completely ignored him. To this day, Mr. Rivera claims he still has not received a response from ACS, either denying or granting him the YDS job.  This is clearly a bad faith and lawless tactic in which the Defendants are denying candidates with murder convictions by simply ignoring them, and if the candidate does not know what to do in response to Defendants' ignoring them, the candidate will be locked in a state perpetual limbo.

involvement in this case was not due to a desire to provide Plaintiff with a thorough "deliberation and consideration", but was more so because the Commissioner informed his hiring personnel that he wanted to be directly involved in all cases when the candidates had murder convictions (i.e., similarly situated as Jacques Edwards).  Indeed, Defendant Cardieri's sworn statements are quite disingenuous. This lack of regard for the truth shows a propensity for untruthfulness and would explain why the Defendants chose the two false, arbitrary, capricious, and irrational reasons for denying Plaintiff the YDS job. [27]

182. For the reasons stated above, the Defendants are not entitled to qualified immunity for the complained of discriminatory conduct. The Defendants' discrimination not only violated clearly established state law rights of which a reasonable person would have known, but it was done so in a completely lawless and bad faith fashion.

183. The Defendants are also not entitled to dismissal of this claim on the ground that a Notice of Claim was not filed, because an attempt to file one was made.  In Plaintiff's verified reply to the Defendants' answer to Plaintiff's amended verified petition, Plaintiff made a request for leave to file and serve a late Notice of Claim and there was no lawful basis for this request to be denied.[28]

---

[27] It certainly would not be unreasonable to conclude that the Defendants were given a direct order from the Commissioner to come up with a way to deny Plaintiff the YDS job without admitting that the actual reason for denying him the job was the murder conviction (a clear and premediated circumvention of Corrections Law, Article 23-A), and the Defendants hastily and recklessly grabbed at issues and ran with them without analyzing all the facts in the case. More importantly, the Defendants apparently did not feel the need to be concerned about the slipshod manner in which they invented the reasons for the denial because they are well aware of the difficulties in getting justice in the courts, especially when the person seeking justice has a criminal conviction, is a layman of the law, is not wealthy, and most lawyers will not take a case like this one Pro Bono.

[28] As demonstrated in Plaintiff's NYSDHR complaint, Defendants had acquired actual knowledge of the essential facts constituting the three claims (discrimination, 1st Amendment violation, and defamation) nine (9) days after these claims accrued on June 24, 2019.  Of greater importance, the NYSDHR complaint provided more information than was required for a Notice of Claim. Furthermore, in its Sur-Reply, Defendants failed to demonstrate that the delay in serving the notice of claim would substantially prejudice them.  Under these circumstances, there was no justifiable reason for the state court to completely disregard this request, even to the point of completely failing to even mention this application in its decision dismissing the Article78 petition, and the appellate court will likely deem this omission a reversible error on the impending appeal.

184. As a proximate result of Defendants' unlawful discriminatory conduct, Plaintiff has

suffered actual emotional and psychological injuries, and other damages and losses as described

herein entitling him to compensatory damages in the amount of one million dollars ($1,000,000.00).

185. In addition to compensatory and consequential damages, Plaintiff is entitled to punitive

damages against each of the individually named Defendants under 42 U.S.C. § 1983 in the amount

totaling three million dollars ($3,000,000.00), in that the actions of each of these individual

Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the

constitutional rights of Plaintiff.

186. Plaintiff is entitled to costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs,

disbursements, and other litigation expenses as allowable by federal and state law.

### FOURTH CLAIM FOR RELIEF

**Violation of 42 U.S.C. § 1983 – Municipality Liability - The
City of New York violated Plaintiff's constitutional rights
when it: 1) failed to train ACS employees on the lawful use
of protected activities to deny employment which caused the
violation of Plaintiff's constitutional right to Freedom of Speech
in violation of the First Amendment and 2) via its Commissioner
of ACS, and approval from the Mayor's Office, the City instituted
a new "hiring protocol" which caused the violation of Plaintiff's
constitutional right to Equal Protection of the Law
and his right to be free of discrimination**
(Against City of New York)

187. Plaintiff incorporates all other paragraphs of this Complaint as if fully set forth herein.

<u>1) Defendant City failed to train ACS employees on the lawful use of protected activities to deny
employment which caused the violation of Plaintiff's constitutional right to Freedom of Speech in
violation of the First Amendment</u>

188. Municipal bodies are liable for constitutional violations under 42 U.S.C. § 1983 when a

city fails to properly train its employees amounting in a deliberate indifference to one's constitutional

rights. See *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989).

189. At all times relevant, Defendant City of New York had a duty to properly train its

employees and agents.

190. Defendant City breached that duty when it failed to train the individual Defendants on the lawful use of protected activities as a basis for denying a candidate employment, which resulted in the violation of Plaintiff's First Amendment right to Freedom of Speech.

191. Based on Defendants attorney's comments made at the February 25, 2020 state court appearance, the Defendant City acknowledged that it does not train its employees on how to avoid violating candidates' First Amendment rights when making hiring decisions.  When the state court judge asked the Defendants' attorney, "What type of writings or political expression would disqualify somebody from this type of position?", the Defendants' attorney said, "I don't think . . . there are any specific types of political or expressive writings that would outright disqualify a person."   This is evidence of the fact that there was no written policy, procedure, guidelines, or training material that would have given an employee some direction on how to address a situation when confronted with protected speech during the hiring process.  If such material existed, it is apparent the Defendants' attorney would have known of its existence and would have presented it in court.

192. Based on the Defendants' response to Plaintiff's November 8, 2019 FOIL request, the Defendant City explicitly admits that it does not train its employees to ensure that they are aware of and incompliance with federal and state constitutional provisions before they are permitted to make hiring decisions.  In the FOIL request, Plaintiff made the following requests:

> "All training manuals, guidelines, records, reports, documents, memorandums, etc., that articulate the training ACS employees undergo before they are permitted to make hiring decisions" and "[a]ll training manuals, guidelines, records, reports, documents, memorandums, pamphlets, etc., that articulate the training ACS employees undergo that ensure that its employees are aware of and in-compliance with federal and state constitutional provisions."

On April 28, 2020, the Defendants responded to both requests as follows: "A diligent search for records responsive to your request did not locate any such records. Accordingly, your request is denied."  Indeed, this response to the FOIL request make unequivocally indisputable the fact that ACS hiring personnel do not undergo any training before they are permitted to make hiring decisions, and therefore has no training program relevant to the issues in this action.

193. The complete failure by ACS to train its hiring personnel on fulfilling First Amendment obligations constitutes deliberate indifference sufficient to give rise to 1983 municipal liability.

194. First, ACS knows to a moral certainty that ACS hiring and supervisory personnel will come in contact with potential employees that have made public statements in their past and with employees that make protected speech in connection with their employment (i.e., grievances, protests, complaints, negative opinions about the agency, water cooler conversations by disgruntled employees, etc.).  Indeed, with the advent of social media such as Facebook, Twitter, Instagram, Tik Tok, etc., it is apparent that potential candidates and employees will express protected speech at some point in their lives, which may surface at a time when they seek employment with city agencies or when they have been employed with agencies for some time, and hiring personnel and supervisors should obviously be trained on how to deal with such issues with First Amendment implications.

195. Second, in 2018, the First Amendment had been well-established for decades.  However, because the law involving protected speech that may affect an employee's employment requires a complex balancing of the employee's and the agency's interests, this is not a situation that was so obvious to figure out and easy to apply.  Even the courts have stated repeatedly that certain First Amendment issues are not super simplistic matters that the average layperson in law can readily figure out.

196. Without training an employee with hiring power may assume that it has unlimited discretion to exclude candidates seeking employment on the basis of candidates' protected conduct, especially when the hiring personnel is uncomfortable with the conduct in question. Specifically, an untrained supervisor might assume that it can punish an employee or a potential employee for engaging in protected speech solely because he or she is in an authority position and disagrees with the speech. These employees would not realize, unless informed through training, that there was a need to balance the interests of both sides before instituting adverse employment actions, as well as consider a series of other factors.

197. Had the individual Defendants undergone some type of training, it is very likely that they would have taken into consideration the fact that *The Whitfield Files* was written over fifteen years ago while Plaintiff was incarcerated ("Where and when the statements are made is certainly a factor to be considered in the overall assessment" *Pappas v. Giuliani*, 290 F.3d 143, 150 [2d Cir. 2002]). Likewise, had Defendants been trained they would have been compelled to consider the fact that Plaintiff had been a Youth Counselor for a decade without experiencing a single blemish to his record, which was favorable information that could not rationally be completely ignored. Indeed, with the appropriate training the Defendants would have known that these factors were extremely important and could not so cavalierly be ignored as was done in this case.

198. Training, of some sort, would have compelled Defendants to consider facts and circumstances similar to those the court considers when viewing a First Amendment claim. Without training the employees would not know that "the content, form, and context of a statement . . . as revealed by the whole record" and when, where, why and under what circumstances was the statement made must be considered. With appropriate training the Defendants would have known it was necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said. Basic training would have compelled an employee to consider these factors and would have known that these factors must be considered to render a fair, reasonable and rational adverse employment decision.

199. An additional factor that required extensive training to implement without violating citizens' rights to freedom of speech was the motivation factor, which required a series of complex evaluations before adverse action can be taken. For example, "It is true that the fact that an employee's speech touches on matters of public concern will not render that speech protected where the employee's motive for the speech is private and personal." However, "The fundamental question is whether the employee is seeking to vindicate personal interests or bring to light a matter of political, social, or other concern to the community."  In addition, without training, an employee

would not know that "the mere fact that a government employee takes a personal interest in the subject matter of the speech at issue does not remove it from the protection of the First Amendment." In light of the detailed, complex, legalistic, and seemingly contradictory nature of the various legal factors to be applied to First Amendment rights issues, it is virtually guaranteed that a completely untrained employee who is a layman of the law will most definitely violate citizens' constitutional rights.[29]

200. There is causation between the Defendant City's failure to train and Plaintiff's injuries in view of the fact that Plaintiff's injuries would have been avoided had the individual Defendants been trained on the legitimate approach to utilizing protected speech as a basis for refusing to hire an employment candidate.

201. A properly trained, high-ranking official with the power to trample over citizens' constitutional rights under the color of law would have certainly hesitated to punish Plaintiff by refusing to hire him considering the facts and circumstances in this case.[30]

202. In light of the duties and responsibilities of ACS administrators responsible for hiring employees to work for ACS, the need for specialized training regarding First Amendment rights is so obvious, and the complete failure to train is so likely to result in the violation of constitutional rights

---

[29] Furthermore, without training, an employee with hiring and firing authority, would have no idea that "False speech, as well as hyperbole, is still entitled to First Amendment protection, as long as it is not made with knowledge or reckless disregard of its falsity."

[30] As demonstrated by the numerous First Amendment lawsuits commenced against various New York City agencies, it is further evident that the Defendant City systematically refuses to train its employees on the proper handling of citizens' protected speech. *Reuland v. Hynes*, 460 F.3d 409 (2d Cir. 2006)(Discussing whether speech was protected by First Amendment in employee speech context); *Bernheim v. Litt*, 79 F.3d 318 (2d Cir. 1996)(Noting that negative reviews and false accusations could constitute adverse employment actions) *Griffin v. City of New York*, 880 F. Supp. 2d 384 (E.D.N.Y. 2012)("There is no dispute that Plaintiff has sufficiently alleged that adverse employment action was taken against him and that a 'causal connection exist' between the speech and such action"); *Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396 (S.D.N.Y. 2014); *Harman v. The City of New York,* 140 F.3d 111 (2nd Cir. 1998)(Court held that "Executive Orders 101 and 641 to be unconstitutional infringements on the First Amendment rights of city employees"); *Bermudez v. the City of N.Y.*, 783 F. Supp. 2d 560 (S.D.N.Y. 2011), inter alia.

such as those described herein that the failure to provide such specialized training is deliberately indifferent to those rights.

203. The deliberately indifferent failure to train by Defendant City resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant City were moving forces in the constitutional violation injuries complained of by Plaintiff. There were several choices the Defendant City could have made. For example, Defendant City could have instituted a training program for its hiring personnel that required them to read landmark First Amendment Freedom of Speech cases.  Such reading mandate would have given the hiring employee some insight into what would constitute a transgression on protected speech and would have been an extremely inexpensive and effective training program.  Another choice could have been to simply hire a Law Professor who would teach the hiring employees about the issues to be mindful of when protected speech surfaces during an employment decision. Simply stated, to completely forego any form of training under circumstances where it is assumed that the hiring employee who is a layman of the law would inherently know how to handle First Amendment right issues is unreasonable.

204. Thus, Defendant City's policy, custom, or practice of refusing to train its employees on the lawful actions to take when making adverse employment decisions based on citizens' protected speech caused the violation of the Plaintiff's First Amendment rights.

205. As a direct and proximate cause of the actions of the Defendant City, Plaintiff has suffered actual emotional and psychological injuries, and other damages and losses as described herein entitling him to compensatory damages for two million dollars ($2,000,000.00).

206. Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs, disbursements, and other litigation expenses as allowable by federal law.

2) Defendant City via its Commissioner of ACS, and approval from the Mayor's Office, instituted a new "hiring protocol" which caused the violation of Plaintiff's constitutional right to be free of selective treatment in violation of Equal Protection of the Law and free of discrimination in violation of state anti-discrimination laws

207. In order to hold a municipality liable, a Plaintiff must prove the "Defendants' acts amounted to a policy or practice the municipality had adopted. This policy must be "officially adopted and promulgated by that body's officers." *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 690 (1978). The decisions of "officials `whose acts or edicts may fairly be said to represent official policy'" may lead to municipal liability. *Pembaur v. City of Cincinnati* 475 U.S. 469, 480 (1986).

208. On or about August 7, 2018, Defendant ACS Commissioner David A Hansell and Eric Phillips, spokesperson for the mayor's office, officially adopted and promulgated a new hiring policy that selectively treated and excluded candidates with murder convictions from working with youth under ACS supervision. As demonstrated above, Defendant Hansell and Mr. Phillips made noticeably clear in their statements that all candidates with murder convictions will no longer be considered for employment with ACS.  As a result of this officially adopted and promulgated policy, the individual Defendants obeyed and enforced the new policy and selectively treated Plaintiff by hiring certain candidates with certain convictions while excluding Plaintiff because he had a murder conviction.

209. Under New York State and City law, Defendant Hansell as the Commissioner of ACS is an official, "whose acts or edicts may fairly be said to represent official policy." As the Commissioner of ACS, he is the top agency official and obviously can adopt and promulgate new policies. Likewise, no one can seriously dispute the fact that the spokesperson of the mayor's office is an official whose edicts or acts may fairly be said to represent official policy.  Since both of these high-ranking city officials with the authority to set municipal policy joined forces, and both adamantly insisted that candidates with murder convictions be excluded from the ACS workforce, this new hiring protocol constitutes official municipal policy under *Monel* and directly caused Plaintiff's selective treatment. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 448 (2nd Cir. 1980)("Surely the mayor is the one

city official whose edicts and acts represent municipal policy, especially when he joins other high-ranking municipal officers in devising and successfully implementing the plan").

210. Here, there is no doubt that a deliberate choice to follow a course of action was made from among various alternatives by Defendant Hansell and Mr. Philips, who were responsible for establishing final policy with respect to ACS's hiring protocols. They could have chosen to adopt and promulgate a new hiring policy that did not outright exclude candidates with murder convictions, but instead could have required additional elements for candidates with this type of conviction that would safeguard against future assaults on children by requiring such candidates to have extensive years of experience working with children without incident.  Another choice to follow could have been to hire candidates with murder convictions, and then closely observe and monitor them before making them a permanent employee. Another choice could have been to hire them and place them in areas where they would have less contact with children. An additional choice obviously was to leave things as they were considering the fact the Jacques Edwards assault on the 6-year-old child was merely an isolated incident.  This reality is supported by the fact this was the first time in ACS history an ACS employee previously convicted of murder had assaulted a child.

211. Thus, Defendant City's new policy of no longer hiring ACS candidates with murder convictions that was adopted and promulgated by high ranking City officials was unreasonable, unlawful and caused the violation of the Plaintiff's First Amendment right to freedom of speech, his Fourteenth Amendment right to equal protection of the law (selective treatment) and his state law right to be free of discrimination pursuant to various New York anti-discrimination laws. Thus, this new hiring policy was the moving force of these constitutional violations.

212. As a direct and proximate cause of the actions of the Defendant City, Plaintiff has suffered actual emotional and psychological injuries, and other damages and losses as described herein entitling him to compensatory damages for two million dollars ($2,000,000.00).

## VI. PRAYER FOR RELIEF

213. Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and grant:

214. A. compensatory and consequential damages, including damages for emotional and psychological distress, humiliation, shame, regret, and other pain and suffering on all claims allowed by law in the amount of five million dollars ($5,000,000.00) against the individually liable Defendants; and four million dollars ($4,000,000.00) against the Municipal Defendant;

B. economic losses on all claims allowed by law;

C. special damages in an amount to be determined at trial;

D. punitive damages on all claims allowed by law against individual Defendants in the amount of thirteen million dollars ($13,000,000.00);

E. attorneys' fees and the costs, disbursements, and other litigation expenses associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

F. pre-and post-judgment interest at the lawful rate; and,

G. any further relief that this court deems just and proper, and any other appropriate relief at law and equity.

## PLAINTIFF REQUESTS A TRIAL BY JURY.

Respectfully submitted this 16th day of October 2020.


*John D. Whitfield*
John D. Whitfield, Plaintiff, Pro Se
10201 Flatlands Ave # 52
Brooklyn, NY 11236
Email: johnwhitfield471@gmail.com
Phone #: 347-355-9083

## VERIFICATION OF AMENDED COMPLAINT

STATE OF NEW YORK        )
                                             ) ss
COUNTY OF KINGS          )

John D. Whitfield, being duly sworn, deposes and says that deponent is the Plaintiff in the

above-encaptioned proceeding, that he has read the foregoing Amended Verified Complaint and

knows the contents thereof, that the same is true to deponent's own knowledge, except as to matters

therein stated upon information and belief, which matters deponent believes to be true.


John D. Whitfield, Plaintiff, Pro Se
10201 Flatlands Ave # 52
Brooklyn, NY 11236
Email: johnwhitfield471@gmail.com
Phone #: 347-355-9083


Sworn to before me this

**16** day of October 2020

NOTARY PUBLIC

Shileen Paula Jefferson
Notary Public State of New York
No. 01JE6279967
Qualified in Kings County
My Commission Expires April 15, 20 **21**

## VERIFICATION OF AMENDED COMPLAINT

STATE OF NEW YORK    )
                     ) ss
COUNTY OF KINGS      )

John D. Whitfield, being duly sworn, deposes and says that deponent is the Plaintiff in the

above-encaptioned proceeding, that he has read the foregoing Amended Verified Complaint and

knows the contents thereof, that the same is true to deponent's own knowledge, except as to matters

therein stated upon information and belief, which matters deponent believes to be true.

John D. Whitfield, Plaintiff, Pro Se
10201 Flatlands Ave # 52
Brooklyn, NY 11236
Email: johnwhitfield471@gmail.com
Phone #: 347-355-9083

Sworn to before me this

__16__ day of October 2020

NOTARY PUBLIC

Shileen Paula Jefferson
Notary Public State of New York
No. 01JE6279967
Qualified in Kings County
My Commission Expires April 15, 20_21_